SUPREME COURT, STATE OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA, )    No:
                                   )
    Plaintiff/Respondent,          )
                                   )    APPELLANT'S PETITION
        v.                         )    FOR REVIEW
                                   )
LARRY PRUNTY,                      )
                                   )
    Defendant/Appellant.           )
                                   )

AFTER OPINION OF THE COURT OF APPEAL
THIRD APPELLATE DISTRICT
SEPTEMBER 7, 2006
CASE NO. C051285

APPEAL FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
SACRAMENTO COUNTY
SUPERIOR COURT CASE NO. 04F06958

THE HONORABLE TROY L. NUNLEY, JUDGE

LAW OFFICES OF JOHN F. SCHUCK
John F. Schuck, #96111
4083 Transport Street, Suite B
Palo Alto, CA 94303
(650) 856-7963

Attorney for Appellant
LARRY PRUNTY
(Appointed by the Court)

PruntyPetitionForReview

## TABLE OF CONTENTS

I.    ISSUES PRESENTED FOR REVIEW ................................. 1

II.   REASONS WHY REVIEW SHOULD BE GRANTED .................... 1

      A.   RIGHT TO COUNSEL ........................................ 1

      B.   RIGHT TO REMAIN SILENT .................................. 2

      C.   "FORCE" FOR PURPOSES OF PENAL CODE SECTION 288 ........ 2

      D.   THE $20.00 SECURITY ...................................... 2

III.  STATEMENT OF THE CASE ........................................ 3

IV.   STATEMENT OF THE FACTS ....................................... 3

V.    ARGUMENT .................................................... 4

      A.   THE TRIAL COURT ERRONEOUSLY DENIED
           APPELLANT'S *MARSDEN* MOTION FOR NEW
           COUNSEL.  AS A RESULT, APPELLANT'S RIGHT TO
           COUNSEL UNDER THE SIXTH AMENDMENT WAS
           VIOLATED. .............................................. 4
           1.   Introduction ........................................ 4
           2.   Appellant was unconstitutionally denied his right to counsel ..... 4
           3.   Conclusion ......................................... 6

      B.   APPELLANT'S PRE-TRIAL STATEMENTS WERE
           OBTAINED IN VIOLATION OF HIS RIGHTS UNDER
           THE FIFTH AMENDMENT AND *MIRANDA* AND
           SHOULD HAVE BEEN EXCLUDED PURSUANT TO
           APPELLANT'S OBJECTION. ................................. 7
           1.   Introduction ........................................ 7
           2.   The facts .......................................... 7
           3.   Appellant's statements were obtained in violation of the Fifth
                Amendment and *Miranda v. Arizona* ...................... 10
           5.   Conclusion ......................................... 13

## TABLE OF CONTENTS

C. THERE IS A CONFLICT REGARDING WHAT
CONSTITUTES FORCE, VIOLENCE, DURESS, MENACE,
OR FEAR OF IMMEDIATE BODILY INJURY FOR
PURPOSES OF PENAL CODE SECTION 288;
THEREFORE, REVIEW IS REQUIRED TO SETTLE THIS
ISSUE ......................................................... 13

1. Introduction .......................................... 13
2. Appellant did not use any force in excess of that
   required to commit the offense ........................... 14
3. Conclusion ........................................... 17

D. THE COURT SECURITY FEE MUST BE STRICKEN ............. 17

1. Introduction .......................................... 17
2. The $20.00 fee violates constitutional ex post facto provisions . . . 18
3. Penal Code section 3 was violated in this case ................ 20
4. Conclusion ........................................... 22

VI. CONCLUSION ..................................................... 22

## TABLE OF AUTHORITIES

CASES                                                              PAGE NO.

*Collins v. Youngblood* (1990)
  497 U.S. 37, 110 S.Ct. 2715 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cooper v. State* (Md.App.2005)
  163 Md.App.70, 877 A.2d 1095 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Garner v. Jones* (2000)
  529 U.S. 244, 120 S.Ct. 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kimmelman v. Morrison* (1986)
  477 U.S. 365, 377, 106 S. Ct. 2574 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Miranda v. Arizona* (1966)
  384 U.S. 436, 86 S. Ct. 1602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7-13

*Missouri v. Seibert* (2004)
  542 U.S. 600, 124 S.Ct. 2601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*New York v. Harris* (1990)
  495 U.S. 14, 110 S. Ct. 1640 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*People v. Aguilera* (1996)
  51 Cal. App. 4th 1151, 59 Cal. Rptr. 2d 587 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*People v. Babcock* (1993)
  14 Cal.App.4th 383, 17 Cal.Rptr.2d 688 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Bergschneider* (1989)
  211 Cal.App.3d 144, 259 Cal.Rptr.219 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Blakeley* (2000)
  23 Cal.4th 82, 96 Cal.Rptr.2d 451 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Bolander* (1994)
  23 Cal.App.4th 155, 28 Cal.Rptr.2d 365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

<u>CASES</u>                                                    <u>PAGE NO.</u>

*People v. Bradley* (1998)
  64 Cal.App.4th 386, 75 Cal.Rptr.2d 244  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Cicero* (1984)
  157 Cal.App.3d 465, 204 Cal.Rptr.582  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Cochran* (2002)
  103 Cal.App.4th 8, 126 Cal.Rptr.2d 416  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Crandell* (1988)
  46 Cal. 3d 833, 251 Cal. Rptr. 227  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*People v. Daniels* (1963)
  222 Cal.App.2d 99, 34 Cal.Rptr.844  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Frazer* (1999)
  21 Cal.4th 737, 88 Cal.Rptr.2d 312  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Grant* (1999)
  20 Cal.4th 150, 83 Cal.Rptr.2d 295  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Griffin* (2004)
  33 Cal.4th 1015, 16 Cal.Rptr.2d 891  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Hart* (1990)
  20 Cal. 4th 546, 85 Cal. Rptr. 2d 132  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*People v. Kusumoto* (1985)
  169 Cal.App.3d 487, 215 Cal.Rptr.347  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Loeun* (1997)
  17 Cal.4th 1, 9, 69 Cal.Rptr.2d 776  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Mom* (2000)
  80 Cal.App.4th 1217, 96 Cal.Rptr.2d 172  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

CASES                                                                    PAGE NO.

*People v. Montero* (1986)
185 Cal.App.3d 415, 229 Cal.Rptr.750 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Mosley* (1999)
73 Cal.App.4th 1081, 87 Cal.Rptr.2d 325 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*People v. Murphy* (2001)
25 Cal.4th 136, 105 Cal.Rptr.2d 387 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Neel* (1993)
19 Cal.App.4th 1784, 24 Cal.Rptr.2d 293 . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15, 17

*People v. Ortiz* (1990)
51 Cal. 3d 975, 275 Cal. Rptr. 191 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*People v. Schulz* (1992)
2 Cal.App.4th 994, 3 Cal.Rptr.2d 799 . . . . . . . . . . . . . . . . . . . . . . 2, 13, 15, 16, 17

*People v. Senior* (1992)
3 Cal.4th 765, 5 Cal.Rptr.2d 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Tapia* (1991)
53 Cal.3d 282, 279 Cal.Rptr. 592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Wallace* (2004)
120 Cal.App.4th 867, 16 Cal.Rptr.3d 152 . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

*Rhode Island v. Innis* (1980)
446 U.S. 291, 100 S. Ct. 1682 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Sanders v. P.G.&E.* (1975)
53 Cal.App.3d 661, 126 Cal.Rptr.415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Tapia v. Superior Court* (1991)
53 Cal.3d 282, 279 Cal.Rptr.592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

<u>CASES</u>                                                    <u>PAGE NO.</u>

*United States v. Bajakajian* (1998)
   524 U.S. 321, 118 S.Ct. 2028 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Williams* (9th Cir.2006)
   435 F.3d 1149 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>STATUTES</u>

California Constitution, article 1, section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Rules of Court, Rules 28 and 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Penal Code section 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 18, 20-22

Penal Code section 288 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 13, 14

Penal Code section 288.5, subdivision (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Penal Code section 288, subdivision (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Code section 288, subdivision (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13, 14

Penal Code section 667.6, subdivision (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Penal Code section 1465.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17-22

Penal Code section 1465.8, subdivision (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States Constitution, article 1, section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States Constitution, article 1, section 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States Constitution, Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7, 10, 12, 13

United States Constitution, Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 6, 7

United States Constitution, Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## PETITION FOR REVIEW

TO THE HONORABLE CHIEF JUSTICE OF CALIFORNIA AND ASSOCIATE
JUSTICES OF THE SUPREME COURT:

Appellant Larry Prunty, pursuant to Rules 28 and 29 of the California Rules of

Court, petitions for review of the Opinion of the Court of Appeal, Third District filed

September 7, 2006. (Exhibit A, attached.)

## I.    ISSUES PRESENTED FOR REVIEW

1. Was appellant's Sixth Amendment right to counsel violated by the trial court

when it denied his *Marsden* motion for new trial?

2. Were appellant's *Miranda* and Fifth Amendment rights to remain silent violated

by law enforcement?

3. What constitutes "force" for purposes of Penal Code section 288?

4. Is the $20.00 security fee provided for by Penal Code section 1465.8 an

unconstitutional ex post facto law? Does it violate Penal Code section 3?

## II.    REASONS WHY REVIEW SHOULD BE GRANTED

### A.    RIGHT TO COUNSEL

Under the Sixth Amendment, a defendant has the right to counsel of his choice.

Here, appellant sought to exercise that right when he requested appointment of new

counsel. The trial court violated this fundamental right when it denied the request.

Review is therefore required to vindicate appellant's Sixth Amendment right to counsel.

**B.    RIGHT TO REMAIN SILENT**

Pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602 and the Fifth

Amendment, a defendant has the right to remain silent when interrogated by law

enforcement. This basic right was violated in the instant case when the police questioned

appellant without first giving him the warnings required by *Miranda.* The Court of

Appeal held there was no violation. Review is required to correct this erroneous ruling.

**C.    "FORCE" FOR PURPOSES OF PENAL CODE SECTION 288**

In *People v. Schulz* (1992) 2 Cal.App.4th 994, 1004, 3 Cal.Rptr.2d 799, 802, the

Sixth District held that "'[f]orce' means '"physical force substantially different from or

substantially in excess of that required for the lewd act."' ...[A] modicum of holding and

even restraining cannot be regarded as substantially different or excessive 'force.'" The

Third District, in *People v. Neel* (1993) 19 Cal.App.4th 1784, 24 Cal.Rptr.2d 293, and in

the instant case, rejected *Schultz*'s analysis. Thus, there is a conflict between the Courts

of Appeal as to the proper interpretation or definition of "force" in the context of a Penal

Code section 288 prosecution. Review is required to resolve this conflict.

**D.    THE $20.00 SECURITY FEE**

In this case, the $20 security fee violates the retroactivity proscriptions of Penal

Code section 3 and also constitutes an unconstitutional ex post facto law. Review is

required to so hold.

## III.   STATEMENT OF THE CASE

An information was filed charging appellant Larry Prunty with violations of Penal

Code section 288.5, subdivision (a), continuous sexual abuse of a child (count 1) and

Penal Code section 288, subdivision (b)(1), lewd acts with a child under 14 years of age

(counts 2 through 20).  (CT1: 72-82.)[1]

On May 16, 2005, trial commenced.  (CT1: 164; RT1: 24.)  On May 24, 2005, the

jury found appellant guilty as charged.  (CT1: 203-222; CT2: 442-448; RT1, 2: 295-308.)

On June 24, 2005, appellant was sentenced to the mid-term of 12 years on count 1.

Pursuant to Penal Code section 667.6, subdivision (d) and California Rules of Court, rule

4.426(a)(2), appellant was sentenced to fully consecutive mid-term sentences of 6 years

on counts 2 through 20.  Thus, appellant's total sentence was 126 years.  (CT1, 2: 5, 479-

481; RT2: 313-321.)

On September 7, 2006, the Court of Appeal affirmed the judgment.

## IV.   STATEMENT OF THE FACTS

As stated in the Court of Appeal's opinion, "[d]efendant abused his stepdaughter

between 1993 and 1998, starting when she was in the second grade."  (Ex. A, p.2.)  The

Court's opinion provides a detailed statement of the facts.  (Ex. A, p.2-4.)

---

[1] "CT" refers to the three-volume Clerk's Transcript.  "RT" refers to the two-volume Reporter's Transcript.

V.    **ARGUMENT**

A.    **THE TRIAL COURT ERRONEOUSLY DENIED APPELLANT'S**
      *MARSDEN* **MOTION FOR NEW COUNSEL.  AS A RESULT,**
      **APPELLANT'S RIGHT TO COUNSEL UNDER THE SIXTH**
      **AMENDMENT WAS VIOLATED.**

      1.    **Introduction**

Appellant was dissatisfied with the representation he was receiving from his

appointed defense counsel.  Therefore, he sought appointment of new trial counsel.  The

trial court denied appellant's request for new counsel.  (RT 3/3/05; CT1: 3.)  However,

this ruling constituted an abuse of discretion which denied appellant his Sixth

Amendment right to counsel.  Review is therefore required.

      2.    **Appellant was unconstitutionally denied his right to counsel.**

It is beyond dispute that, "[T]he right of a criminal defendant to counsel and to

present a defense are among the most sacred and sensitive of our constitutional rights."

(*People v. Ortiz* (1990) 51 Cal. 3d 975, 982, 275 Cal. Rptr. 191, 196; accord, *Kimmelman*

*v. Morrison* (1986) 477 U.S. 365, 374, 377, 106 S. Ct. 2574, 2582, 2584 ["The right to

counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the

legitimacy, of our adversary process...***... [T]he right to counsel is the right to effective

assistance of counsel."])

This fundamental right to counsel requires that new counsel be appointed to

represent an indigent defendant when present counsel is providing ineffective assistance

or where the relationship between the defendant and his or her attorney has devolved into

an irreconcilable conflict. (*People v. Hart* (1990) 20 Cal. 4th 546, 603, 85 Cal. Rptr. 2d 132, 167; *People v. Marsden, supra*, 2 Cal. 3d at 124-125, 84 Cal. Rptr. at 160.)

Pursuant to *Marsden* and *Hart*, prior to trial, the trial court allowed appellant to explain why he wanted new counsel appointed. Appellant informed the trial court that counsel had not interviewed the witnesses. She "cursed" at him. He believed she had divulged defense evidence to the prosecution. On the two visits counsel had with appellant, "...she's ended the conversation with, this conversation's over." (RT 3/3/05.)

Counsel claimed she did not make any inappropriate comments to the prosecutor nor did she reveal any confidence. However, counsel agreed that communication with appellant "...has been strained for some time." They have had "strained relations... The last visit...was very strained...we did have this kind of conversation or language that came out. This time I did lose my cool." The conversation "...was extremely frustrating...for counsel. The last visit "...was contentious." Counsel conceded that appellant "...is correct there has been a strained relationship between himself and myself." She agreed that, during "...a lot of the jail visits," there was "frustration and breakdown in communication." (RT 3/3/05.)

The trial court's denial of appellant's *Marsden* motion constituted an abuse of discretion. From appellant's and counsel's statements, and from the almost cursory cross-examination of the prosecution's witnesses, it is clear the attorney-client relationship had irretrievably broken down; they simply could not work together effectively and this

strained relationship caused counsel to represent appellant at trial in less than a zealous manner. Appellant believed that counsel had betrayed him to the prosecution. Counsel expressly agreed that the relationship was strained. Obviously, a strained, difficult relationship precludes effective assistance of counsel. As a result, this unproductive relationship violated appellant's constitutional right to counsel under the Sixth Amendment. His right to effective counsel was substantially impaired. Thus, the motion for new counsel should have been granted. (*People v. Crandell* (1988) 46 Cal. 3d 833, 854, 251 Cal. Rptr. 227, 235 [new counsel should be appointed where "...defendant and counsel have become embroiled in such an irreconcilable conflict that no effective representation is likely to result."])

As a matter of law, appellant provided more than sufficient cause for replacement of his trial counsel. The contentious relationship between counsel and appellant foreclosed any chance of cooperation and ensured that effective representation would not be forthcoming. The trial court should have granted appellant's motion.

### 3.  Conclusion

The trial court erred when it denied appellant's *Marsden* motion. As a result, appellant was denied his rights to counsel, effective assistance of counsel, and to present a defense under the Sixth Amendment and the California Constitution, article 1, section 15. Review is therefore required to vindicate these fundamental rights.

**B.    APPELLANT'S PRE-TRIAL STATEMENTS WERE OBTAINED IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH AMENDMENT AND *MIRANDA* AND SHOULD HAVE BEEN EXCLUDED PURSUANT TO APPELLANT'S OBJECTION.**

### 1.    Introduction

Appellant's statements to Officer Alioto and Detective Tyndale were obtained in violation of his right to remain silent under the Fifth Amendment and *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S. Ct. 1602.[2]  Therefore, appellant objected to admission of the statements on the ground that Officer Alioto's conduct was likely to elicit an incriminating response from him and that the statement he gave to Detective Tyndale was a byproduct of Alioto's illegal interrogation.  After holding an evidentiary hearing (RT1: 51-96), the trial court denied the objection. (RT1: 90-93.)  However, as a matter of law, this ruling was wrong and severely prejudicial to appellant.  His rights to due process, a fair trial, to remain silent, and fundamental fairness under the Fifth, Sixth and Fourteenth Amendments were violated.  Review is therefore required.

### 2.    The facts

At the evidentiary hearing, Officer Alioto testified that, prior to going to appellant's residence on August 10, 2004, he had spoken with Corina.  Corina had described to Alioto "...over a period of years...touching and fondling for sexual

---

[2] Appellant's initial statement, "...I've been waiting for you.  I'm on the phone with the CPS worker right how" (RT1: 190), was not unconstitutionally obtained and thus was not admitted improperly at trial.

gratification." Alioto agreed he "...had some knowledge of...why [he was] arresting Mr. Prunty." (RT1: 54-55, 72-74.)

A "little after noon...," Alioto knocked on appellant's door. He answered and said, "...I've been waiting for you. I'm on the phone with the CPS worker right now." Officer Alioto spoke to the CPS worker "...for...a matter of seconds..." (RT1: 55, 63, 66) and, without informing appellant of his *Miranda* rights, interrogated him for "[a]bout 10 minutes approximately." (RT1:68.) Alioto asked "Why am I here?" Appellant stated that there had been inappropriate acts between him and Corina. Alioto asked appellant to "...clarify what you meant by lewd acts." Appellant stated "...those acts including touching of genitalia." (RT1: 55-56, 68-69, 70.) After obtaining these inculpatory statements, Officer Alioto, for the first time, told appellant he was under no obligation to talk to him and to not say anything else until the *Miranda* warnings were given. (RT1: 56, 69, 71.)

Appellant was handcuffed and placed in the rear of a police car at about 12:30 p.m. Officer Alioto began to transport appellant to police headquarters at around 1:00-1:15. Prior to starting transportation, Alioto allegedly read appellant his *Miranda* rights from a police department issued card. Alioto claimed appellant understood these rights. On the way to headquarters, Alioto continued to discuss the case with appellant. (RT1: 56-59, 66-67, 75.)

The drive to police headquarters took about 20 minutes. (RT1: 58.) At head-

quarters, Alioto spoke with Detective Tyndale and "described the situation." Appellant

was interviewed by Detective Tyndale. (RT1: 58, 77-78.) The interview started at 2:27

(CT3: 601), over an hour after the *Miranda* warnings allegedly had been given by Officer

Alioto. Detective Tyndale did not inform appellant of his *Miranda* rights prior to the

interrogation. The transcript shows the following coloquy:

> "DET. TYNDALE: Okay. Okay, the officer that brought you
> in, --
>
> MR. PRUNTY:    Uh-huh.
>
> DET. TYNDALE: Um, he advised you of your rights?
>
> MR. PRUNTY:    Uh-huh.
>
> DET. TYNDALE: You know and he said you were willing
> to talk to us –
>
> MR. PRUNTY:    Uh-huh.
>
> DET. TYNDALE: -- and answer some questions? Um, why
> don't we just start from the beginning?
> Kind of run down real quick for me.
>
> MR. PRUNTY:    Okay." (CT 2: 492.)

Appellant thereafter made a lengthy statement regarding the commission of many sex

offenses with Corina. The recorded statement was played at trial. (RT1: 208-210.)

Appellant's statements to Officer Alioto made during the interrogation in appellant's

residence were also admitted. (RT1: 190-191.)

### 3. Appellant's statements were obtained in violation of the Fifth Amendment and *Miranda v. Arizona*.

The Fifth Amendment to the United States Constitution guarantees that "No person...shall be compelled in any criminal case to be a witness against himself." To ensure compliance with this fundamental right, the Court in *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S. Ct. at 1612 held:

> "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safe-guards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."

(Accord, *New York v. Harris* (1990) 495 U.S. 14, 20, 110 S. Ct. 1640, 1644 ["Statements taken during legal custody would of course be inadmissible...if *Miranda* warnings were not given... "]; *Rhode Island v. Innis* (1980) 446 U.S. 291, 297-298, 100 S. Ct. 1682, 1687-1688; *People v. Aguilera* (1996) 51 Cal. App. 4th 1151, 1160-1161, 59 Cal. Rptr. 2d 587, 591-592.)

"'[I]nterrogation under *Miranda* refers not only to express questioning, but also to
any words or actions on the part of the police...that the police should know are reasonably
likely to elicit an incriminating response..." (*Rhode Island v. Innis, supra*, 446 U.S. at
300-301, 100 S. Ct. at 1689-1690, *People v. Mosley* (1999) 73 Cal.App.4th 1081, 1089,
87 Cal.Rptr.2d 325, 330 ["For *Miranda* purposes, interrogation is defined as any words or
actions on the part of the police that the police should know are reasonably likely to elicit
an incriminating response"]; *People v. Aguilera, supra,* 51 Cal.App.4th at 1161, 59
Cal.Rptr.2d at 592.)

In *Missouri v. Seibert* (2004) 542 U.S. 600, 609-617, 124 S.Ct. 2601, 2608-2613,
the Court held that where, as here, the police deliberately omitted the *Miranda* warnings
during an initial interrogation in which the suspect confessed, a subsequent Mirandized
confession is inadmissible. (Accord, *United States v. Williams* (9th Cir.2006) 435 F.3d
1149, 1150 ["...a trial court must suppress postwarning confessions obtained during a
deliberate two-step interrogation where the midstream *Miranda* warning...did not
effectively apprise the suspect of his rights."]; *Cooper v. State* (Md.App.2005) 163
Md.App.70, 74, 877 A.2d 1095, 1097.)

Here, when Officer Alioto arrived at appellant's residence, he knew that appellant
had been molesting Corina for a number of years. As soon as appellant said, "I've been
waiting for you...," Alioto, who appeared to be a reasonable officer, knew that appellant
had made an inculpatory statement corroborative of the criminal molestation claims.

Clearly, Alioto would not have permitted appellant to leave. Alioto also knew that any questioning would certainly elicit incriminating statements, yet he interrogated appellant for 10 minutes without advising him of his *Miranda* rights and obtained a confession before telling appellant he had no obligation to answer the officer's questions. As a matter of law, the Fifth Amendment was violated; all statements to Officer Alioto subsequent to "I've been waiting..." should have been suppressed.

The lengthy statement given to Detective Tyndale also should have been suppressed. First, Tyndale never read the *Miranda* rights to appellant prior to the start of the interrogation. And second, pursuant to *Seibert, supra*, the police strategy of obtaining an unwarned statement at appellant's house was adopted to undermine the salutary principles of *Miranda.* The unwarned interrogation at appellant's residence lasted for 10 minutes. Appellant informed Alioto "...that there had been inappropriate behavior, inappropriate acts between he and the victim" (RT1: 55) and gave "...his explanation of those acts including touching of genitalia." (RT1: 69.) Detective Tyndale's interrogation commenced at 2:27 p.m. (CT2: 491), about one hour, 15 minutes or so after Alioto had read the *Miranda* rights. No one ever told appellant that the warning regarding "anything he said could be used against him" also applied to his previous, unwarned statement. Appellant could very well have been under the impression that Tyndale's interrogation was nothing more than a continuation of Alioto's un-Mirandized questioning. As in *Seibert,* the warnings given 75 minutes before Tyndale's interrogation did not "...convey a

## 2.    Appellant did not use any force in excess of that required <u>to</u> <u>commit the offense</u>.

The offense of forcible lewd or lascivious act is defined in Penal Code section 288,

subdivision (b)(1):

> "(a) Any person who willfully and lewdly commits any
> lewd or lascivious act...upon or with the body, or any part or
> member thereof, of a child who is under the age of 14 years,
> with the intent of arousing, appealing to, or gratifying the lust,
> passions, or sexual desires of that person or the child, is guilty
> of a felony...
>
> (b)(1) Any person who commits an act described in
> subdivision (a) by use of force, violence, duress, menace, or
> fear of immediate and unlawful bodily injury on the victim or
> another person, is guilty of a felony and shall be punished by
> imprisonment in the state prison for three, six, or eight years."

The term "force" as used in section 288 is not defined by the statute. Its meaning,

however, has been well-established in case law as "that level of force substantially

different from or substantially greater than that necessary to accomplish the [act] itself."

*(People v. Mom* (2000) 80 Cal.App.4th 1217, 1224-1225, 96 Cal.Rptr.2d 172, 177;

*People v. Cochran* (2002) 103 Cal.App.4th 8, 13, 126 Cal.Rptr.2d 416, 420; *People v.*

*Bergschneider* (1989) 211 Cal.App.3d 144, 153, 259 Cal.Rptr.219, 223; *People v. Cicero*

(1984)157 Cal.App.3d 465, 474, 204 Cal.Rptr.582, 589.) In *People v. Griffin* (2004) 33

Cal.4th 1015, 1027, 16 Cal.Rptr.2d 891, 899, the Supreme Court made clear "...that the

'force' required to commit a forcible lewd act under subdivision (b) [must] be

substantially different from or substantially greater than the physical force inherently

PruntyPetitionForReview                      14

necessary to commit a lewd act proscribed under subdivision (a)." That such force was absent in the instant case is illustrated by cases which have construed the term "force" in the context of section 288, subdivision (b).

For example, in *People v. Schulz, supra,* 2 Cal.App.4th at 1004, 3 Cal.Rptr.2d at 802, the Court stated:

> "'[F]orce" means '"physical force substantially different from or substantially in excess of that required for the lewd act."' We do not regard as constituting 'force' the evidence that defendant grabbed the victim's arm and held her while fondling her. The 'force' factor differentiates the charged sex crime from the ordinary sex crime. Since ordinary lewd touching often involves some additional physical contact, a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force.'"

(Accord, *People v. Senior* (1992) 3 Cal.4th 765, 774, 5 Cal.Rptr.2d 14, 20.) In *People v. Babcock* (1993) 14 Cal.App.4th 383, 387-388, 17 Cal.Rptr.2d 688, 691-692, the Court expressly rejected the reasoning of *Schulz* and *Senior.* Other authorities have not followed *Schulz* and *Senior.* (See, e.g., *People v. Bolander* (1994) 23 Cal.App.4th 155, 160-161, 28 Cal.Rptr.2d 365, 368; *People v. Neel* (1993) 19 Cal.App.4th 1784, 1785-1789, 24 Cal.Rptr.2d 293.) So did the Court of Appeal in the instant case. (Ex. A, p.7-9.) However, the analysis and reasoning of *Schulz* and *Senior* is consistent with the requirement that the force used must be *substantially* different from or *substantially* greater than that necessary to accomplish the act. The other authorities misconstrue the element of *substantial* force. Clearly, there is a conflict in the reported cases.

Applying *Schulz* to the facts of the instant case, it must be concluded that appellant did not forcibly commit any offenses against Corina. The evidence in this case does not reflect any *substantial* force beyond that necessary to commit the acts. The evidence shows either that Corina basically acquiesced to appellant's sexual conduct or that appellant did not apply any form of force, violence or duress over and above that minimally necessary to commit the offenses. The incidents were completed without any effort on the part of appellant to threaten, injure, or otherwise exert physical force upon her to continue.

Corina testified that, regarding the incidents of inappropriate touching, appellant never threatened physical harm nor did he ever hit her or use any violence. (RT1: 168-169.) Corina testified that when she said appellant had forced her to do these acts, she meant "...she didn't want to be there, ...didn't want to participate..." He was not "...rough on [her] using physical force besides the sex stuff...to accomplish the sex stuff." He did not hold her down. (RT3: 169.) The "force" that was employed by appellant, such as "...he would grab my hands and try to make me touch him and I'd pull away and he'd grab them" (CT3: 170) and pushing him and turning her face away (CT3: 142, 145), was nothing more than that necessary to commit the act. Clearly, the force used by appellant was not substantially different from or substantially greater than the usual or minimal force needed to accomplish the offenses. "[T]he requirement of 'force'...simply cannot be stretched to encompass the type of conduct involved in this case, ...where the victim's

will was not overcome by any physical force substantially different from or greater than that necessary to accomplish the act itself." (*People v. Kusumoto* (1985) 169 Cal.App.3d 487, 494, 215 Cal.Rptr.347, 351; accord, *People v. Montero* (1986) 185 Cal.App.3d 415, 431-432, 229 Cal.Rptr.750, 758.) But, under *Neel,* there is sufficient force. Which line of cases is correct?

### 3. Conclusion

The concept of "force" means something qualitatively different than merely the victim's lack of consent or simply being "forced" to do something she did not want to do. (*People v. Kusumoto, supra,* 169 Cal.App.3d at 494-494.) Under *Schulz,* given appellant's lack of use of any substantial force to facilitate or continue the actions, no forcible offenses occurred. But, the Court here rejected *Schulz,* thus setting up a conflict. This Court should grant review.

### D. THE COURT SECURITY FEE MUST BE STRICKEN.[3]

#### 1. Introduction

The trial court imposed a $20.00 court security fee pursuant to Penal Code section 1465.8. (CT2: 481; RT2: 318-319.) However, appellant's offenses were committed between 1993 and 1998, long before section 1465.8 became operative in August 2003. Thus, imposition of the court security fee violates the ex post facto provisions of the

---

[3] This issue is presently pending before this Court in *People v. Alford,* case no. S142508.

United States and California Constitutions and the retroactivity proscriptions of Penal Code section 3. The fee must be stricken.

## 2. The $20.00 fee violates constitutional ex post facto provisions.

An ex post facto law is a retrospective statute which makes the punishment for a crime more burdensome. (*Collins v. Youngblood* (1990) 497 U.S. 37, 41-42, 110 S.Ct. 2715, 2718-2719; *People v. Blakeley* (2000) 23 Cal.4th 82, 91, 96 Cal.Rptr.2d 451, 457 ["'a statute'" which makes more burdensome the punishment for a crime after its commission"'"'" is unconstitutional.)

Under the United States Constitution, article 1, section 9, "No...ex post facto Law shall be passed. Pursuant to the United States Constitution, article 1, section 10, "No State shall...pass any...ex post facto Law..." (Accord, *Garner v. Jones* (2000) 529 U.S. 244, 249, 120 S.Ct. 1362, 1367 ["The States are prohibited from enacting an *ex post facto* law."])

The California Constitution, article 1, section 9 includes a similar preclusion: "A...ex post facto law...may not be passed." (*People v. Frazer* (1999) 21 Cal.4th 737, 754, 88 Cal.Rptr.2d 312, 324 ["The ban on ex post facto legislation..."]) The Courts "...have consistently interpreted the state ex post facto clause no differently from its federal counterparts.." (*Id.,* fn.15.)

Penal Code section 1465.8 imposes a "fee...on every conviction for a criminal offense." Imposition of a "fee" upon conviction is no different than imposition of a fine,

and, as a matter of law, a fine is punishment. (*United States v. Bajakajian* (1998) 524 U.S. 321, 327, 118 S.Ct. 2028, 2033 ["'the word "fine" was understood to mean a payment to a sovereign as punishment for some offense."]; *Sanders v. P.G.&E.* (1975) 53 Cal.App.3d 661, 677, 126 Cal.Rptr.415, 425 ["the term 'fine' refers to a pecuniary punishment imposed as a punishment only.'") As a matter of law, a section 1465.8 fee constitutes punishment.

In the instant case, application of Penal Code section 1465.8 as to appellant's convictions violates the State and Federal ex post facto clauses. His offenses were committed from 1993 through 1998. Section 1465.8 was added in 2003 and became operative on August 17, 2003, over five years after the offenses were committed. As a matter of law, the $20.00 court security fee imposed here is unconstitutional. This Court should so hold.

In *People v. Wallace* (2004) 120 Cal.App.4th 867, 16 Cal.Rptr.3d 152, the Court held that section 1465.8 did not violate constitutional ex post facto proscriptions because the fee is a nonpunitive civil assessment. But, subdivision (a) of section 1465.8 states the fee "...shall be imposed on every conviction for a criminal offense..." Clearly, according to the express words of the statute, the fee is imposed because of *criminal* conduct; thus, regardless of how the payment is denominated, it is a fine, i.e., punishment, and is subject to the ex post facto proscriptions. Indeed, although Justice Mosk concurred with the majority opinion under compunction of previous authority, he stated, regarding the court

security fee, "The imposition of a monetary obligation pursuant to a Penal Code provision

would seem to be a penalty that is subject to the ex post facto laws... I believe the

obligation results in punishment." (120 Cal.App.4th at 879, 16 Cal.Rptr.3d at 161.)

Based on the argument herein, and on Justice Mosk's comments, this Court should reject

*Wallace*'s analysis.

### 3.    Penal Code section 3 was violated in this case.

Penal Code section 3 states, "No part of it [the Penal Code] is retroactive, unless

expressly so declared." As stated in *People v. Daniels* (1963) 222 Cal.App.2d 99, 101, 34

Cal.Rptr.844, 846:

> "It is a cardinal rule of statutory construction that every statute
> will be construed to operate prospectively unless the contrary
> legislative intention is clearly expressed. This rule is
> particularly applicable to Penal Code statutes. A statute is
> given retroactive effect only when there is clearly expressed
> legislative intent that it is to have that effect."

This principle is well-settled. (See, e.g., *People v. Bradley* (1998) 64 Cal.App.4th 386,

396-397, 75 Cal.Rptr.2d 244, 250 ["As a general rule, criminal statutes are therefore

applied prospectively only, in the absence of a legislative intent to the contrary.")

As a matter of law, there is no express declaration of any Legislative intent in

section 1465.8 that it have retroactive effect. And, because the language of section

1465.8 is clear and unambiguous, there is no need for interpretation in an effort to glean

such an intent. (*People v. Loeun* (1997) 17 Cal.4th 1, 9, 69 Cal.Rptr.2d 776, 780 ["If

there is no ambiguity in the language of the statute, then...the plain meaning of the

PruntyPetitionForReview                    20

language governs. ...Where the statute is clear, courts will not interpret away clear

language in favor of an ambiguity that does not exist." (Internal quotes omitted.)]) If the

Legislature had intended retroactivity, it would have so provided. (See, e.g., *People v.*

*Murphy* (2001) 25 Cal.4th 136, 159, 105 Cal.Rptr.2d 387, 404 ["...the Legislature has

shown that...it knows how to use language clearly expressing...intent."])  This Court may

not read retroactive application into section 1465.8.

As noted, *People v. Wallace, supra,* 120 Cal.App.4th 867, 16 Cal.Rptr.2d 152 held

that section 1465.8 did not violate constitutional ex post facto proscriptions because the

\$20.00 fine was not punishment. However, *Wallace* did not involve Penal Code section 3

and that section's proscription against retroactivity. For this reason, it is inapposite as to

the instant point.

Penal Code section 3 applies to the entire Penal Code, and is not limited to

punishment. Thus, even if, *arguendo, Wallace* is correct, section 1465.8 nevertheless

violates section 3 because it adds new consequences to and increases a defendant's

liability for his or her pre-enactment conduct. (*People v. Tapia* (1991) 53 Cal.3d 282,

287-288, 279 Cal.Rptr. 592, 594 ["...Certainly a law is retrospective if it..., as applied to a

past crime, 'change[s] the legal consequences of an act completed before [the law's]

effective date,' namely the defendant's criminal behavior."]; *People v. Grant* (1999) 20

Cal.4th 150, 157, 83 Cal.Rptr.2d 295, 298 ["...application of a law is retrospective...if it

attaches new legal consequences to, or increases a party's liability for, an event,

transaction, or conduct that was *completed* before the law's effective date."]) The fact

that section 1465.8 may not involve punishment does not mean that it is not subject to

section 3's prohibition against retroactive application.

### 4.    Conclusion

As a matter of law, constitutional ex post facto provisions and the retroactivity

proscription of Penal Code section 3 apply to Penal Code section 1465.8. Thus, because

appellant committed his offenses before section 1465.8 became operative, he is not

subject to the $20.00 court security fee.

## VI.    CONCLUSION

For the reasons stated above, review is required.

Dated: _____ September 2006

Respectfully submitted,
LAW OFFICES OF JOHN F. SCHUCK
John F. Schuck, #96111
4083 Transport Street, Suite B
Palo Alto, CA 94303
(650) 856-7963

By _____
JOHN F. SCHUCK
Attorney for Appellant
LARRY PRUNTY
(Appointed by the Court of Appeal)

## CERTIFICATE OF WORD COUNT

In reliance on the word count of the computer program used to generate this brief,

I, John F. Schuck, hereby certify that this Petition for Review contains 5,166 words.

I declare under penalty of perjury that the above is true and correct.

Dated: September ___, 2006

John F. Schuck

EXHIBIT    B

EX B

1 | JAN SCULLY

2 | DISTRICT ATTORNEY

3 | 901 G STREET

4 | SACRAMENTO, CA 95814

5 | (916) 874-6218

FILED / ENDORSED

MAR – 4 2005

By, E. Gonzalez , Deputy Clerk

SPD-04-304762

N. PHILLIPS, DDA

TEAM: 8/MO (SACA)

XRef: 1796220

ENDORSED

6

7

8 | **SUPERIOR COURT OF CALIFORNIA**

9 | **COUNTY OF SACRAMENTO**

By D. Maez

10

11 | THE PEOPLE OF THE STATE OF CALIFORNIA,

COMPLAINT deemed information

~~AMENDED INFORMATION~~ NO.

12 | vs.

04F06958

13 | LARRY PRUNTY

In the Superior Court of the County of

14 | Sacramento, the 4th day of March, 2005

15 | Defendant(s),

16 | The defendant(s), LARRY PRUNTY, is accused by the District Attorney of said County of

17 | Sacramento, by this information, as follows:

18 | **COUNT ONE**

19 | On or about and between February 22, 1993, and February 21, 1996, at and in the County of

20 | Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a

21 | violation of Section 288.5(a) of the Penal Code of the State of California, in that said defendant

22 | did unlawfully engage in three and more acts of "substantial sexual conduct", as defined in Penal

23 | Code Section 1203.066(b), and three and more acts in violation of Section 288 with CORINA

24 | M., a child under the age of 14 years, to wit, age 5 to 7 years, while the defendant(s) resided

25 | with, and had recurring access to, the child.

26

27 | "NOTICE: The above offense is a serious felony within the meaning of Penal Code Section

28 | 1192.7(c)."

29

30 | "NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section

31 | 290. Willful failure to register is a crime."

32

33 | "NOTICE: Conviction of this offense will require the court to order you to submit to a blood test

34 | for evidence of antibodies to the probable causative agent of Acquired Immune Deficiency

35 | Syndrome (AIDS). Penal Code Section 1202.1."

36 | **COUNT TWO**

37 | For a further and separate cause of action, being a different offense of the same class of crimes

38 | and offenses and connected in its commission with the charges set forth in Count One hereof: On

39 | or about and between February 22, 1996, and February 21, 1997, at and in the County of

40 | Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a

41 | 03040004.C05                                    (1)                                    000059

violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT THREE

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One and Two hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT FOUR

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Three hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of

03040004.C05                              (2)                              000060

fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT FIVE

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Four hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT SIX

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Five hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

03040004.C05                           (3)                           000061

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT SEVEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Six hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT EIGHT

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Seven hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

03040004.C05                                    (4)

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT NINE

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Eight hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT TEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Nine hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT ELEVEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Ten hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT TWELVE

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Eleven hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT THIRTEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Twelve hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT FOURTEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Thirteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

03040004.C05                                    (7)                                    000065

## COUNT FIFTEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Fourteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT SIXTEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Fifteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

03040004.C05                    (8)                    000066

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41

### COUNT SEVENTEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Sixteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT EIGHTEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Seventeen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

1
2
3
4

### COUNT NINETEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Eighteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section  288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT TWENTY

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Nineteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section  288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

03040004.C05                    (10)                    000068

Contrary to the form, force and effect of the Statute in such case made and provided, and against the peace and dignity of the People of the State of California.

Subscribed to this 4th day of March, 2005.

JAN SCULLY
District Attorney of Sacramento County,
in the State of California.

By:_____
NOAH PHILLIPS
Deputy District Attorney

CGS

03040004.C05                    (11)                    000069

EXHIBIT C

EX. C

### DECLARATION OF LARRY PRUNTY

I, Larry Prunty, Petitioner, do so declare, under penalty of perjury pursuant to the laws of the United States of America as follows:

1. On August 10, 2004, my wife, Nanette Ramos told me that on August 9, 2004, her daughter (my step-daughter) Corina went to the police station, and accused me of sexually abusing her for a long period of time.

2. I became upset and screamed at Nanette. Nanette asked me if the allegations were true, and I said they were not.

3. Nanette told me that a police officer was going to show up on that day to ask me questions and get my side of the story. At that time I became upset, and we started arguing. An hour later, I heard a knock on the door. I opened the door, and saw a police officer, at which time I said "I know why you're here." He asked me if I was "Larry," and after saying yes, he placed handcuffs on me, told me I was under arrest, and placed me in his patrol car.

4. At no time did the arresting officer (now known as Officer Alioto read me my Miranda rights   He drove me to the police station where another officer began asking me questions, I became confused, at which time, I made up a story about abusing Corina so they would stop pressuring me. I was scared for my life.

EXECUTED on this $\underline{15}$ day of February, 2008 in the state of California, city of Calipatria.

Larry Prunty

EXHIBIT D

EX D

1  Q     Okay.  What -- what did you know about the nature of
2  the complaint?
3  A     What the victim had described to me over a period of
4  years including (sic) touching and fondling for sexual
5  gratification.
6  Q     So you had spoken to the victim and interviewed her
7  before you talked to Mr. Prunty; is that correct?
8  A     From the day before.
9  Q     And you had talked to family members of her as well;
10 have you not -- did you not?
11 A     I spoke --
12 Q     -- prior to making contact with Mr. Prunty?
13 A     I spoke with, uh, a few members of his family who had
14 no idea what was going on.
15 Q     And when you spoke -- when you spoke to the alleged
16 victim in this case and she told you what happened, did you
17 believe her?
18 A     I felt it was credible enough to take a report.
19 Q     And you felt it was credible enough to follow-up on it?
20 A     Yes, ma'am.
21 Q     And so when he -- when Mr. Prunty first answered the
22 door and said I know why you're here because of lewd acts,
23 because I committed lewd acts on my stepdaughter, given what
24 you had heard from the alleged victim is it your testimony,
25 sir, that you did not form the intent at that time to take
26 this man to jail?
27 A     The reason why I say no is because the acts had
28 occurred several years prior to the contact.  I had no idea

```
 1  at that point whether they were just merely touching
 2  misdemeanor type assaults or felony type assaults. I wasn't
 3  that familiar with the touch of the law so no, I couldn't
 4  arrest him right then and there for his admission to a
 5  misdemeanor so that's why I asked him to clarify for me.
 6          THE COURT: All right. Continue, Counsel, my
 7  apologies.
 8          MS. WEIKEL: Did you get that last part here?
 9          THE COURT: I'm sorry.
10          (The Court reviewed the realtime screen).
11          THE COURT: Continue. I got it.
12          Tell them we'll be about five or 10 minutes.
13          MS. WEIKEL: Would you like me to proceed?
14          THE COURT: Yes. Proceed.
15  Q   (By Ms. Weikel) Okay. Let me ask you this. After he
16  said I know why you're here, it's because of the lewd acts
17  that I committed against my stepdaughter, at that moment in
18  time would you say that Mr. Prunty was free to leave after
19  saying that?
20  A   That did change things considerably, yes.
21  Q   So it -- it -- it's fair to say he wasn't free to leave
22  after he said -- after those words came out of his mouth?
23  A   Correct.
24  Q   And this was approximately 12:15?
25  A   Yes.
26  Q   And then you stated that you transported him in your --
27  or you actually handcuffed him and put him in the back of
28  your patrol car; is that right?
```

1  A     Yes.

2  Q     And then you waited for other officers to arrive and to

3  check in with your sergeant and detectives, right?

4  A     Yes.

5  Q     And then after, uh, a period of I guess other matters,

6  like I just described, then you began to transport Mr. Prunty

7  downtown; did you not?

8  A     Well, to hall of justice.  It's Freeport and Franklin

9  or Fruitridge.

10  Q     Okay.  And what time was it in your best estimation

11  that you read Mr. Prunty his Miranda Rights off of your

12  preapproved card?

13  A     I -- I really can't estimate.  Most likely between half

14  an hour and 45 minutes from initial contact.

15  Q     So between 1 o'clock and 1:15; would that be a fair

16  estimate?

17  A     I would -- I would have to guess.

18  Q     Well, I don't want you to guess, but I -- but we don't

19  need to be completely precise.  So your best estimate.

20  A     That would be my best estimate would be around 1:15.

21  Q     Okay.  So how far away was from it Mr. Prunty's house

22  to the station where you took him?

23  A     As I think I stated before, between 10 and 12 minutes

24  driving time.

25  Q     And after you got him to the station what did you do

26  with Mr. Prunty?

27  A     As I stated, he was placed in an interview room.

28  Q     And approximately what time was he placed in that

EXHIBIT E

EX E.

```
 1  A     I don't recall if I did.
 2  Q     Did you ask him to -- the various categories of sexual
 3  assault and whether he had participated in -- within those
 4  categories?
 5  A     What do you --
 6  Q     You know what I mean.  That there's some types of
 7  touching that is sex and some type of touching that is oral
 8  sex.
 9        Did you ask him to -- which categories of sexual
10  contact he had with the alleged victim?
11  A     Well, he pretty much clarified by saying he touched her
12  breasts and genitalia and likewise so I didn't -- that's at
13  the point where I told him you are under no obligation to
14  talk to me.
15  Q     Okay.  But before you said that he was under no
16  obligation to talk to you, um, he had already described the
17  -- to you some substantial sexual contact with the victim; is
18  that a fair statement?
19  A     Yes, it would be a fair statement.
20  Q     When you were at his door that day were you in full
21  uniform?
22  A     Yes, I was.
23  Q     Did you have a gun with you?
24  A     I would have had to have.
25  Q     And when you knocked on the door and he answered the
26  door and you had that initial conversation, in your opinion
27  was he free to leave at that point?
28  A     Absolutely.  The screen door was still closed.
```

1    Q    So absolutely.

2       If -- if you knocked on the door and he said I know why

3   you're here --

4    A    He could have technically slammed the door.

5       THE COURT: Wait a minute. Wait a minute. Stop.

6       Finish your question.

7    Q    (By Ms. Weikel) You knock on the door. You know why

8   you're there, right? You have information before you went

9   out to that call about the nature of this investigation --

10   A    Yes, I did.

11   Q    -- right?

12       So you know -- you knew why you were there, right?

13   A    Yes, ma'am.

14   Q    And were you there really to arrest him, weren't you?

15   A    No, I was not.

16   Q    Why were you there?

17   A    I was there to get his side of the story.

18   Q    Okay. And under what -- if he would have said I don't

19   know anything about what you're talking about, would you then

20   have said okay, Mr. Prunty, have a nice day and return to

21   your patrol car and gone on your way?

22   A    I don't know because that didn't happen.

23   Q    When did you form the opinion that you should take him

24   into custody?

25   A    When he made the statements about the contact and the

26   conduct.

27   Q    Okay. When he -- when he first said I know why you're

28   here because of lewd acts, when he made those first initial

EXHIBIT F

EX F

| | |
|---|---|
| 1 | TUESDAY, MAY 17, 2005 |
| 2 | MORNING SESSION |
| 3 | ---o0o--- |

4       The matter of the People of the State of California

5   versus Larry Prunty, Defendant, No. 04F06958, came on

6   regularly before the Honorable Troy L. Nunley, Judge of the

7   Superior Court of California, County of Sacramento, State of

8   California, sitting in Department 22 thereof.

9       The People were represented by Noah Phillips, Deputy

10   District Attorney for the County of Sacramento, State of

11   California.

12       The Defendant Larry Prunty was personally present and

13   represented by Paula A. Weikel, Assistant Public Defender for

14   the County of Sacramento, State of California, as his

15   counsel.

16       The following proceedings were then had, to-wit:

17       THE COURT:  All right.  We're on the record in the

18   matter of the People of the State of California versus Larry

19   Prunty.

20       This matter has been sent here for a jury trial, and

21   the jury should be here in several moments, if they're not

22   already outside.

23       In any event, um, Counsel for the defense indicated

24   that she liked to conduct a Miranda hearing, um, to see if

25   the defendant was properly mirandized prior to making

26   incriminating -- certain incriminating statements.

27       And my understanding Miss Weikel, over and above the

28   Miranda hearing, you also requesting a hearing under 402 Sub

```
 1   (B)?

 2        MS. WEIKEL:  I am.

 3        THE COURT:  All right.  All right.  So we'll -- do you

 4   have any objection to doing the Miranda hearing as well as

 5   the hearing under Evidence Code Section 402 Sub (B) at the

 6   same time?

 7        Because essentially Evidence Code Section 402 at any

 8   party's request, the Court is required to do a hearing

 9   concerning the admissions that the defendant's made in

10   confession or admission that the defendant made.  So I'm

11   prepared to do that.

12        But I think the two issues dovetail into one another,

13   confession, admission, as well as Miranda.  Because my

14   understanding is that, at least according to the prosecution,

15   the defendant was properly mirandized and then they proceeded

16   to make certain incriminating statements.

17        Is that correct, Counsel?

18        MR. PHILLIPS:  Yes.

19        THE COURT:  All right.  Does any party have any

20   objection to me doing the Miranda hearing and 402 Sub (B)

21   hearing simultaneously?

22        MR. PHILLIPS:  No.

23        MS. WEIKEL:  No.

24        THE COURT:  All right.  Let's proceed.

25        MR. PHILLIPS:  Officer Alioto.

26        THE COURT:  All right.  C'mon up, Officer.

27        THE CLERK:  Please raise your right hand.

28        Do you solemnly state that the evidence you shall give
```

EXHIBIT G

EX G

1   Q     What kind of -- what, if any, conversation did you have
2   with him at the door?
3   A     I knocked on the door.  The door opened and the
4   defendant stated I've been waiting for you.  I'm on the phone
5   with the CPS worker right now.
6   Q     All right.  And by August 10th of 2000 and 4 you had --
7   is it fair to say that you had some knowledge of, uh, why you
8   were arresting Mr. Prunty?
9   A     Yes.  Was contacting Mr. Prunty.  Yes, I did.
10  Q     Okay.  And you had -- uh, you had made contact was it
11  the day prior with a, uh, young lady by the name of Corina
12  Montez?
13  A     Yes, I did.
14  Q     Okay.  You meet Mr. Prunty at the door.  He says I've
15  been waiting for you.
16        What, if anything, do you ask him?
17  A     I actually waited for -- for him to get off the phone,
18  and I -- then I spoke to the CPS worker for I think a matter
19  of seconds.  Told him that --
20  Q     On the phone?
21  A     On the phone, 'cuz he had been speaking with her.  And
22  I asked him well, why am I here?  And that's when he um --
23  Q     What did he say?
24  A     He informed me at that point that there had been
25  inappropriate behavior, inappropriate acts between he and the
26  victim.
27  Q     Okay.  Did he describe the nature of the inappropriate
28  actions?

1   A     He stated that it was a -- uh, I think the word that he
2   used was lewd, sexual --

3   Q     Okay.

4   A     -- contact.

5   Q     Did he describe in anymore detail the particularities
6   of that kind of contact when you first speak with him at the
7   door?

8   A     I asked him to just clarify what he meant by -- by
9   lewd, and that's when he -- he -- he went in to very, very
10  little detail.  I don't recall the -- the -- the -- exactly
11  what he said but it was sexual in nature.

12  Q     Um, what, if anything, did you do next?

13  A     I informed him that he was under no obligation to talk
14  to me at that point, and advised him basically not to say
15  anything more until I had the opportunity to mirandize him.

16  Q     Okay.  Um, what, if anything, did you physically do
17  with him at that point in time?

18  A     At that point I also detained him in handcuffs, and I
19  notified my sergeant at which time I, uh, placed the
20  defendant in the rear seat of my police vehicle.

21  Q     Once you get him in the police vehicle, what happens
22  from there?

23  A     I waited for the sergeant to arrive.  Advised him of
24  the situation.  Contacted the detectives in our sexual
25  assault unit and, uh, was planning on transporting the
26  defendant.

27        Prior to starting the transport, I then activated my in
28  car camera in my police vehicle and mirandized him from

```
 1  verbatim from our S.P.D.  -- my Sacramento Police Department
 2  issue Miranda card.
 3  Q    All right.  Um, prior to that date, August 10th, had
 4  you everd use that Miranda card to mirandize someone?
 5  A    Every time I mirandize somebody.
 6  Q    All right.  Did you have an opportunity to, uh, read
 7  Mr. Prunty his Miranda warnings -- his Miranda Rights from
 8  the card on August 10th of 2000 and 4?
 9  A    Yes, I did.
10  Q    Did he appear to understand the Miranda warnings you
11  were providing to him?
12  A    Yes.  I -- yes, he did.  He -- he answered yes four
13  times as I read the rights.
14  Q    Verbally?
15  A    Yes.
16  Q    How many questions are there?
17  A    There are four.
18  Q    Okay.  After you read him his Miranda warnings and he
19  verbally answered yes to your questions, what if anything
20  happened next between the two of you?
21  A    We, I -- I drove him to, uh, our police headquarters to
22  where the detectives' unit is located, and we had a
23  conversation on the way there.
24  Q    Okay.  Uh, did the conversation in some regards relate
25  to, uh, his stepdaughter, Corina?
26  A    Yes, it did.
27  Q    Okay.  How long did you speak with him about that?
28  A    About?
```

EXHIBIT   H

EX H

```
 1          MR. PHILLIPS:  It's not -- this is going to be it.
 2          THE COURT:  Okay.
 3                         (tape played).
 4    Q     (By Mr. Phillips)  Okay.  For the record, um, Officer
 5    Alioto, I'm going to play it again slowly.
 6          But does it appear on the tape, Court Exhibit 1-A, that
 7    the, um, numbers in the bottom right-hand corner had
 8    changed --  or strike that.
 9          Did you have an opportunity to watch that?
10    A     Just now?
11    Q     Yeah.
12    A     Yes, I did.
13    Q     Can you give us your impression based on your
14    experience with, um, in camera tapes what, if anything, is
15    going on on the tape?
16    A     It -- it actually appears like that the -- that the
17    videotape either skipped or failed to a record, hence the
18    blue screen.
19    Q     Okay.
20    A     Thus, meaning that the record was activated but it
21    wasn't actively recording.
22    Q     Okay.  Did you -- uh, I'll probably just let the tape
23    play for itself but --
24    A     Yes.
25                         (tape played).
26    Q     (By Mr. Phillips)  Do you want me to stop it?
27    A     Yeah.  The part where it skipped right there.  I don't
28    know if you noticed that.
```

EXHIBIT    I

EX.I

1          But this is not the way the happened, and that's not
2    the way testimony was.  The testimony was a question and
3    answer session at a time Mr. Prunty was not free to leave,
4    and at which time some of the major details in this case came
5    out.

6          And what happened later after the warnings and after
7    the advisements was just a clarification of what had already
8    been said.  So I don't think that that saves the statement
9    that Mr. Prunty had made.

10          THE COURT:  All right.  Is the matter submitted?
11          MR. PHILLIPS:  Yes.

12          THE COURT:  All right.  Essentially what you have in
13    this case is this.  And this is respects to the Miranda
14    issue.

15          Um, according to the Officer prior to going to the
16    residence the alleged victim told the Officer that the
17    defendant had been molesting her over a period of time.  In
18    fact, over a number of years.

19          Based on that information, the Officer -- and let's
20    face it, at this point in time the case is still in the
21    investigatory stage.  Okay.  He goes to the defendant's
22    house.

23          Now, once the Officer knocks -- knocks on the door and
24    by no prompts from the Officer, the first words out of the
25    defendant's mouth, according the Officer Alioto, was I've
26    been waiting for you.  And the Officer notices that the
27    defendant is on the telephone.

28          Okay.  Um, now, at that point in time clearly there is

1  no Miranda violation because the Officer hasn't even stated
2  his purpose for being there.  You know, he just knocked on
3  the door.  The defendant answers and says I know why you're
4  here.  Um, and he says I've been waiting for you.

5       The defendant apparently is on the phone with child
6  protective services, and he gives the telephone to the
7  Officer without any prompting from the Officer and, um, tells
8  the Officer that I'm on the phone with CPS and the Officer
9  engages in a brief conversation with, um, CPS.

10      Now, that actually has some implication to a large
11  extent because the question is did the defendant voluntarily
12  give the phone off to the Officer or did the Officer force
13  the defendant to give the phone over?

14      Now, clearly based on the Officer Alioto's testimony
15  the defendant voluntarily gave the phone over to the Officer.

16      Now, at this point in time one -- one crucial aspect is
17  -- is, um, -- is lacking here.  The Officer doesn't say
18  anything.  He doesn't say, for example, I'm here to arrest
19  you or I have a warrant so at this point in time, um, there
20  is no Miranda problem.

21      In fact, the only thing the Officer says, and this is
22  in response to the defendant saying I know why you're here,
23  the Officer says why am I here?  And that was the testimony.

24      And at that point in time the defendant says, um, in
25  response to why am I here, there has been inappropriate
26  sexual or lewd and sexual conduct between me and my
27  stepdaughter.  Okay. that's the testimony.

28      Now, this is only in response to the question why am I

1 | here? Up to this point this is not custodial. There's
2 | nothing you can't even say this is custodial.

3 | Because let's face it. Up to this point everything up
4 | to this point is initiated by the defendant, and the Officer
5 | is still engaged in a consensual encounter or investigatory
6 | stage.

7 | Now, the defendant tells the Officer, and I indicated
8 | that, um, he committed lewd act on his stepdaughter and the
9 | Officer says well, what do you mean by lewd acts? And at
10 | that point in time the -- um, and I'll indicate this at this
11 | point in time I still don't see any custody. The Officer
12 | hasn't drawn a gun. He hasn't put handcuffs on the
13 | defendant.

14 | In fact, um, the only way the officer enters the
15 | residence presumably is because the defendant gives him a
16 | telephone and presumably invites him into the residence. So
17 | the Officer doesn't even force his way into the residence in
18 | any manner.

19 | Um, so at this point it doesn't appear to the Court
20 | that anything has happened to make the defendant feel not
21 | free to end the consensual encounter.

22 | Now, once the defendant gives a brief description of
23 | the lewd act what does the Officer do? Does he go further
24 | and say well, tell me more? He says don't say anything more
25 | until I give you your Miranda Rights he tells him.

26 | And at that point in time he's essentially saying to
27 | him I have an intent to arrest you. I'm going to read you
28 | your Miranda Rights,

1    And, you know, even when you look at the Officer's
2  conduct -- and, in fact, when he testified, he said the
3  defendant was not free to leave once he admitted that he
4  committed lewd acts on the victim.

5    Now, the true question here is whether a reasonable
6  person in the defendant's shoes would not have felt free to
7  leave at that moment.  And it's not dependent upon the
8  Officer's question.  It's actually dependent upon the
9  Officer's -- Officer's behavior.

10    And quite frankly, the Court hasn't found anything in
11  Officer Alioto's behavior that would lead one to believe --
12  in looking at this reasonably that would lead one to believe
13  that he wasn't free to leave.

14    So, um, I don't see any, um, -- um, any Miranda
15  violation.  It appears to me that the Officer was invited in,
16  and that's accorded by the fact that the defendant gave him
17  the phone.

18    And I will indicate to -- to Counsel that it sounded to
19  me like what you have is an invitation -- an implied
20  invitation to enter.  And I don't find any Miranda violation.

21    Now, as to the examination under Evidence Code Section
22  402 Sub (B), that's a different issue.  And I'll have a
23  ruling for you this afternoon because I want to finish my
24  review of the transcript, but the Miranda Motion is hereby
25  denied.

26    All right.  And we'll deal with the other motion in
27  limines briefly this afternoon.

28    MS. WEIKEL:  Do we want to come back before 1:30 or do

1  we want to come --

2       THE COURT:  1:30 is fine because the jury will be

3  filtering in at 1:30.

4       Okay.  We're off the record.

5       MS. WEIKEL:  We have other motions that aren't going to

6  take that much time that just need to be put on the record,

7  the exclusion motion, etceterae.

8       THE COURT:  Right.  That's what I just indicated.

9

10

11                          (noon recess)

12

13                            --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT J

EX: J

1  he come into your bedroom?

2  A    A lot of times.  I can't even count.

3  Q    More than five?

4  A    Probably.

5  Q    More than 10?

6  A    Probably, yeah.

7  Q    Um, you lived there -- how long do you think you lived

8  at the T Street apartment?

9  A    For about two years 'cuz I ways living there from

10  second to third grade.  Probably a year and a half, two

11  years.

12  Q    How often do you think he came into your bedroom while

13  you were living at the T Street address -- excuse me, at the

14  4th Street address?

15  A    A lot of times.  I can't even count.

16  Q    If it was, um -- would it be more or less than a couple

17  times a week?

18  A    Be a couple times a week.

19  Q    Were there any particular -- were -- were there certain

20  nights of the week that he would come in more often than not?

21  A    No.

22  Q    Okay.  So it wasn't like every Saturday night?

23  A    No.

24  Q    All right.  Um, did you notice any pattern to the -- to

25  the days that he would come?

26  A    Na-uh.

27  Q    Can you tell us, um, what your earliest memory as far

28  as physically what he would do with you?

1  A    Second grade.

2  Q    Uh, when he would come into your room during the second

3  grade, uh, how did this inappropriate conduct start?  That is

4  what were the things that he would do to you initially?

5  A    Like touch me in places that he wasn't supposed to

6  touch me.

7  Q    Can you describe those places for us?

8  A    He touched my breasts, that's what he -- he would do

9  that or he touched -- tried to feel my vagina under like my

10  clothes were on.

11  Q    When you say he would try to feel your vagina, would it

12  be on the outside of your clothes or the inside of your

13  clothes?

14  A    Outside.

15  Q    Would he say anything to you while he was doing this?

16  A    No.  Not that -- sometimes he would but I can't

17  remember.

18  Q    Okay.  Um, at any point in time did, uh, he ever touch

19  you under your clothes?

20  A    Yes.

21  Q    Would he ever touch you under your clothes while

22  you were still living at that -- at that apartment on 4th

23  Street?

24  A    Yes.

25  Q    Um, how long was it before he started touching you

26  under your clothes?

27  A    I don't know.

28  Q    How often would he touch you under your clothes?

1  A    I don't know.  A lot of times,

2  Q    Um, at any point in time did, uh, his hand touch your

3  vagina?

4  A    Yes.

5  Q    At any point in time did his fingers go inside of your

6  vagina?

7  A    Yes.

8  Q    How often do you think that he did that?

9  A    I don't know.

10  Q    Um, would that kind of conduct occur while you were at

11  the 4th Street address?

12  A    Yes.

13  Q    Can you tell us whether or not he ever put more than

14  one finger in your vagina at the same time?

15       Do you understand my question?

16  A    Yeah.  I understand that question.  Yeah.  But I don't

17  think so.  I'm not --

18  Q    Okay.

19  A    -- perfectly sure.

20  Q    Did -- um, do you have any memories at the T Street

21  address of him actually, uh, placing a finger in your vagina?

22  A    Yeah.  I can remember him trying to, yeah.

23  Q    Can you tell us about that?  What would happen when he

24  would try to?

25  A    I either started to cry or like push away, like try to

26  move or something.

27  Q    How effective was that when you would try to, uh, push

28  away?

EXHIBIT K

1  so of course he would stop.

2  Q    Okay.  Um, how many times do you think he tried to

3  insert a finger into your vagina while you were living down

4  there at T Street -- excuse me, 4th Street?  Sorry about

5  that.

6  A    Um, I don't really know.  He came into my room a lot of

7  times, all the time so --

8  Q    Um, other than placing his fingers on your vagina and,

9  um, touching your breasts did he do or engage in any other,

10  um, inappropriate behavior with you?

11  A    Yes.

12  Q    Um, what else did he do?

13       THE COURT:  I'm sorry, Counsel.  Let me -- let me

14  interrupt you at this point.

15       Are you talking about 4th Street or T Street?

16       MR. PHILLIPS:  I've been mislabeling it.  It is 4th

17  Street.

18       THE COURT:  Okay.

19       MR. PHILLIPS:  And I apologize.

20  Q    (By Mr. Phillips)  The, uh, apartment that we saw up

21  there in People's 6, um, other than touching you with his

22  fingers, um, did he engage in any other inappropriate

23  behavior with you at that apartment?

24  A    Yes.

25  Q    What, if anything, else occurred?

26  A    Um, he would take his penis out and make me touch it.

27  Q    Where?

28  A    With my hands.

```
 1  Q    Okay.  And where -- what part of his penis would you
 2  touch?
 3  A    All of it.
 4  Q    How would he make you touch his penis?
 5  A    Um, he grabbed my hands and he would make me touch it
 6  up and down.
 7  Q    Okay.  Would you ever try to stop touching his penis?
 8  A    Yeah.  Yes.
 9  Q    What would happen when you would try to stop touching
10  his penis?
11  A    He would keep trying to make me touch it until, you
12  know, I would just fight with him then --
13  Q    Was he excited or not excited with -- when you would
14  touch his penis?  That is not a great question.
15       Was he erect when you would be touching his penis?
16  A    Yes.
17  Q    Okay.  Did he, um, at any point in time when you would
18  touch his -- his penis, would -- would he ejaculate?
19  A    Sometimes.
20  Q    How often would you, uh, touch his penis?
21  A    I don't know.
22  Q    More than once?
23  A    Yes.
24  Q    Okay.  In the -- the -- in the scheme of things how
25  often was it that you would be touching his penis versus, you
26  know, him touching your vagina or something else?
27  A    How often?
28  Q    Yes.
```

MC–275

'Name  **Larry Prunty**

Address  **P.O.Box 5002**

**Calipatria, CA 92233**

CDC or ID Number  **V-86405**

## SUPERIOR COURT OF SACRAMENTO COUNTY

## STATE OF CALIFORNIA

(Court)

*MMC*

| | |
|---|---|
| **LARRY PRUNTY** | **PETITION FOR WRIT OF HABEAS CORPUS** |
| Petitioner | |
| vs. | CV No.  **08  2070** |
| **LARRY SCRIBNER, Warden.** | *(To be supplied by the Clerk of the Court)* |
| Respondent | |

## INSTRUCTIONS—READ CAREFULLY

*(PR)*

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

**PETITION FOR WRIT OF HABEAS CORPUS**

THOMSON
\*
WEST

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380

MC–275

This petition concerns:

- [XX] A conviction
- [ ] Parole
- [ ] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [ ] Other (specify): _____

1. Your name: Larry Prunty

2. Where are you incarcerated? Calipatria State Prison, P.O.Box 5002, Calipatria, CA 92233

3. Why are you in custody?  [XX] Criminal Conviction  [ ] Civil Commitment

   Answer subdivisions a. through i. to the best of your ability.

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      Continuous sexual abuse; and lewd and lascivious acts.

   b. Penal or other code sections: Penal Code §§ 288.5; and 288(b)(1).

   c. Name and location of sentencing or committing court: Sacramento County Superior Court, 720 Ninth Street, Sacramento, CA 95814.

   d. Case number: Superior Court Case No. 04F06958.

   e. Date convicted or committed: May 25, 2005.

   f. Date sentenced: June 24, 2005.

   g. Length of sentence: 126 years.

   h. When do you expect to be released? N/A

   i. Were you represented by counsel in the trial court?  [XX] Yes.  [ ] No. If yes, state the attorney's name and address: Paula Weikel (she changed her last name to Spano), Public Defender's Office, 720 Ninth Street., Sacramento, CA 95814.

4. What was the LAST plea you entered? (check one)

   [XX] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [XX] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6.  GROUNDS FOR RELIEF                                                                    MC–275

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached Memorandum of Points and Authorities

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

See attached Memorandum of Points and Authorities

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

See attached Memorandum of Points and Authorities

7. **Ground 2 or Ground _____** *(if applicable):*    MC–275

See attached Memorandum of Points and Autorities

a. Supporting facts:

See attached Memorandum of Points and Authorities.

b. Supporting cases, rules, or other authority:

See attached Memorandum of Points and Authorities.

MC–275

8. Did you appeal from the conviction, sentence, or commitment?    XX Yes.  ☐  No.  If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
Court of Appeal, Third Appellate District.

b. Result  Affirmed. (Appendix A.)                    c.  Date of decision:  Sep, 7, 2006.

d. Case number or citation of opinion, if known:  C051285. (Appendix A.)

e. Issues raised:  (1)  Not in possession of brief, but they must be the same

(2)              as those raised on petition for review, see Exhibit A.

(3) _____

f. Were you represented by counsel on appeal?  XX Yes.  ☐  No. If yes, state the attorney's name and address, if known:

John F. Schuck, 4083 Transport St., Suite B. Palo Alto, CA 94303.

9. Did you seek review in the California Supreme Court?   XX Yes ☐  No.  If yes, give the following information:

a. Result  Denied. (Appendix B.)              b.  Date of decision: December 20, 2006

c. Case number or citation of opinion, if known:  S147216. (Appendix B.)

d. Issues raised:  (1)  Please see Exhibit A for Petition.

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
My appellate attorney was ineffective, please see Argument II, p 31

of Memorandum of Points and Authorities.

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:
N/A

b. Did you seek the highest level of administrative review available?  ☐  Yes.  ☐  No.
Attach documents that show you have exhausted your administrative remedies.

MC–275

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

Please see attached page.

_____

16. Are you presently represented by counsel? ☐ Yes. ☒☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: March 8, 08

_____
(SIGNATURE OF PETITIONER)

## ATTACHMENT TO QUESTION 15

On December 20, 2006, the California Supreme Court denied review in my case; and in early January, 2007, my appellate attorney sent me a copy of the trial transcript.

It took me a couple of weeks to read the entire transcript, and so in early February, 2007, I began attending weekly sessions at the prison law library in order to understand and formulate a legal theory for filing a petition for writ of habeas corpus. Understanding the law and formulating a legal theory to attack my conviction was a little difficult, especially where I only have a high school education, and am a very slow reader. It became even more difficult after I became aware of the prison's strict law-library policy. For one, prisoner's are only allowed to attend one two-hour library session per week (see attachment 1, page 4); we are not allowed to check out any books (attachment 1, page 4); and can not make copies for our own use, the copier is to be used only for "documents that are completed and ready to me mailed to the court (attachment 1, page 3). Put simply, if an inmate wants to learn or study a particular piece of law, he must hand copy the material out of the book and take it back to the cell. This is time consuming when you take into consideration that we're only allowed to go to the library once a week for only two hours.

In late February, 2007, I wrote a letter to my trial attorney, asking her of she can send me a copy of the client-file, in that I was (1) investigating my case; and (2) formulating my arguments to file a petition for writ of habeas corpus.

While waiting for a response from my attorney and while going to the law library every week, in May, 2007, I was placed in administrative segregation (the hole) as a result of an argument I had with my cell mate. Before going to the hole, my property was placed on administrative hold, in that we're not allowed to have any personal property in the hole, not even legal work. In June of 2007, I was released from the hole, but I did not obtain my property until July, 2007.

During my time in the hole, I did not receive a response from my trial attorney. As such, in July, 2007, I wrote her again, asking her for the same. Meanwhile, I continued to use my weekly two hours at the library to investigate and formulate my arguments.

On October, 2007, I filed a complaint to the state bar as a result of my trial attorney nor responding to my letters; and on December 6, 2007, the state bar informed my that it had contacted my trial attorney and directed her to make available my client-file (see attachment 2); and on December 31, 2007, my trial counsel mailed to me a copy of the client-file (attachment 3).

After researching the client-file, I discerned a lot of information that I did not know existed. I used this information to complete my legal claims, and began the process of drafting a petition. With the assistance of another inmate, I typed this petition, and now present it to the court.

///

///

///

///

///

///

///

///

///

///

///

///

ATTACHMENT 1

# CALIPATRIA STATE PRISON
# DOM SUPPLEMENT



| California Department of Corrections | Chapter: 55000 CUSTODY/SECURITY OPERATIONS | |
|---|---|---|
| | Subchapter: 53000 ACTIVITIES | Division: EDUCATION |
| OPERATIONS MANUAL | Section:53060 LIBRARY/LAW LIBRARY | Revision Date: January 2002 |

RESPONSIBILITY FOR REVIEW:          Associate Warden-Central Operations
REVIEWED ANNUALLY:                       During the month of July
DATE OF LAST REVIEW:                     January 2001

**53060.1**
**LIBRARY/LAW**
**LIBRARY POLICY**

Yard "A" and "D" Libraries are designated Law Libraries for this institution. Yard "A" Library will accommodate "A" and "B" Yard Inmates and Yard "D" Library will accommodate "C" and "D" Yard inmates.

Yard "B", "C", and Minimum Support Facility (MSF) Yard Libraries are designated Recreational Libraries. Yard "A" and "D" Inmates will have recreational access through the Law Libraries on those yards.

A general fiction and non-fiction book collection, newspapers, and magazines shall be available in all Yard Libraries. Every Yard Library will maintain a current book collection list for inmate access. Only Recreational Library users will have access to Recreational Materials.

**53060.6**
**LIBRARY/LAW**
**LIBRARY PURPOSE**

"A" and "D" Law Libraries will be opened everyday, Sunday through Saturday with the exception of legal holidays and during emergency situations.

Access to the Law Library for "B" and "C" Yard Inmates will be on alternating days with "A" and "D" Yard Inmates.

At no time will inmates from different yards be allowed access to Law Libraries at the same time.

Three (3) sessions at two (2) hours per session will be scheduled each day.

Larry Prunty

NAME
CDC# V-86405

PRISON IDENTIFICATION/BOOKING NO.
P.O.Box 5002

ADDRESS OR PLACE OF CONFINEMENT
Calipatria, CA 92233

Note:   It is your responsibility to notify the Clerk of Court in writing of any
        change of address. If represented by an attorney, provide his name,
        address, telephone and facsimile numbers, and e-mail address.

*FILED*

APR 2 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

530

# UNITED STATES DISTRICT COURT
## **NORTHERN** DISTRICT OF CALIFORNIA

**LARRY PRUNTY**

FULL NAME (*Include name under which you were convicted*)

Petitioner,

v.

**LARRY SCRIBNER, Warden,**

NAME OF WARDEN, SUPERINTENDENT, JAILOR OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER

Respondent.

CASE NUMBER:

CV  08  2070

MMC

(PR)

To be supplied by the Clerk of the United States District Court

☐ _____ AMENDED

### PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254

PLACE/COUNTY OF CONVICTION _____
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(*List by case number*)
CV _____
CV _____

## INSTRUCTIONS - PLEASE READ CAREFULLY

1.   To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.   In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge the judgment entered by a different California state court, you must file a separate petition.

3.   Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.   Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.   You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

5.   You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

6.   When you have completed the form, send the original and two copies to the following address:

Clerk of the United States District Court for the Central District of California
United States Courthouse
ATTN: Intake/Docket Section
312 North Spring Street
Los Angeles, California 90012

PLEASE COMPLETE THE FOLLOWING: (*Check appropriate number*)

This petition concerns:
1. ☒ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   a. Place of detention ___Calipatria State Prison___
   b. Place of conviction and sentence ___Sacramento County Superior Court___

2. Conviction on which the petition is based *(a separate petition must be filed for each conviction being attacked)*.
   a. Nature of offenses involved *(include all counts)*: ___Continuous sexual abuse; and lewd and lascivious acts___

   b. Penal or other code section or sections: ___Penal Code §§ 288.5 and 288(b)(1).___

   c. Case number: ___04F06958___
   d. Date of conviction: ___May 25, 2005___
   e. Date of sentence: ___June 24, 2005.___
   f. Length of sentence on each count: ___1 count § 288.5 (12 years); count 2-20 § 288(b)(1) (114 years).___

   g. Plea *(check one)*:
      ☒ Not guilty

      ☐ Guilty

      ☐ Nolo contendere
   h. Kind of trial *(check one)*:
      ☒ Jury

      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?   ☒ Yes   ☐ No
   If so, give the following information for your appeal *(and attach a copy of the Court of Appeal decision if available)*:
   a. Case number: ___C051285 (Appendix A for court opinion).___
   b. Grounds raised *(list each)*:
      (1) ___I do not have the brief, but I do have the brief filed in supreme court, arguments were the same, Exhibit A.___

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (28 U.S.C § 2254)

CV-69 (04/05)                                                                    Page 2 of 10

(2) _____

(3) _____

(4) _____

(5) _____

(6) _____

c. Date of decision: September 7, 2006. (Appendix A.)

d. Result Affirmed (Appendix A.)

_____

4. If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision?  ☒Yes  ☐ No

If so give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a. Case number: S147216 (Appendix B.)

b. Grounds raised *(list each)*:

(1) Please see Exhibit A for Brief.

(2) _____

(3) _____

(4) _____

(5) _____

(6) _____

c. Date of decision: December 20, 2006. (Appendix B.)

d. Result Denied review.

_____

5. If you did not appeal:

a. State your reasons _____

_____

_____

_____

_____

b. Did you seek permission to file a late appeal?    ☐ Yes  ☐ No

6. Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☒Yes  ☐ No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a. (1) Name of court: __Please see attached Request for Stay.__

   (2) Case number: _____

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

   (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

   (5) Date of decision: _____

   (6) Result _____
   _____

   (7) Was an evidentiary hearing held?    ☐ Yes  ☐ No

b. (1) Name of court: _____

   (2) Case number: _____

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

   (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

   (5) Date of decision: _____

   (6) Result _____
   _____

   (7) Was an evidentiary hearing held?    ☐ Yes  ☐ No

c. (1) Name of court: _____

   (2) Case number: _____

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

   (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?    ☐ Yes  ☐ No

7.  For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the facts supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

**CAUTION:**    *Exhaustion Requirement:* In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present all of your grounds to the California Supreme Court.

a.  Ground one: __Please see attached Memorandum of Points and Authorities__

_____

(1) Supporting FACTS: _____

_____

_____

_____

_____

| | | |
|---|---|---|
| (2) Did you raise this claim on direct appeal to the California Court of Appeal? | ☐ Yes | ☐ No |
| (3) Did you raise this claim in a Petition for Review to the California Supreme Court? | ☐ Yes | ☐ No |
| (4) Did you raise this claim in a habeas petition to the California Supreme Court? | ☐ Yes | ☐ No |

b.  Ground two: _____

_____

(1) Supporting FACTS: _____

_____

_____

_____

_____

| | | |
|---|---|---|
| (2) Did you raise this claim on direct appeal to the California Court of Appeal? | ☐ Yes | ☐ No |
| (3) Did you raise this claim in a Petition for Review to the California Supreme Court? | ☐ Yes | ☐ No |

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

c.   Ground three: _____

(1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

d.   Ground four: _____

(1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

e.   Ground five: _____

(1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

8. If any of the grounds listed in paragraph 7 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: Please see attached

Request for Stay

_____

_____

9. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction? ☐ Yes ☒ No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a. (1) Name of court: _____

   (2) Case number: _____

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

   (4) Grounds raised *(list each)*:

   (a) _____

   (b) _____

   (c) _____

   (d) _____

   (e) _____

   (f) _____

   (5) Date of decision: _____

   (6) Result _____

   _____

   (7) Was an evidentiary hearing held?    ☐ Yes  ☐ No

b. (1) Name of court: _____

   (2) Case number: _____

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

   (4) Grounds raised *(list each)*:

   (a) _____

   (b) _____

   (c) _____

   (d) _____

   (e) _____

   (f) _____

   (5) Date of decision: _____

   (6) Result _____

(7) Was an evidentiary hearing held?     ☐ Yes   ☐ No

10. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect
    to this judgment of conviction?     ☒ Yes   ☐ No

    If so, give the following information *(and attach a copy of the petition if available)*:

    (1) Name of court: Sacramento Superior Court

    (2) Case number: Don't know yet.

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: mailed

    (4) Grounds raised *(list each)*:

    (a)    Please see attached Request for Stay.

    (b)    _____

    (c)    _____

    (d)    _____

    (e)    _____

    (f)    _____

11. Are you presently represented by counsel?     ☐ Yes   ☒ No

    If so, provide name, address and telephone number: _____

    _____

    _____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding,

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on March 8, 08
*Date*

_____
*Signature of Petitioner*

<table>
<tr><td>_____<br>Petitioner<br><br>_____<br>Respondent(s)</td><td>**DECLARATION IN SUPPORT<br>OF REQUEST<br>TO PROCEED<br>IN FORMA PAUPERIS**</td></tr>
</table>

I, _____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1.  Are you presently employed?  ☐ Yes    ☐ No

    a.  If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer. _____
    _____

    b.  If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received. _____

2.  Have you received, within the past twelve months, any money from any of the following sources?

    a.  Business, profession or form of self-employment?     ☐ Yes    ☐ No
    b.  Rent payments, interest or dividends?                 ☐ Yes    ☐ No
    c.  Pensions, annuities or life insurance payments?       ☐ Yes    ☐ No
    d.  Gifts or inheritances?                                ☐ Yes    ☐ No
    e.  Any other sources?                                    ☐ Yes    ☐ No

    If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months: _____
    _____
    _____

3.  Do you own any cash, or do you have money in a checking or savings account? *(Include any funds in prison accounts)*
    ☐ Yes    ☐ No

    If the answer is yes, state the total value of the items owned: _____
    _____

---

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property? *(Excluding ordinary household furnishings and clothing)*  ☐ Yes    ☐ No

   If the answer is yes, describe the property and state its approximate value: _____

   _____

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support: _____

   _____

   _____

   I, declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

   Executed on _____         _____
                    *Date*                         *Signature of Petitioner*

## CERTIFICATE

I hereby certify that the Petitioner herein has the sum of $_____ on account to his credit

at the _____ institution where he is

confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said institution: _____

_____

_____

_____         _____
        *Date*                         *Authorized Officer of Institution/Title of Officer*

1 | Larry Prunty
 | CDC# V-86405
2 | P.O.Box 5002
 | Calipatria, CA 92233
3 | Petitioner In Propria Persona

4

5

6

7

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10

11 | **LARRY PRUNTY,**                      ) **PETITION FOR WRIT OF HABEAS**
 |                                        ) **CORPUS**
12 |                    Petitioner,        )
 |                                        )
13 |              v.                       )
 |                                        )
14 | **LARRY SCRIBNER, Warden,**            )
 |                                        )
15 |                    Respondent.        )

16

17

18

19

20 | **PETITION FOR WRIT OF HABEAS CORPUS**

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES                                     1

ARGUMENT I

    PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL
    RIGHTS UNDER THE 6TH AND 14TH AMENDMENTS, IN
    THAT HE WAS DENIED THE RIGHT TO COMPETENT TRIAL
    COUNSEL                                                           1

      a. Standard of Review For Ineffective Assistance
         Of Counsel Claim                                        3

      b. Trial Counsel's Acts And Omissions At Preliminary
         Hearings And At Trial Fell Below The Reasonable
         Standard Guaranteed Under The State and Federal
         Constitutions                                           4

         1. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
           BRING TO THE COURT'S ATTENTION THE FACT THAT
           THE STATUTE OF LIMITATIONS FOR ALL CHARGES OF
           SEXUAL ABUSE HAD RUN OUT AND THUS THE COURT DID
           NOT HAVE JURISDICTION TO TRY PETITIONER                 5

           A. Relevant Law                                         6

           B. Relevant Facts                                       6

           C. Under Penal Code § 800, The Statute of Lim-
              tations To Charge Petitioner Had Run Out,
              Thus Counsel's Failure To Bring This To The
              Court's Attention Was A Violation Of His
              State And Federal Rights To (1) An Effec-
              tive Attorney; (2) Due Process; And (3)
              Equal Protection.                                   7

         2. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
           BRING TO THE COURT'S ATTENTION THAT PETITIONER
           WAS ARRESTED WITHOUT PROBABLE CAUSE, THEREBY VIO-
           LATING HIS CONSTITUTIONAL RIGHT UNDER THE FOURTH
           AMENDMENT: AND ACCORDINGLY, UNDER THE EXCLU-
           SIONARY RULE, ALL EVIDENCE GENERATED BY POLICE
           AFTER PETITIONER'S ARREST SHOULD HAVE BEEN
           EXCLUDED                                                8

           A. Relevant Law                                         9

           B. Relevant Facts                                      11

i

C. Petitioner's Constitutional Rights Under The
Fourth Amendment Was Violated, In That, Con-
trary To Officer Alioto's Testimony, Peti-
tioner Was Arrested Before Making The Alleged
Inculparoty Statements; Thus Counsel's Failure
To Bring This To The Court's Attention Deprived
Petitioner Of His Right To Competent Counsel;
Due Process; And Equal Protection                    14

3. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
BRING TO THE COURT'S ATTENTION THAT BEFORE PETI-
TIONER WAS ARRESTED, POLICE DID NOT READ HIM
HIS RIGHTS UNDER ARIZONA V. MIRANDA, THUS VIO-
LATING HIS CONSTITUTIONAL RIGHTS UNDER THE 5TH
AMENDMENT                                            16

A. Relevant Law                                      17

B. Relevant Facts                                    18

C. During The Evidentiary Hearing, The Court
Did Not Make Any Findings At To Whether
Police Read Petitioner His Miranda Rights,
And Therefore The Prosecutor Should Not
Have Been Able To Present To The Jury The
Taped Confession, And Counsel's Failure To
Point This Out To The Court Was A Violation
Of Petitioner's Constitutional Right To A
Competent Attorney                                   20

4. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING
TO BRING TO THE COURT'S ATTENTION THAT THERE
WAS INSUFFICIENT EVIDENCE TO CONVICT PETI
TIONER AS TO COUNT 1                                 21

A. Relevant Law                                      22

B. Relevant Facts                                    23

C. There Was Insufficient Evidence To Convict
Petitioner On Count 1, And Counsel's Failure
To Bring This To The Court's Attention Dep-
rived Him Of Competent Counsel                       26

5. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING
TO BRING TO THE COURT'S ATTENTION THAT THERE
WAS INSUFFICIENT EVIDENCE TO CONVICT PETI-
TIONER AS TO COUNTS 2-20                             27

A. Relevant Law                                      28

B. Relevant Facts                                                    28

C. There Was Insufficient Evidence To Con-
   vict Petitioner As To Counts 2-20, And
   Counsel's Failure To Bring This To The
   Court's Attention Deprived Petitioner Of
   Competent Counsel

6. THE CUMULATIVE EFFECT OF ERRORS HEREIN
   DEPRIVED PETITIONER OF DUE PROCESS                                 32

ARGUMENT II

   PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE REP-
   RESENTATION OF EFFECTIVE APPELLATE COUNSEL                         31

ARGUMENT III

   THE TRIAL COURT ERRONEOUSLY DENIED PETITIONER's
   MARSDEN MOTION FOR NEW COUNSEL. AS A RESULT,
   PETITIONER'S RIGHT TO COUNSEL UNDER THE SIXTH
   AMENDMENT WAS VIOLATED                                             32

   a. Petitioner Was Unconstitutionally Denied His
      Right To Counsel                                                32

   b. Conclusion                                                      34

ARGUMENT IV

   PETITIONER'S PRETRIAL STATEMENTS WERE OBTAINED IN
   VIOLATION OF HIS RIGHTS UNDER THE FIFTH AMENDMENT
   AND MIRANDA; AND SHOULD HAVE BEEN EXCLUDED PURSUANT
   TO PETITIONER'S OBJECTION                                          35

   a. The Facts                                                       35

   b. Petitioner's Statements Were Obtained In Vio-
      lation Of The Fifth Amendment And Arizona
      v. Miranda                                                      37

   c. Conclusion                                                      40

VERIFICATION                                                         41

PROOF OF SERVICE                                                     41

1            **TABLE OF AUTHORITIES**

2                                                    Page

3 Federal Cases

4 Arizona v. Miranda
(1966) 384 U.S. 436                   17, 21

Beck v. Ohio
6 (1964) 379 U.S. 89                   10, 11

7 Chambers v. Mississippi
(1972) 410 U.S. 284                   30

Evitts v. Lucey
9 (1985) 469 U.S. 387                   31

10 Illinois v. Gates
(1985) 462 U.S. 213                 10, 11

Jackson v. Virginia
12 (1979) 443 U.S. 307                 22, 23

13 Nunes v. Mueller
350 F.3d 1045 (9th Cir. 2003)          3

Ornelas v. U.S.
15 (1996) 517 U.S. 690                 11

16 Powell v. Alabama
(1932) 287 U.S. 45                   4

Sibron v. New York
18 (1968) 392 U.S. 40                   4

19 Strickland v. Washington
(1984) 466 U.S. 668                 4

21 U.S. v. Marion
(1971) 404 U.S. 307                 6

22 U.S. v. Sharpe
(1985) 470 U.S. 675                 10

24 State Cases

In re Sanders
26 (1970) 2 Cal.3d. 1033              4

People v. Allen
(1985) 165 Cal.App.3d 616                                    23

People v. Barnes
(1986) 42 Cal.3d 284                                         22

People v. Carrin
(2001) 26 Cal.4th 81                                          6

People v. Hoez
(1988) 200 Cal.App.3d 811                                   28

People v. Ibarra
(1963) 60 Cal.2d 460                                         4

People v. Johnson (1980) 26 Cal.3d 357
(1980) 26 Cal.3d 284                                     22, 23

People v. Jones
(1990) 51 Cal.3d 294                                     27, 28

People v. Ledesma
(1987) 43 Cal.3d 171                                         4

People v. Lewis
(1990) 50 Cal.3d 262                                        21

People v. Mabin
92 Cal. 4th 654                                             7

People v. Markham
(1989) 49 Cal.3d 63                                        18

People v. Martinez
(2000) 26 C.4th 750                                         6

People v. Murtishaw
(1981) 29 Cal.3d 733                                       18

People v. Pope
(1979) 23 Cal.3d 412                                        4

People v. Rodriquez
(2002) 28 Cal.4th 543                                    23, 26

People v. Sims
(1993) 5 Cal.4th 405                                       21

People v. Vazquez
(1996) 51 Cal.App 4th 1277                              23, 36

People v. Witham
(1995) 38 Cal.App.4th 1283                              23, 26

<u>Federal Statutes/Codes</u>

Constitution, Amend. 4                                          5, 9

Constitution, Amend. 5                                          5, 21

Constitution, Amend. 6                                            21

<u>State Statutes/Codes</u>

Constitution, Art. I, Sec 7(a), 24, 29                          5, 8

Penal Code § 800                                                   6

Penal Code § 288.5                                          7, 23, 26

Penal Code § 803(f)                                            7, 8

///

**MEMORANDUM OF POINTS AND AUTHORITIES**

**ARGUMENT**

**I**

**PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS UNDER THE 6TH AND 14TH AMENDMENTS, IN THAT HE WAS DENIED THE RIGHT TO COMPETENT TRIAL COUNSEL**

## Introduction

The California and United States constitutions guarantee that a defendant, in a criminal proceeding, will have a competent atto-rney to uphold and protect his or her rights regardless of the accusations.

Here, in February, 2004, Petitioner's step-daughter, Corina, went to police and filed a report accusing Petitioner of sexually abusing her from 1993 to 1998. After taking Corina's report, police Officer Joe Alioto reported that Corina's accusations were not credible enough to arrest Petitioner, but were credible enough to investigate, and interview him to get his side of the story. The following day, Officer Alioto went to Petitioner's house, but in-stead of interviewing him, Officer Alioto handcuffed Petitioner, placed him under arrest, and then took him down to police head-quarters to be interrogated. These actions resulted in Petitioner making inculpatory statements, which, the police used to charge him with (1) continuous sexual abuse; and (2) lewd and lascivious acts.

Before trial, defense counsel Paula Weikal, moved to dismiss (1) Petitioner's inculpatory statements to Officer Alioto; and (2) his taped confession at the police station,--in that he was never read his miranda rights. Although the court held an evidentiary hearing, wherein it found that Petitioner's admissions to Officer

1

1 | Alioto were voluntary, the court at no time made a finding of fact
2 | as to whether Officer Alioto, or any police officer, read Petitioner
3 | his miranda rights; nonetheless, Petitioner's inculpatory state-
4 | ments were introduced to the jury.

5 | At trial, the prosecutor asked Corina if Petitioner sexually
6 | abused her; although she answered "yes," she, however, was unable to
7 | provide any information as to (1) when she was abused; and (2) how
8 | many times Petitioner abused her, stating "I don't know" and "I
9 | don't remember."

10 | Consequently, Petitioner was not provided with a competent
11 | trial attorney as guaranteed by the state and federal constitutions.
12 | Specifically, counsel's incompetence resulted from, among other
13 | things, the cumulative effect of the following specific acts and
14 | omissions:

15 | (1) once Petitioner was arrested, counsel failed to bring to the
16 | court's attention the fact that the statute of limitations
17 | for all charges of sexual abuse had run out, and thus the
18 | court did not have jurisdiction to try Petitioner;

19 | (2) before trial, counsel failed to raise the claim that Peti-
20 | tioner was arrested without probable cause, and that his
21 | admissions to police should have been excluded as "fruit of
22 | the poisonous tree";

23 | (3) before making inculpatory statements to police, Petitioner
24 | was not read his miranda rights, thus counsel failed to make
25 | sure the taped confession was excluded at trial; and
26 |

27 | (4) after the prosecution presented its case-in-chief, trial
28 | counsel failed to request that all charges be dismissed, in

2

1    that the prosecutor failed to prove all the elements of the

2    sexual abuse (specifically, when the abuse occurred, and

3    how often).

4

5   a. **Standard of Review for Ineffective Assistance of Counsel Claim**

6        Both the state and federal governments provide state prisoners

7   the opportunity to show that he or she was deprived of a competent

8   trial attorney. In that respect, a state prisoner may file a peti-

9   tion for writ of habeas corpus in the state courts where he or she

10  resides, providing facts as to the theory of how and why trial coun-

11  sel was ineffective. Initially, when the prisoner files the habeas

12  petition, he or she need not "prove" the claim of ineffective coun-

13  sel. Instead, the court requires the prisoner to only make a "prima

14  facie" showing; meaning, Petitioner's factual allegations are taken

15  as true, and if those facts would entitle him or her to relief,

16  than the Petitioner has made a prima facie showing. (See Cal. Rules

17  of Court, Rule 4.551(c); Nunes v. Mueller,[1] state court"should not

18  have required [petitioner] to prove his claim without affording

19  him an evidentiary hearing.")[2]

20       Although Petitioner--at this stage--is not required to prove

21  his claim of ineffective counsel; Petitioner, here, nonetheless,

22  asserts that trial counsel's performance fell below the reasonable

23  standard set forth in the state and federal constitutions.

24       Generally speaking, both constitutions require that counsel

25  _____

26  1.  (2003) 350 F.3d 1045 (9th Cir.)

    2.  Id. at 1054.

27

28

                                3

be "effective," (Powell v. Alabama;[3] People v. Ibarra;[4] In re Sand-
ers[5]), and "reasonably competent" when "acting as [the defendant's]
conscientious advocate." (See People v. Pope;[6] and Strickland v.
Washington.[7]) To test whether counsel was not "effective" or
"reasonably competent," a petitioner must make two showings. First,
the Petitioner must show that "counsel's performance was dificient"
(see People v. Ledesma;[8] Strickland v. Washington[9].) To prove difi-
ciency of counsel, Petitioner "must establish that counsel's rep-
resentation fell below an objective standard of reasonableness . . .
under prevailing professional norms." (See Ledesma, supra;[10] and
Strickland, supra;[11]) And second, that counsel's deficiencies were
prejudicial. (See Ledesma, supra;[12] Strickland, supra[13].)


### Trial Counsel's Acts and Ommission at Preliminary hearings and at Trial fell below the reasonable standard guaranteed under the State and Federal Constitutions

Both the California and Federal Constitutions guarantee a
criminal defendant to (1) an effective attorney; and (2) due process

---

3. (1932) 287 U.S. 45, 72
4. (1963) 60 Cal.2d. 460, 464
5. (1970) 2 Cal.3d 1033, 1041
6. (1979) 23 Cal.3d 412, 423
7. 466 U.S. 668, 668-695
8. (1987) 43 Cal.3d 171, 215
9. supra, at 687-688.
10. supra, at 216.
11. supra, at 687-688.
12. supra at 218.
13. supra, at

///

4

1 | of law. (See California Constitution[14] and U.S. Constitution[15].)

2 | Here, Petitioner's trial counsel made several mistakes that

3 | resulted in him being convicted; where, otherwise, Petitioner

4 | would have been acquitted of all charges. As such, Petitioner sets

5 | forth below the four errors of trial counsel that resulted in a

6 | violation of his state and federal rights.

7

8  **1. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING**
   **TO THE COURT'S ATTENTION THE FACT THAT THE STATUTE**
9  **OF LIMITATIONS FOR ALL CHARGES OF SEXUAL ABUSE HAD**
   **RUN OUT AND THUS THE COURT DID NOT HAVE JURISDICTION**
10 **TO TRY PETITIONER**

11 | Introduction

12 | The Due Process Clause of the 14th Amendment to the United

13 | States Constitution protects persons from being convicted of crimes

14 | where the statute of limitations to charge that person has run out.

15 | Here, the prosecutor charged Petitioner with committing several,

16 | sexual acts with his step-daughter, in violation of Penal Code 288.5

17 | and 288(b)(1). Those statutes, however, required that the victim

18 | report the acts to police no later than six years after the acts took

19 | place. But Petitioner's step-daughter did not report the acts until

20 | six years and six months after the act took place. Accordingly, then,

21 | since the statute of limitations to charge Petitioner had run out,

22 | the court did not have jurisdiction to try Petitioner, and therefore

23 | counsel's failure to bring this to the court's attention violated

24 | Petitioner's right to (1) have a competent attorney; and (2) Due

25

26 | 14. Art. I, Sec §§ 7(a), 24, 29.

27 | 15. Amend. 5 and 14.

28 | ///

1  Process of Law.

2

3  **A. Relevant Law**

4     Generally, the statute of limitations period protects criminal
5  defendants during the prearrest and preaccusation stages (see U.S.
6  v. Marion[16]), while the due process clause protects criminal def-
7  endants after the statute of limitations has expired and before the
8  right to a speedy trial has attached, that is before the defendant
9  is arrested or a complaint is filed.(See People v. Martinez;[17] and
10 People v. Cattin[18].)

11     Penal Code § 800 establishes a statute of limitations for all[19]
12 crimes that are punishable by eight years or more. However, if the
13 particular crime is a "sex crime," § 803 permits prosecution for
14 those crimes where "[t]he limitation period specified in [prior
15 statute of limitation's] has expired"--provided that (1) a victim
16 has reported an allegation of abuse to the police; (2) [t]here is
17 independent evidence that corroborates the victim's allegations; and
18 (3) the prosecution is begun within one year of the victim's re-
19 port.

20

21 **B. Relevant Facts**

22    On August 9, 2004, Petitioner's step-daughter, Corina, made a
23 complaint to police that Petitioner had sexually abused her from
24 1993 to 1998. (Exhibit B.) Accordingly, on March 4, 2005, the

25

26    16. (1971) 404 U.S. 307, 322-333  30 L.Ed.2d 468
27    17. (2000) 26 C.4th 750, 765 767
      18. (2001) 26 Cal.4th 81, 107
28    19. All statutory references are to the Penal Code unless otherwise specified.

6

1  prosecutor charged Petitioner, under § 288.5, with one count of

2  committing "continuous sexual abuse" on Corina between February

3  22, 1993 to February 21, 1996; and 19 counts, under § 288(b)(1),

4  of committing "lewd and lascivious" acts with Corina between Feb-

5  ruary 22, 1996 to February 21, 1998. (Exhibit B .)

6

7  **C. Under Penal Code § 800, The Statute of Limitations To Charge
   Petitioner Had Run Out, Thus Counsel's Failure To Bring This**

8  **To The Court's Attention Was A Violation Of His State And
   Federal Rights To (1) An Effective Attorney; (2) Due Process;**

9  **And (3) Equal Protection**

10  Petitioner was charged with sexually abusing Corina from Feb-

11  ruary 22, 1993 to February 21, 1998. As such, in order for the pro-

12  secutor to have met the statute of limitations, Corina must have

13  reported the alleged abuse to the police no later than February 21,

14  2004. But that did not happen. Instead, Corina made her complaint

15  to police on August 9, 2004. Thus, the statute of limitations to

16  charge and/or convict Petitioner had ran out.

17  Although one may argue that § 803(f) "revives" the statute of

18  limitations where there is "independent evidence that corroborates

19  the victim's allegations," that argument fails for one reason. The

20  only evidence that existed when Corina made her report to police

21  were her allegations, which, standing alone, did not provide "evid-

22  ence" that was "independent" to her allegations. (See People v.

23  Mabin,[20] (Evidence that defendant was previously charged for sexual

24  offence was "independent" to victim's "allegations."[21])

25  _____

26  20. 92 Cal.4th 654, 657  112 Cal.Rptr.2d 159.

27  21. Id. at 657.

28  ///

1 | And, that Petitioner made inculpatory statements is irrele-
2 | vant, in that § 803(f) requires that the independent evidence exist
3 | at the moment the victim made her allegations. But even if the
4 | inculpatory     statements could corroborate Corina's allegations
5 | (which they do not) those statements were not valid as a matter of
6 | law. (See subclaims 2, 3, and 6.)

7 | Accordingly, because (1) the statute of limitations on the
8 | charges against Petitioner had run out; and (2) the court did not
9 | have jurisdiction to try Petitioner; counsel's failure to bring the
10 | above to the court's attention was prejudicial; --for, if brought
11 | to the court's attention, the court would have had no choice but to
12 | dismiss all charges against Petitioner, thus violating his state
13 | and federal constitutional rights to (1) effective counsel; (2)
14 | due process; and (3) equal protection. (See California[22] and U.S.[23]
15 | Constitutions.)

16 |

17 | **2. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING TO THE**
18 | **COURT'S ATTENTION THAT PETITIONER WAS ARRESTED WITHOUT**
**PROBABLE CAUSE, THEREBY VIOLATING HIS CONSTITUTIONAL RIGHT**
19 | **UNDER THE FOURTH AMENDEMNT; AND ACCORDINGLY, UNDER THE**
**EXCLUSIONARY RULE, ALL EVIDENCE GENERATED BY POLICE AFTER**
20 | **PETITIONER'S ARREST SHOULD HAVE BEEN EXCLUDED**

21 | ### Introduction

22 | The Fourth Amendment to the U.S. Constitution protects all
23 | persons from unreasonable searches and seizures. Here, Corina made
24 | allegations to police that Petitioner had, over a course of many

25 |
26 | 22. Art. I, Sec §§ 7(a), 24, 29.
   | 23. Amend. 5 and 14.
27 |
28 | ///

8

1  years, sexually abused her. The officer in charge of taking Cor-
2  ina's report, stated in the report that he did not have probable
3  cause to arrest Petitioner because (1) the alleged crimes occurred
4  several years in the past; (2) the officer still had to obtain Peti-
5  tioner's side of the story; and (3) the crimes could have been of
6  a misdemeanor nature. The police officer went to Petitioner's house,
7  but at no time obtained Petitioner's side of the story, nor did the
8  officer inquire into his belief that the crimes were merely a mis-
9  demeanor; instead, the officer arrested Petitioner, resulting in
10 him being arrested without probable cause. Accordingly, trial coun-
11 sel's failure to bring this to the court's attention was a viola-
12 tion of (1) his Fourth Amendment right; (2) right to have the
13 state's evidence excluded as "fruit of the poisonous tree"; and (3)
14 and his right to effective counsel.

15

16 ## A. Relevant Law

17     The Fourth Amendment of the United States Constitution governs
18 all searches and seizures conducted by government agents. That
19 Amendment contains two separate clauses: a prohibition against un-
20 reasonable searches and seizures, and a requirement that probable
21 cause support each warrant issued. (See U.S. Const. Amend. Four.)
22 Interpreted literally, the Fourth Amendment requires a government
23 agent to have probable cause before obtaining a warrant or probable
24 cause before seizing and searching a person.

25     Probable cause, then, is required to justify governmental
26 intrusions upon interests protected by the Fourth Amendment.
27 ///
28 ///

9

1 | The United States Supreme Court, in Beck v. Ohio,[24] held that pro-
2 | bable cause to obtain an arrest warrant or to conduct a warrantless
3 | arrest exists when police have, at the moment of arrest, knowledge
4 | of facts and circumstances grounded in reasonable trustworthy info-
5 | rmation and sufficient in themselves to warrant a belief by a pru-
6 | dent man in believing that the arrested person committed or was
7 | committing an offense. (See Beck.)[25]

8 | Because probable cause refers back to the "knowledge" and
9 | "facts" in possession of the individual officer as applied solely
10 | to the "circumstances" of the individual case, the Court has dec-
11 | lined to formulate a "bright line rule" (see U.S. v. Sharpe)[26] that
12 | a court may apply to all cases to determine at what point the facts
13 | and knowledge (held by the particular officer) developed in pro-
14 | bable cause. (See Sibron v. New York.)[27] Rather, in Illinois v.
15 | Gates,[28] the Court held that Fourth Amendment claims must be rev-
16 | iewed on a case-by-case analysis using the "totality-of-the-circum-
17 | stances approach."[29]

18 | To this, the Court explained that the probable cause determina-
19 | tion is two fold and that each step warrants its own assessment.
20 | First, judges must determine the "historic facts," that is, the

21 |

22 | 24. (1064) 379 U.S. 89, 85 S.Ct 223 13 L.Ed.2d 142
   | 25. Id. at 91.
23 | 26. (1985) 470 U.S. 675, 685
24 | 27. (1968) 392 U.S. 40, 59 88 S.Ct 1889 20 L.Ed.2d 917
25 | 28. (1985) 462 U.S. 213
26 | 29. Id. at 231.

27 | ///
28 | ///

10

1  events that occurred leading up to the stop or search. Second, the
2  judge must decide "whether these historical facts, viewed from the
3  stand point of an objectively reasonable police officer," amount to
4  probable cause. (See Ornelas v. U.S.;[30] also see Beck, [when the
5  constitutional validity of an arrest is challenged, it is the fun-
6  ction of the court to determine the facts available to the officer
7  at the moment of arrest; it is the function of the court to deter-
8  mine whether the facts available to the officer at the moment of
9  arrest would "warrant a man of reasonable caution in the belief that
10 an offence has been committed.[31]

11     This form of review, the Court held, is necessary because
12 articulating precisely what "reasonable suspicion" and "probable
13 cause" mean is not possible. --They are common sense, nontechnical
14 conceptions that deal with "'the factual and practical considera-
15 tion of everyday life on which reasonable and prudent men, not
16 legal technicians, act"; finding, that "[o]ne simple rule will not
17 cover every situation. (See Illinois;[32] also see Beck, [court can
18 not properly discharge its fourth amendment analysis unless it
19 obtains all necessary facts.].)[33]

21     **B. Relevant Facts**

22     On August 9, 2004, Corina went to police complaining that Peti-
23 tioner sexually abused her from 1993 to 1998.

25 30. (1996) 517 U.S. 690
26 31. supra, at 91.
27 32. supra, at 231, quoting Brinegar v. U.S., (1949) 338 U.S. 160, 175
28 33. supra, at 96.

11

1    The following day, Petitioner was made aware by his wife that
2 Corina had made said allegations, and that a police officer was
3 going to come to the house to interview him. (Exhibit C .) Upon
4 hearing this information, Petitioner became upset, and asked his
5 wife how Corina could make such allegations against him. (Exhibit C.)
6 A couple of hours later, and after a heated discussion between Peti-
7 tioner and his wife, there was a knock on the door. There, standing
8 on the porch was Police Officer Joe Alioto. Upon seeing the Officer,
9 Petitioner opened the door, at which time he stated "I know why
10 you're here"; Officer Alioto ordered Petitioner to exit the house,
11 handcuffed him, and placed him in the back seat of his patrol car,
12 never having a chance to speak. (Exhibit C.)

13    Before trial, Officer Alioto testified at a preliminary hearing
14 that he did not go to Petitioner's house to arrest him, for he had
15 no probable cause to do so, in that (1) Corina's allegations were
16 not credible enough to make him believe that a crime was committed
17 (Exhibit D, p.1);(2) the allegations could be misdemeanor type crimes
18 (Exhibit D, p.2);and (3) Officer Alioto still had to get Petitioner's
19 side of the story. (Exhibit D.) But that because of statements by
20 Petitioner that he sexually abused Corina, that he had no choice
21 but to arrest Petitioner. (Exhibit D, p. 1.)

22    In relevant part, the following took place at the preliminary
23 hearing:

24  Q: [by defense counsel] And when you knocked on the door and he
25     [Petitioner] answered the door and you had that initial
26     conversation, in your opinion was he free to leave at that
27     point?
28 ///

12

1    A: [by officer Alioto] Absolutely.

2  (Exhibit E, p.1.)

3    Q: And were you not there really to arrest him, weren't you?

4    A: No I was not.

5    Q: Why were you there?

6    A: I was there to get his side of the story.

7  (Exhibit E, p. 2.)

8    Q: And so when he -- when Mr. Prunty first answered the door and
9        said I know why you're here because of lewd acts, because I
10       committed lewd acts on my step daughter, given what you heard
11       from the alleged victim is it your testimony, sir, that you
12       did not inform the intent at that time to take this man to
13       jail?
14   A: The reason I say no is because the acts had occurred several
15       years prior to the contact. I had no idea at that point
16       whether they were just merely touching misdemeanor type
17       assaults or felony type assaults.
18  (Exhibit D, pp. 1-2.)
19
20   Q: Did you ask him to -- which categories of sexual contact he
21       had with the alleged victim?
22   A: Well, he pretty much clarified by saying he touched her
23       breasts and genitalia and likewise so I didn't -- that's at
24       the point where I told him you are under no obligation to
25       talk to me.
26  (Exhibit E, p. 1.)
27  ///
28  ///

13

1  Q: SO it -- it -- it's fair to say he wasn't free to leave after

2      those words came out of his mouth?

3  A: Correct.

4  Q: And this was approximately 12:15?

5  A: Yes.

6  Q: And then you stated that you transported him in your -- or

7      you actually handcuffed him in the back of you patrol car; is

8      that right?

9  A: Yes.

10  (Exhibit D, p. 3.)

11  C. **Petitioner's Constitutional Rights Under The Fourth Amend-
     ment Was Violated, In That, Contrary To Officer Alioto's
12     Testimony, Petitioner was Arrested before making the alleged
     Inculpatory Statement; Thus Counsel's Failure To Bring This
13     To The Court's Attention Deprived Petitioner Of His Right To
     Competent Counsel; Due Process; And Equal Protection**

14
     As previously mentioned, if a government agent is to seize or
15
  arrest a private citizen, the Fourth Amendment requires that agent
16
  to have probable cause before obtaining a warrant or probable cause
17
  before seizing and searching that person. Here, Officer Alioto had
18
  neither.
19
     At the preliminary hearing, Officer Tinsdale testified that
20
  Corina's allegations, as he (an officer) saw them were not credible
21
  enough to seize (arrest) Petitioner, but only sufficient to follow-
22
  up and get Petitioner's side of the story. (Exhibit E .) (See Beck,
23
  [to have probable cause, officer must have, at the moment of arrest,
24
  "trustworthy information" to warrant a belief by a prudent man in
25
  believing that a crime was committed.)[34] Put simply, Officer Alioto
26

27  _____

    34. supra, 379 U.S. at 91.
28

14

1  as the person who took the report, was the only person who had the
2  chance to observe Corina's demeanor, and judge her allegations as
3  to whether they were "trustworthy" enough to arrest Petitioner, and
4  did not believe that a crime had been committed. Accordingly, Offi-
5  cer Alioto did not have the right to seize Petitioner, that is,
6  unless he obtained more information that would have led him to bel-
7  ieve that the alleged crimes had been committed.

8      But Officer Alioto did not obtain any more information. Inst-
9  ead, Officer Alioto went to Petitioner's house, and before speak-
10  ing with him, handcuffed and arrested him. (Exhibit C .) Thus, Peti-
11  tioner was arrested without probable cause.

12      That Officer Alioto testified at the preliminary hearing that
13  he went to Petitioner's house to get his side of the story is not
14  true. The transcript shows that Officer Alioto stated that he went
15  to Petitioner's house, and was told by Petitioner "I know why you're
16  here, because I committed sexual lewd acts with my step-daughter. "
17  (Exhibit D .) Not knowing whether the sex acts were of misdemeanor
18  or felony type, he initiated a 10 minute interview with Petitioner
19  (Exhibit D ), wherein he obtained information that led him to believe
20  that Petitioner had committed the acts, and accordingly, arrested
21  Petitioner. (Exhibit D .) However, this testimony is false; for,
22  there is no such thing as misdemeanor sexual lewd acts against a
23  minor. As far as the penal code is concerned, any person who comm-
24  itts a sexual lewd against a minor is guilty of a felony, there is
25  no law that suggests that such conduct could be a misdemeanor.

26      Therefore, Officer Alioto's testimony that he conducted a 10
27  minute interview into supposed misdemeanor sex acts is not true, no
28  such interview ever took place. Accordingly, Petitioner was arrested

1 | without probable cause, and counsel's failure to bring this to the
2 | court's attention was prejudicial. The court, upon finding that
3 | Petitioner was arrested without probable cause, would have had no
4 | choice but to exclude Petitioner's confession from the trial as
5 | "fruit of the poisonous tree," thus Petitioner would have received
6 | an acquittal, or a lighter sentence. Consequently, violating Peti-
7 | tioner's constitutional right to a competent attorney.

8

9  **3. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING TO THE
   COURT'S ATTENTION THAT BEFORE PETITIONER WAS ARRESTED, POLICE
10  DID NOT READ HIM HIS RIGHTS UNDER MIRANDA V. ARIZONA, THUS
   VIOLATING HIS CONSTITUTIONAL RIGHTS UNDER THE 5TH AMENDMENT**

11

### Introduction

12

13 | The 5th Amendment to the United States Constitution protects
14 | defendant's, during a criminal proceeding, from testifying against
15 | oneself. In Arizona v. Miranda, the United States Supreme Court
16 | held that the principle against self-incrimination must be applied
17 | as early as the moment the defendant is arrested; holding, that a
18 | police officer is required to inform the arrestee that he or he has
19 | the right to remain silent.

20 | Here, Petitioner was not read his miranda right before or
21 | after being arrested. As a result, Petitioner made inculpatory
22 | statements that the prosecutor planned to use against him at trial.
23 | During preliminary hearings, Petitioner's attorney filed a motion
24 | requesting that the court hold an evidentiary hearing to see if (1)
25 | Petitioner's admissions to Officer Alioto before his arrest were
26 | voluntary; and (2) if Petitioner was read his miranda rights. The
27 | Court held a hearing, although it found that Petitioner's admiss-
28 | ions to Officer Alioto were voluntary; at no time did the court make

16

1 a finding as to whether Petitioner was ever read his miranda rights.

2    Thus, because the court failed to make a finding that Peti-
3 tioner was read his miranda rights, it did not have authority to
4 allow the prosecution to introduce Petitioner's statements to the
5 jury, and counsel's failure to bring this to the court's attention
6 deprived Petitioner of (1) effective counsel; (2) due process; and
7 (3) equal protection.

8

9    **a. Relevant Law**

10    The 5th Amendment to the United States Constitution protects
11 persons immediately after their arrest--from being a witness against
12 oneself--by requiring police to advise the arrested person of his
13 or her right to remain silent. In Arizona v. Miranda,[35] the United
14 States Supreme Court held that, "[w]hen an individual is taken into
15 custody or otherwise deprived of his freedom by the authorities in
16 any significant way and is subjected to questioning, the privilege
17 against self-incrimination is jeopardized. Procedural safeguards
18 must be employed to protect the privilege."[36]

19    Those safeguards require that the suspect be advised prior to
20 any questioning as follows:

21    -- the suspect has the right to remain silent, and that anything
22       he or she says can he used against him or her in a court of
23       law;

24    -- the suspect has the right to the presence of an attorney;
25    -- if the suspect can not afford an attorney, one will be
26

27    35. (1966) 384 U.S. 436
28    36. Id. at 478.

1    appointed for him or her prior to any questioning, if he or
2        she desires.

3  See Miranda.)[37] Failure to advise the arrested person of these
4  rights is a violation of the 5th Amendment. (See Miranda, e.g.)

5      If these safeguards are not provided to an arrested person,
6  and that person makes involuntary or incriminating statements in
7  violation of miranda, there are several methods that may be used to
8  object to the statement at various stages in court proceedings.
9  Initially, counsel may object to use of the statement at the pre-
10 liminary hearing or any other pretrial hearing at which the prose-
11 cuter introduces the statement. (Evidence Code §§ 400-406.) In
12 moving to exclude a disputed confession or admission, the defendant
13 has the burden of presenting evidence on the issue of whether the
14 statement is illegal, but the prosecutor has the burden of proof as
15 to whether the statement was voluntary or in compliance with mir-
16 anda. (People v. Murtishaw.)[38] The standard of proof is prepon-
17 derance of the evidence. (People v. Markham.)[39]

18

19    **b.** Relevant Facts

20      After Petitioner's arrest, law enforcement made out a police
21 report stating that Petitioner had made incriminating statement to
22 police officers (1) upon his arrest; and (2) during his interro-
23 gation; statements, which the prosecutor intended to use at trial

24  _____

25    37. Id. at 444.
26    38. (1981) 29 Cal.3d 733, 753  175 Cal.Rptr 738.
      39. (1989) 49 Cal.3d 63, 71  260 Cal.Rptr 273.
27
    ///
28

1  against Petitioner. Prior to trial, defense counsel, Paula Weikel
2  indicated that the court should conduct a miranda hearing (as to
3  the interrogation) and a 402 hearing (as to the incriminating
4  statements made during arrest)--to see if (1) Petitioner's admiss-
5  ions were voluntary; and (2) if he was read his miranda rights
6  before the alleged confession. (Exbibit F .) Finding that both
7  issues were similar, the court decided to hold a hearing and decide
8  both issues simultaneously. (Exhibit F, p. 2.)

9      At the hearing, Officer Alioto testified, claiming that as he
10  approached Petitioner's house, Petitioner opened the door and said
11  "I've been waiting for you," and that Petitioner continued by in-
12  forming Officer Alioto that he had committed illegal sex acts with
13  Corina. (Exhibit  G.) At which time, Officer Alioto placed Peti-
14  tioner under arrest, and placed him in his car. Once in the car,
15  he turned on the car camera, and recorded himself reading Peti-
16  tioner his miranda rights. (Exhibit G, pp. 2-3.)

17      To corroborate this claim, Officer Alioto brought to the court
18  a video cassette to show the Miranda advisement; but when Officer
19  Alioto tried to play the tape, there was nothing recorded, only a
20  blue screen; at which time he suggested "that the videotape either
21  skipped or failed to record, hence the blue screen." (Exhibit H.)

22      Officer Alioto then testified to driving Petitioner to the
23  police department, where he handed him over to another officer, who
24  interrogated him, resulting in Petitioner making inculpatory state-
25  ments. (Exhibit F.)

26      After Officer Alioto's testimony, the court went into a play-
27  by-play analysis of how Officer Alioto approached Petitioner's
28  house, and how Petitioner was under no obligation to speak with him,

1   but took it upon himself to inform Officer Alioto that he had comm-
2   itted sexual acts with Corina. As such, the court found that Peti-
3   tioner's admissions at the time he encountered Officer Alioto were
4   not given in violation of the law. (Exhibit I.) The court, how-
5   ever, failed to make any findings of fact as to whether or not (1)
6   Officer Alioto read Petitioner his Miranda rights; and (2) whether
7   Petitioner's statements at the police station were voluntary.

8

9   C. **During The Evidentiary Hearing, The Court Did Not Make**
    **Any Findings As To Whether Police Read Petitioner His**
10  **Miranda Rights, And Therefore The Prosecutor Should Not**
    **Have Been Able To Present To The Jury The Taped Confession,**
11  **And Counsel's Failure To Point This Out To The Court Was A**
    **Vilation Of Petitioner's Right To A Competent Attorney**

12
        Evidence Code § 402 states that if a defendant contests the
13
    validity of a "confession or admission" the court must determine
14
    the question of "admissibility" before that evidence can be used
15
    against the defendant in a trial. (Evidence Code § 402.)
16
        Here, Petitioner challenged the validity of the taped confess-
17
    ion, by asserting that at no time did any officer inform him that
18
    he had the right to remain silent. (Exhibit F.) Although the court
19
    held a hearing in that respect, the court wanted to use the same
20
    hearing to decide the issue of whether Petitioner's admissions to
21
    Officer Alioto, upon their encounter, were voluntary. As a result,
22
    the court focused its attention to the conversation between Peti-
23
    tioner and Oficer Alioto at Petitioner's house, and never got to
24
    whether Petitioner was read his Miranda rights.
25
        Thus, because the court did not find that Officer Alioto read
26
    Petitioner his Miranda rights, the taped confession should not
27  ///
28

20

1  have been introduced at trial. (See People v. Sims,[40] [For confess-

2  ion to be valid, court must find that defendant knowingly and inte--

3  lligently waived right to remain silent]; also see People v.

4  Lewis;[41] and Miranda.[42]) And counsel's failure to bring this to the

5  court's attention was a violation of Petitioner's state and federal

6  constitutional rights to (1) effective counsel;[43] (2) Miranda

7  rights;[44] (3) due process;[45] and (4) equal protection.[46]

8

9  **4. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING TO THE
   COURT'S ATTENTION THAT THERE WAS INSUFFICIENT EVIDENCE TO**

10  **CONVICT PETITIONER AS TO COUNT 1**

11  **Introduction**

12  The Due Process clause of the 14th Amendment requires that the

13  prosecutor, in a criminal trial, prove every element of an offense.

14  Here, Petitioner was charged--under Penal Code 288.5--with one

15  count of "continuous sexual abuse" against his step daughter, Cor-

16  ina. Under the statute, the prosecutor had to prove that Petitioner

17  committed three acts of sexual abuse within a three month period.

18  At trial, Corina stated that Petitioner had touched her inappro-

19  priately, but when asked when the crimes occurred, or how often he

20  abused her, Corina was unable to give any specifics, answering "I

21  _____

22  40. (1993) 5 Cal.4th 405, 439  20 Cal.Rptr.2d 537.

23  41. (1990) 50 Cal.3d 262, 274  266 Cal.Rptr 834

24  42. See e.g.

    43. U.S. Const. Amend. Six.

25  44. U.S. Const. Amend. Five.

26  45. Cal. Const. Art. I, §§ 7(a), 24, 29; U.S. Const. Amend. 5 and 14.

    46. Id.

27

28  ///

1   don't know" and "I don't rememeber." Accordingly, then, Corina's
2   testimony was insufficient to prove that Petitioner committed three
3   acts of sexual abuse within three months; therefore, the prosecu-
4   tor did not prove every element of the crime; and counsel's fail-
5   ure to bring this to the court's attention deprived Petitioner of
6   his right to competent counsel.

7
8   **B. Relevant Law**

9   In a criminal trial, a jury can not find a defendant guilty of
10  a crime unless the prosecutor presented sufficient evidence to prove
11  every element of the crime. The test to determine sufficiency of the
12  evidence is "whether, on the entire record, a rational trier of
13  fact could find [the defendant] guilty beyond a reasonable doubt."
14  (See People v. Johnson, [47] ["Finding the task twofold. First, the
15  court must resolve the issue in light of the whole record . . . .
16  Second, the court must judge whether the evidence of each of the
17  essential elements . . . is  substantial . . ."[48]]; see also Jack-
18  son v. Virginia;[49] and People v. Barnes.[50]) Substantial evidence
19  must support each essential element underlying the verdict: "'it
20  is not enough for the respondent simply to point to 'some' evidence
21  supporting the finding.'" (See Johnson.[51]) If the facts as proved

22  _____

23  47. (1980) 26 Cal.3d. 557, 576-578.
24  48. Id. at 576-577.
    49. (1979) 443 U.S. 307, 318-319  61 L.Ed.2d 560  99 S.Ct 278.
25  50. (1986) 42 Cal.3d 284, 303.)
26  51. supra, 26 Cal.3d at 577, quoting People v. Bassett (1968) 69 Cal.2d 122,
        138.
27  ///
28
                                        22

1  equally support two inconsistent interpretations, the judgment goes

2  against the party bearing the burden of proof as a matter of law.

3  (See People v. Allen.)[52] Evidence that fails to meet this substan-

4  tive standard violates the Due Process Clause of the Fourteenth

5  Amendment and Article I, § 15 of the California Constitution. (See

6  Jackson;[53] and Johnson.[54])

7  　　　To establish guilt for a charge under Penal Code 288.5, the

8  prosecutor must prove that the defendant "engage[d] in three or

9  more acts of substantial sexual conduct" with a child under the age

10  of 14 within a three month period. (See § 288.5; People v. Rodri-

11  guez;[55] People v. Vasquez;[56] and People v. Witham,[57] ["In the case

12  of a defendant charged with violating section 288.5, the require-

13  ment of proof beyond a reasonable doubt, is that the defendant

14  engaged in at least three acts of sexual abuse with the child vic-

15  tim within the prescribed time frame."[58]].)

16

17  **B. Relevant Facts**

18  　　　On March 4, 2004, the district attorney's office filed a

19  complaint charging Petitioner--under Penal Code § 288.5--with one

20  count of "continuous sexual abuse" between February 22, 1993 to

21  February 21, 1996. (Exhibit B.)

22

23  52. (1985) 165 Cal.App.3d 616, 626, citing Pennsyvania R. Co. v. Chamberlin,
      (1933) 288 U.S. 333, 339 77 L.Ed. 819 53 S.Ct 391.

24  53. supra, 443 U.S. at 319.

25  54. supra, 26 Cal.3d at 575-578.

26  55. (2002) 28 Cal.4th 543, 550.

27  56. (1996) 51 Cal.App.4th 1277, 1287.
      57. (1995) 38 Cal.App.4th 1283, 1297.

28  58  Id.

At trial, the prosecutor asked Corina to state her earliest
memory of Petitioner doing something inappropriate to her, and how
often it would happen. Although Corrina mentioned that Petitioner
sexually abused her, she could not say what day, month, or year the
crime occurred, and was unable to say how many times it happened.
In relevant part, the following took place at trial:

Q: [by prosecutor]: Can you tell us, um, what your earliest
    memory as far as physically what he would do with you?

A: [by Corina] Second grade.

Q: Uh, when he would come into your room during the second grade,
   uh, how did this inappropriate conduct start? That is what
   were the things that he would do to you initially?

A: Like touch me in places that he wasn't suppose to touch me.

Q: Can you describe those places for us?

A: He touched my breasts, that's what he -- he would do or he
   touched -- tried to feel my vagina under like my clothes
   were on.

                *              *              *              *

Q: Okay. Um, at any point in time did, uh, he ever touch you
   under your clothes?

A: Yes.

Q. Would he ever touch you under your clothes while you were
   still living at that -- at that apartment on 4th Street?

A: Yes.

Q: Um, how long was it before he started touching you under
   your clothes?

A: I don't know.

24

1   Q: How often would he touch you under your clothes?

2   A: I don't know. A lot of times.

3   Q. Um, at any point in time did, uh, his hand touch you vagina?

4   A: Yes.

5   Q. At any point in time did his fingers go inside of your

6       vagina?

7   A: Yes.

8   Q. How often do you thing that he did that?

9   A. I don't know.

10  (Exhibit J, pp. 1-3.)

11  Q. Okay. um, how many times do you think he tried to insert a

12      finger into your vagina while you were living down there at

13      T Street -- excuse me, 4th Street? Sorry about that.

14  A. Um, I don't really know. He came into my room a lot of times,

15      all the time so --

16  (Exhibit K.)

17

18  Q. The, uh, apartment that we saw up there in People's 6, um,

19      did he engage in any other inappropriate behavior with you

20      at that apartment?

21  A: Yes.

22  Q. What, if anything, else occurred?

23  A: Um, he would take his penis out and make me touch it.

24  Q. Where?

25  A. With my hands.

26      *            *            *            *

27  Q. How often would you, uh, touch his penis?

28  A. I don't know.

Q. More than once?

A. Yes.

(Exhibit  K, pp. 1-2.)

### C. There was insufficient evidence to convict Petitioner on Count 1, And Counsel's Failure To Bring This To The Court's Attention Deprived Him of Competent Counel

A judgment must be supported by substantial evidence in light of the whole record. As previously noted, Rodriguez, Vazquez, and Whitman, hold that testimony regarding incidents without any explanation of dates or occurrences can not be regarded as substantial evidence, and this defect requires reversal of conviction.

Here, the prosecutor charged Petitioner with one count of § 288.5, claiming that Petitioner committed continuous sexual abuse on Corina between February 22, 1993 to February 21, 1996. To begin with, § 288.5 does not allow a prosecutor to charge a defendant with one count of continuous sexual abuse for a three year period. Rather, it must be for a three month period. (See. § 288.5; Rodriguez;[59] Vazquez;[60] and Whitman.[61] Consequently, the prosecutor's charging document was too broad, and not supported by law. Thus violating Petitioner's state and federal constitutional rights to due process and equal protection.

Even if the prosecutor were to have filed multiple § 288.5's

---

59. 28 Cal. 4th 543.
60. 51 Cal.App.4th 543.
61. 38 Cal.App.4th 1283.

///

///

26

to cover the three year gap, the prosecutor nonetheless could not have proved that three acts of substantial sexual abuse occurred within any three month period. At trial, the prosecutor asked Corina repeatedly if Petitioner had ever touched her inappropriately; although Corina went into some detail of sexual touching, she, however, was unable to say what day, week, or month the crime occurred, or how often it happened. (See People v. Jones,[62] [Prosecutor is required to prove that three acts occurred within a three month period.].) Therefore, there was insufficient evidence to convict Petitioner as to count 1; and counsel's failure to bring this to the court's attention was prejudicial, for the court would have had no choice but to dismiss the count.   .

### 5. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING TO THE COURT'S ATTENTION THAT THERE WAS INSUFFICIENT EVIDENCE TO CONVICT PETITIONER AS TO COUNTS 2-20

### Introduction

The Due Process Clause of the 14th Amendment requires that the prosecutor, in a criminal trial, prove every element of an offense. Here, the prosecutor charged Petitioner--under Penal Code § 288(b)(1)--with 19 counts of lewd and lascivious acts against Corina between February 22, 1996 to February 21, 1998. However, 288(b)(1) does not allow  two year gaps for each count. Rather, each count must have its own individual date as to when that particular count occurred, as to give Petitioner an idea of when that count occurred, so he or she may properly defend oneself. Accordingly, then, the prosecutor's charging document violated Petitioner's constitutional

62. (1990) 51 Cal.3d 294, 314.

1 rights to due process, and counsel's failure to bring this to the

2 court's attention deprived him of competent counsel.

3

4 **A. Relevant Law**

5 With respect to Petitioner's general rights to (1) due process

6 and (2) the prosecution's burden of proving every element of the

7 offense, Petitioner requests that this adopt section A. of subclaim

8 3. (See page 22-23.)

9 To establish guilt for a charge under 288(b)(1) the prosecutor

10 must prove that (1) on a particular date (2) Petitioner used force

11 violence, duress, menace, or fear, against a victim to arouse his

12 sexual desires. § See § 288(a) and (b)(1).) Failure to prove both

13 is a violation of due process, because it makes it impossible for

14 the jury to agree upon any specific act or acts as they pertain to

15 a particular date. (See People v. Hoez;[63] People v. Jones.[64]

16

17 **B. Relevant Facts**

18 The prosecutor charged Petitioner with 10 counts of lewd and

19 lascivious acts against Corina between February 22, 1996 to Feb-

20 ruary 21, 1997, and another 10 counts for February 22, 1997 to Feb-

21 ruary 21, 1998. (Exhibit B.)

22 During trial, the prosecutor asked Corina several questions as

23 to Petitioner forcing her to commit sexual acts with him, but at no

24 time during her testimony did she say how often he sexually abused

25 her, nor did she ever give a date as to when any of the crimes

26 _____

27 63. (1988) 200 C.A.3d 811, 814-817 246 Cal.Rptr 352

64. (1990) 52 Cal.3d 294, 309-310 270 Cal.Rptr 611.

28

28

took place. (See subclaim 4, pp.

### C. There Was Insufficient Evidence to Convict Petitioner as to Count 2-20, And Counsel's Failure To Bring This To The Court's Attention Deprived Petitioner Of Competent Counsel

The prosecution's charging document was not supported by law, and it violated Petitioner's constitutional rights to due process; for, it made it impossible for Petitioner to defend himself.

Here, the prosecutor charged Petitioner with 9 identical counts (2-10). Each count stated the same thing, that Petitioner committed lewd and lascivious acts against Corina between Fenruary 22, 1996 to February 21, 1997. And, the prosecutor charged Petitioner with 10 more identical counts (11-20). --Each count stated the same thing, that Petitioner committed lewd and lascivious acts against Corina between February 22, 1997 to February 21, 1998. But § 288(b)(1) does not allow for such broad and general language. Rather, the prosecutor was required to charge Petitioner with independent counts, each with its own date as to when that particular act occurred. (See § 288.(b)(1).) Specifically, this type of charging document makes it impossible for a defendant to defend himself. For instance, counts 2-10 are to have taken place between February 22, 1996 to February 21, 1997. Does that mean that five acts occurred in February, 2006, and five in February, 2007? Or did one act occur each month except for June and July? Or did all nine occur in one month? Petitioner did not know, and accordingly, could not defend himself.

Both the state legislature and court's have held that when it comes to charging a defendant under a general umbrella, it must be done under § 288.5, but even then, each count can not exceed a three

29

month period; here, what the prosecutor suggests is to be allowed to make one charge under § 288(b)(1), and say that the crime could have happened anytime between a 12 month period. That suggestion is too broad, and not supported by law. Thus, Petitioner's constitutional rights to due process and equal protection were violated.

Even if the prosecutor had the right to charge Petitioner in this fashion (which he did not), the prosecutor still failed to prove every element of the crime. For, to convict Petitioner the prosecutor was required to prove that Petitioner engaged in lewd and lascivious acts 19 times between said dates. But as mentioned in subclaim 4 , pp 23-26, Corina failed to mention that the acts occurred on any amount of times, and failed to mention that the crimes occurred on any particular dates; thus, counsel's failure to bring this to the court's attention was prejudicial, in that the court would have had no other choice but to dismiss all counts.

### 6. THE CUMULATIVE EFFECT OF ERRORS HEREIN DEPRIVED PETITIONER OF DUE PROCESS

The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair.(Chambers v. Missippi.)[65]

Here, trial counsel made several errors, which taken together, result in a violation of several constitutional rights, all of which resulted in Petitioner being deprived of competent counsel.

---

65. (1973) 410 U.S. 284.

///

**ARGUMENT**

**II**

**PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE REPRESENTATION OF EFFECTIVE OF APPELLATE COUNSEL**

The United States Supreme Court has held that a criminal defendant is entitled to effective representation on direct appeal. (See Evitts v. Lucey, (1985) 469 U.S. 387.)

Here, Petitioner appealed his conviction; but appellate counsel failed to raise Argument I in the direct appeal. This was the result of (1) appellate counsel not properly reading the trial transcript; and failing to obtain the client file from trial counsel, which contained the discovery material that Petitioner used to raise said claims.

Thus, appellate counsel's acts and omissions resulted in Argument I of this Petition not being raised on direct appeal. Thereby violating Petitioner's constitutional right to effective appellate counsel.

///
///
///
///
///
///
///
///
///
///

31

ARGUMENT

III

**THE TRIAL COURT ERRONEOUSLY DENIED PETITIONER'S MARSDEN MOTION FOR NEW COUNSEL. AS A RESULT, PETITIONER'S RIGHT TO COUNSEL UNDER THE SIXTH AMENDMENT WAS VIOLATED**

**Introduction**

Petitioner was dissatisfied with representation he was receiving from his appointed defense counsel. Therefore, he sought appointment of new trial counsel. The trial court denied Petitioner's request for new counsel. (RT 3/3/05; CT 1:3.) However, this ruling constituted an abuse of discretion which denied Petitioner his Sixth Amendment right to counsel.

a. **Petitioner was unconstitutionally denied his right to counsel**

It is beyond dispute that, "[T]he right of a criminal defendant to counsel and to present a defense are among the most sacred and sensitivce of our constitutional rights." (People v. Ortiz (1990) 51 Cal.3d 975, 982; accord, Kimmleman v. Morrison (1986) 477 US. 365, 374 ["The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the ligitimacy, of our adversary process . . .*** . . .[T]he right to counsel is the right to effective assistance of counsel."])

This fundamental right to counsel requires that new counsel be appointed to represent an indigent defendant when present counsel is providing ineffective assistance or where the relationship between the defendant and his or her attorney has developed into an irreconcilable conflict. (People v. Hart (1990) 20 Cal.4th 546, 603; People v. Marsden, supra, 2 cal. 3d at 124-124.)

1    Pursuant to Marsden and Hart, prior to trial, the trial court
2   allowed Petitioner to explain why he wanted new counsel appointed.
3   Petitioner informed the trial court that counsel had not inter-
4   viewed the witnesses. She "cursed" at him. He believed she had
5   divulged defense evidence to the prosecution. On the two visits
6   counsel had with Petitioner, " . . .she's ended the conversation
7   with, this conversation's over." (RT 3/3/05.)

8    counsel claimed she did not make any inappropriate comments to
9   the prosecutor nor did she reveal any confidence. However, counsel
10  agreed that communication with Petitioner " . . . has been strained
11  . . . we did have this kind of conversation or language that came
12  out. This time I did lose my cool." The conversation " . . .was
13  extremely frustrating . . . for counsel." The last visit " . . .
14  was contentious." Counsel conceded that Petitioner " . . . is corr-
15  ect there has been a strained relationship between himself and my-
16  self." She agreed that, during " . . . a lot of the jail visits,"
17  there was "frustration and breakdown in communication." (RT 3/3/05.)

18    The trial court's denial of Petitioner's trial motion consti-
19  tuted an abuse of discretion. From Petitioner's and counsel's
20  statements, and from the almost cursory cross examination of the
21  prosecutions' witnesses, it is clear the attorney-client relation-
22  ship had irretrievably broken down; they simply could not work to-
23  gether effectively and this strained relationship cause counsel to
24  represent Petitioner at trial in less than a zealous manner, Peti-
25  tioner believed that counsel had betrayed him to the prosecution.
26  Counsel expressly agreed that the relationship was strained. Obvi-
27  ously, a strained, difficult relationship precludes effective
28

33

assistance of counsel. As a result, this unproductive relationship violated Petitioner's constitutional right to counsel under the Sixth Amendment. His right to effective counsel was substantially impaired. Thus, the motion for new counsel should have been granted. (People v. Crandell (1988) 46 Cal.3d 833, 854 [new counsel should be appointed where ". . . defendant and counsel have become embroiled in such an irreconcilable conflict that no effective representation is like to result."])

As a matter of law, Petitioner provided more than sufficient cause for replacement of his trial counsel. The contentious relationship between counsel and Petitioner foreclosed any chance of cooperation and ensured that effective representation would not be forthcoming. The trial court should have granted Petitioner's motion.

### b. Conclusion

The trial court erred when it denied Petitioner's Marsden motion. As a result, Petitioner was denied his rights to counsel, effective assistance of counsel, and to present a defense under the Sixth Amendment and the California Constitution, Article I, Section 15.

**ARGUMENT**

**IV**

**PETITIONER'S PRETRIAL STATEMENTS WERE OBTAINED
IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH
AMENDMENT AND MIRANDA; AND SHOULD HAVE BEEN
EXCLUDED PURSUANT TO PETITIONER'S OBJECTION**

Introduction

Petitioner's statements to Officer Alioto and Detective Tyndale were obtained in violation of his right to remain silent under the Fifth Amendment and Miranda v. Arizona, (1966) 384 U.S. 436. Therefore, Petitioner objected to admission of the statements on the ground that Officer Alioto's conduct was likely to elicit an incriminating response from him and that the statement he gave to Detective Tyndale was a byproduct of Officer Alioto's illegal interrogation. After holding an evidentiary hearing (RT 1:51-96). the trial court denied the objection. (RT 1:90-93.) however, as a matter of law, this ruling was wrong and severely prejudicial to Petitioner. His rights to due process, a fair trial, to remain dilent, and fundamental fairness under the Fifth, Sixth, and Fourteenth Amendments were violated.

a. **The Facts**

At the evidentiary hearing, Officer Alioto testified that, prior to going to Petitioner's residence on August 10, 2004, he had spoken with Corina. Corina had described to Officer Alioto " . . . over a period of years . . . touching and fondling for sexual gratification." Alioto agreed he ". . . had some knowledge of . . .why [he was] arresting Mr. Prunty." (RT 1:54-55, 72-74.)

A "little after noon, . . ." Officer Alioto knocked on Petitioner's door. He answered and said " . . .I've been waiting for

35

you. I'm on the phone with the CPS worker right now." Officer
Alioto spoke to the CPS worker " . . .for . . .a matter of seconds
. ." (RT 1:55, 63, 66) and, without informing Petitioner of his
Miranda rights, interrogated him for "about 10 minutes approxima-
tely." (RT 1:68.) Officer Alioto asked "Why am I here?" Petitioner
stated that there had been inappropriate acts between him and Cori-
na. Officer Alioto asked Petitioner to " . . . clarify what you
meant by lewd acts." Petitioner stated " . . . those acts including
touching of genitalia." (RT 1: 55-56, 68-69, 70.) After obtaining
these inculpatory statements, Officer Alioto, for the first time,
told Petitioner he was under no obligation to talk to him and to
not say anything else until the Miranda warnings were given. (RT
1: 56, 69, 71.)

Petitioner was handcuffed and placed in the rear of a police
car at about 12:30 p.m. Officer ALioto began to transport Petitioner
to police headquarters at around 1:00-1:15. Prior to starting tran-
sportation, Officer Alioto allegedly read Petitioner his Miranda
rights from a police department issued card. Officer Alioto claims
Petitioner understood these right. On the way to headquarters, Off-
icer ALioto continued to discuss the case with Petitioner. (RT 1:
56-59, 66-67, 75.)

The drive to police headquarters took about 20 minutes. (RT
1:58.) At headquarters, Officer Alioto spoke with Detective Tyndale
and "described the situation." Petitioner was interviewed by Det
ective Tyndale. (RT 1:58, 77-78.) The interview started at 2:27
(CT 3: 601), over an hour after the Miranda warnings allegedly had
been given by Officer Alioto. Detective Tyndale did not inform Pet-
itioner of his Miranda rights prior to the interrogation. The

trascript shows the following coloquy:

Det. Tyndale: Okay. Okay, the officer that brought you in, --

Mr. Prunty:    Uh-huh.

Det Tyndale:   Um, he advised you of your rights?

Mr. Prunty:    Uh-huh.

Det. Tyndale: You know and he said you were willing to talk to
              us --

Mr. Prunty:    Uh-huh.

Det. Tyndale: -- and answer some questions? Um, why don't we
              just start form the beginning? Kind of run down
              real quick for me.

Mr. Prunty:    Okay. (CT 2: 492.)

Petitioner thereafter made a lengthy statement regarding the comm-
ission of many sex offenses with Corina. The recorded statement was
played at trial. (RT 1: 208-210.) Petitioner's statements to Offi-
cer Alioto made during the interrogation in Petitioner's residence
were also admitted. (RT 1: 190-191.)

### b. Petitioner's statements were obtained in violation of the Fifth Amendments and Miranda v. Arizona

The Fifth Amendment to the United States Constitution guaran-
tees that "No person . . . shall be compelled in any criminal case
to be a witness against himself." To ensure compliance with this
fundamental right, the Court in Miranda v. Arizona, supra, 384 U.S.
at 444, held:

> "[T]he prosecution may not use statements, whether
> exculpatory or inculpatory, stemming from custodial
> interrogation of the defendant unless it demonstrates the use

37

of procedural sage-guards effective to secure the privilege
against self-incrimination. by custodial interrogation, we
mean to question initiated by law enforcement officers after a
person has been taken into custody or otherwise deprived of
his freedom of action in any significant way. As for the
procedural safeguards. to be employed, unless other fully
effective means are devised to inform accused person of their
right of silence and to assure a continuous opportunity to
exercise it, the following measures are required. Prior to
any questioning, the person must be warned that he has a
right to remain silent, that any statement he does make may
be used as evidence against him, and that he has a right to
the presence of an attorney, either retained or appointed.
The defendant may waive effectuation of these right, pro-
vided the waiver is made voluntary, knowingly and intelli-
gently."

(Accord, New York v. Harris, (1990) 495 U.S. 14, 20 ["Statements
taken during legal custody would of course be inadmissible . . . of
Miranda warnings were not given . . ."]; Rhode Island v. Innis
(1980) 446 U.S. 291, 297-298' People v. Aguilera (1996) 51 Cal.App.
4th 1151 1160-1161.)

"'[I]nterogation under Miranda refers not only to express
questioning, but also to any words or actions on the  part of the
police . . . that the police should know are reasonable likely to
elicit an incriminating response . . ." (Rhode Island v. Innis,
supra 446 U.S. at 300-301; People v. Mosley, (1999) 73 Cal.App.4th
1081, 1089 ["For Miranda purposes, interrogation is defined as any
words or actions on the part of the police that the police should

38

1 know are reasonably likely to elicit an incriminating response"];
2 People v. Aguilera, supra 51 Cal.App.4th at 1161.)

3    In Missouri v. Seibert, (2994) 542 U.S. 600, 609-617, the Court
4 held that where, as here, the police deliberately omitted the Mira-
5 nda warnings during an initial interrogation in which the suspect
6 confessed, a subsequent Mirandized confession is inadmissible. (Acc-
7 ord, United States v. Williams (9th Cir. 2006) 435 F.3d 1149, 1150
8 [" . . .a trial court must suppress post warning confessions obtain-
9 ed during a deliberate two-step interrogation where the midstream
10 Miranda warning . . . did not effectively apprise the suspect of
11 his rights."] Cooper v. State (Md.App.2005) 163 Md.App.70, 74   877
12 A.2d 1095, 1097.)

13    Here, when Officer Alioto arrived at Petitioner's residence,
14 he knew that Petitioner had been molesting Corina for a number of
15 years. As soon as Petitioner said, "I've been waiting for you . . .
16 " Officer Alioto, who appeared to be a reasonable officer, knew
17 that Petitioner had made made an inculpatory statement corrobora-
18 tive of the criminal molestation claims. Clearly, Officer ALioto
19 would not have permitted Petitioner to leave. Officer Alioto also
20 knew that any questioning would certainly elicit incriminating
21 statements, yet he interrogated Petitioner for 10 minutes without
22 advising him of his Miranda rights and obtained a confession before
23 telling Petitioner he had no obligation to answer the officer's
24 questions. As a matter of law, the Fifth Amendment was violated;
25 all statements to Officer Alioto subsequent to "I've been waiting
26 . . ." should have been suppressed.

27    The lengthy statement given to Detective Tyndale also should
28 have been suppressed. First, Detective Tyndale never read the

1    Miranda rights to Petitioner prior to the start of the interroga-
2    tion. And second, pursuant to Seiber, supra, the police strategy
3    of obtaining an unwarned statement at Petitioner's house was
4    adopted to undermine the salutary principles of Mirnada. The un-
5    warned interrogation at Petitioner's residence lasted for 10 minu-
6    tes. Petitioner informed Officer Alioto " . . . that there had been
7    inappropriate behavior, inappropriate acts between he and the vic-
8    tim" (RT 1:55) and gave " . . . his explanation of those acts incl-
9    uding touching of genitalia." (RT 1:69.) Detective Tydale's interr-
10   ogation commenced at 2:27 p.m. (CT 2:491), about one hour, 15 min-
11   utes or so after Officer Alioto allegedly read the Miranda rights.
12   No one ever told Petitioner that the warning regarding "anything
13   he said could be used against him: also applied to his previous,
14   unwarned statement. Petitioner could very well have been under the
15   ipression that Detective Tyndale's interrogation was nothing more
16   than a continuation of Officer ALioto's un-Mirandized questioning.
17   As in Seiber, the warnings given 75 minutes before Tyndale's inte-
18   rrogation did not " . . . convey a message that [he] retained a
19   choice about continuing to talk." (542 U.S. at 617.)
20
21      c. **Conclusion**
22       The trial court perpetuated the violation of Petitioner's
23   Fifth Amendment and Miranda rights when it denied his suppression
24   motion. This Court cannot say beyond a reasonable, that, if Peti-
25   tioner's statements had been suppressed, a result more favorable
26   to hm would not have occurred.
27
28

40

# VERIFICATION

STATE OF CALIFORNIA
COUNTY OF IMPERIAL

(C.C.P. SEC. 446 & 2015.5; 28 U.S.C. 1746)

I, **Larry Prunty** _____ DECLARE UNDER PENALY OF PERJURY THAT: I AM THE **Petitioner**
IN THE ABOVE ENTITLED ACTION. I HAVE READ THE FOREGOING DOCUMENTS AND KNOW THE CONTENTS THEREOF
AND THE SAME IS TRUE OF MY OWN KNOWLEDGE EXCEPT AS TO MATTERS STATED THEREIN UPON INFORMATION,
AND BELIEF, AND AS TO THOSE MATTERS, I BELIEVE THEM TO BE TRUE.

EXECUTED THIS _____8_____ DAY OF **March** _____ AT _____
CALIPATRIA STATE PRISON, CALIPATRIA CALIFORNIA 92233-5002

(SIGNATURE)
DECLARANT/PRISONER

---

# PROOF OF SERVICE BY MAIL

(C.C.P. SEC. 1013 (a) & 2015.5 28 U.S.C. 1746)

I, **Bismarck Ceja** _____ AM A RESIDENT OF CALIPATRIA STATE PRISON, IN THE COUNTY OF
IMPERIAL, STATE OF CALIFORNIA, I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE AND AM / AM NOT A
PARTY OF THE ABOVE ENTITLED ACTION. MY STATE PRISON ADDRESS IS P.O. BOX 5002, CALIPATRIA STATE PRISON,
CALIPATRIA, CALIFORNIA 92233-5002.
ON **March 8, 2008** . IS SERVED THE FOREGOING
:

**PETITION FOR WRIT OF HABEAS CORPUS AND
A REQUEST TO STAY HABEAS PROCEEDINGS**

SET FORTH EXACT TITLE OF DOCUMENTS SERVED

ON THE PARTY(S) HEREIN BY PLACING A TRUE COPY(S) THEREOF, ENCLOSED IN A SEALED ENVELOPE(S) WITH
POSTAGE THEREON FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT BOX SO PROVIDED AT
CALIPATRIA STATE PRISON, CALIPATRIA, CALIFORNIA 92233-5002.

Northern District court
P O Box 1306
Eureka, CA
95502

THERE IS DELIVERY SERVICE BY UNITED STATES MAIL AT THE PLACE SO ADDRESSED, AND THERE IS REGULAR
COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE PLACE SO ADDRESSED. I DECLARE
UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

DATE  March 8, 2008 .    Bismarck Cej
(DECLARANT / PRISONER)

APPENDIX   A

APP A.

FILED

SEP - 7 2006

NOT TO BE PUBLISHED

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT

**COPY**

BY_____ Deputy

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

THE PEOPLE,

      Plaintiff and Respondent,

    v.

LARRY PRUNTY,

      Defendant and Appellant.

C051285

(Super. Ct. No.
04F06958)

A jury convicted defendant Larry Prunty of continuous sexual abuse of a child and 19 counts of forcible lewd and lascivious acts with a child under 14 years of age. He was sentenced to an aggregate term of 126 years in state prison.

On appeal, defendant contends (1) the trial court erred in not excluding evidence of statements that defendant claims were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (hereafter *Miranda*)), (2) there is insufficient evidence that he committed the offenses by use of force or duress, (3) the court should have granted his *Marsden* motion (*People v. Marsden* (1970)

SEE CONCURRING OPINION



EXHIBIT A

2 Cal.3d 118 (hereafter *Marsden*)), (4) his due process rights were violated when the jury gave the trial judge a birthday gift, and (5) the imposition of a \$20 security fee violated the prohibition against ex post facto laws.  We shall affirm the judgment.

FACTS

Defendant sexually abused his stepdaughter between 1993 and 1998, starting when she was in the second grade.  The victim, who was 17 at the time of trial, testified that the family was living in an apartment on 4th Street when the molestations began.  Defendant would come into her room after everyone else was asleep.  He touched her genitals "a lot of times" and tried to insert his fingers into her vagina.  She would cry and try to push him away, but defendant would continue until the victim started crying loudly, which presented a risk of awakening her mother.

Defendant forced the victim to touch his penis, grabbing her hands and making her "touch it up and down."  She always resisted and tried to pull away, but he would grab her hands and force her to continue.  Sometimes he ejaculated.  According to the victim, defendant also tried "lot[s] of times" to put his penis in her mouth.  Although she would move her head to the side or push him away with her hand to avoid the contact, he would grab her head and try to force his penis into her mouth. A couple of times he was successful, because she was "little not that strong."  Defendant also put his mouth on her breasts and tried to put his penis in her vagina a few times.

2

Defendant molested the victim about 20 times a month while they lived in the 4th Street apartment. He never threatened her life or hit her, but he told her not to tell her mother or anyone else.

When the family moved in with the victim's grandmother, defendant continued to molest the victim more than once a week in the same manner as he did at the 4th Street apartment. On one occasion early in the morning, he came to her room and lay down on top of her. Her grandmother heard her crying, went to the bedroom, and saw defendant on top of the victim. When her grandmother asked what was happening, defendant claimed he was simply wrestling with the victim and accidentally touched her breast. When the victim later told her grandmother that defendant had touched her breasts and "down there," the grandmother informed the victim's mother, who confronted defendant. He denied that anything sexual occurred and repeated his claim of an accidental touching. Thereafter, defendant ceased molesting the victim.

Years later, in August 2004, defendant's criminal conduct came to light when Child Protective Services (CPS) investigated an unrelated matter.[1] The victim told the CPS worker about the molestations, and on August 9, 2004, the victim gave a statement to Officer Joe Alioto.

---

[1] According to the probation report, CPS received a report that the victim's mother was abusing methamphetamine and marijuana, and was not supervising her children.

3

The following day, Officer Alioto went to defendant's home to follow up on the report and get defendant's "side of the story." When Alioto arrived, defendant answered the door and stated: "I've been waiting for you. I'm on the phone with the CPS worker right now." Alioto went into the residence, and defendant handed him the telephone, stating the CPS worker wanted to speak to him. When he ended the phone call less than a minute later, Alioto asked defendant, "[W]ell, why am I here?" Defendant replied there had been inappropriate lewd behavior between defendant and his stepdaughter.

Officer Alioto did not know what defendant meant by this statement or whether it warranted his arrest. This was so because the acts had occurred several years before and Alioto did not know whether defendant was referring to felony or misdemeanor conduct. Alioto "wasn't that familiar with the touch of the law" and did not believe that he could arrest defendant for an admission to a misdemeanor. Therefore, Alioto asked defendant to clarify what he meant. Defendant said he had touched the victim's genitals and she had touched his. At this point, Alioto advised defendant not to say anything else until he had received *Miranda* warnings and told defendant he was under no obligation to talk. Alioto then handcuffed and arrested defendant and read him of his *Miranda* rights prior to transporting him to the police station.

Detective Mark Tyndale interviewed defendant at the police station after confirming that defendant had been advised of and had waived his *Miranda* rights. Defendant admitted committing various sexual acts with the victim, including oral copulation.

4

DISCUSSION

I

According to defendant, the trial court erred in denying his motion to exclude the statements he made to Officer Alioto and Detective Tyndale.   In his view, the statements were obtained in violation of *Miranda, supra,* 384 U.S. 436 [16 L.Ed.2d 694] because (1) he was in custody when Alioto first questioned him, and (2) Alioto should have given the *Miranda* warnings as soon as defendant stated, "I've been waiting for you."   We disagree.

*Miranda* requires that before a person is subjected to custodial interrogation, warnings must be given apprising the person that he has the right to remain silent, that any statement he makes can be used against him, and that he has the right to counsel, retained or appointed.   (*Miranda, supra,* 384 U.S. at pp. 444-445 [16 L.Ed.2d at pp. 706-707].)   However, "[a]bsent 'custodial interrogation,' *Miranda* simply does not come into play."   (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)

A defendant is in custody if a reasonable person in the defendant's position would have believed that his freedom of movement was restrained to a degree normally associated with a formal arrest.   (*California v. Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279]; *People v. Ochoa* (1998) 19 Cal.4th 353, 401.)   Whether a reasonable person would have believed that he was so restrained depends upon the objective circumstances of the questioning.   (*Stansbury v. California* (1994) 511 U.S. 318, 323 [128 L.Ed.2d 293, 298].)   Although no one factor is controlling, pertinent factors include (1) whether the investigation has focused

5

on defendant, (2) whether defendant voluntarily agreed to the interview, (3) whether the police informed defendant that he was under arrest or in custody, (4) whether the indicia of arrest are present, (5) the location of the interview, and (6) the length and form of the questioning. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1753.)

Here, Officer Alioto did not arrest or physically restrain defendant when he arrived at his residence. Alioto did not force his way into defendant's home, did not demand that defendant answer Alioto's questions, and did not otherwise indicate that defendant was not free to simply refuse to answer any questions and shut the door in Alioto's face. Instead, defendant stated he had been waiting for Alioto, and voluntarily permitted Alioto to enter defendant's home to speak on the phone with a CPS worker. Less than a minute later, Alioto asked defendant why the officer was there, and defendant freely stated that it was because of defendant's inappropriate lewd conduct with his stepdaughter. Alioto was uncertain whether defendant was admitting to conduct that warranted his arrest, so he asked defendant to clarify what he meant. Defendant explained that he was referring to genital contact, whereupon Alioto informed defendant to say nothing further until being advised of his *Miranda* rights. At that point, Alioto arrested defendant, handcuffed him, and advised him of his rights before transporting him to the station.

As did the trial court, we conclude that the totality of the circumstances did not create any restraint on defendant of the degree associated with a formal arrest at the time defendant

6

volunteered that he had molested the victim. A reasonable person in defendant's circumstances would not have felt compelled to talk to Officer Alioto, and would have felt free to ask Alioto to leave rather than invite him into defendant's home. Thus, defendant's initial statements to Alioto were properly introduced in evidence, as were his statements to Detective Tyndale, which were obtained a short time after defendant was informed of and waived his *Miranda* rights.

Defendant hints that his statements to Detective Tyndale must be suppressed because Tyndale did not readvise defendant of his *Miranda* rights before interrogating him. Because defendant cites no authority for the proposition that Tyndale was required to readvise defendant of his rights before questioning him, his contention requires no further discussion. (*People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4 [an argument is forfeited if it is raised in a perfunctory fashion without any supporting analysis and authority].)

II

Defendant was convicted of 19 counts of lewd and lascivious conduct with a child under 14 years of age "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ." (Pen. Code, § 288, subd. (b)(1); further section references are to the Penal Code unless otherwise specified.) He challenges the sufficiency of the evidence to support the verdicts, observing that "force" means "physical force substantially different from or substantially greater than that necessary to accomplish the lewd act itself."

7

(*People v. Cicero* (1984) 157 Cal.App.3d 465, 473-474.)  Relying
on two cases from the Sixth Appellate District, *People v. Senior*
(1992) 3 Cal.App.4th 765 (hereafter *Senior*) and *People v. Schulz*
(1992) 2 Cal.App.4th 999 (hereafter *Schulz*), defendant contends
that his acts of forcing the victim's mouth onto his penis when
she tried to pull away from the oral copulation, and physically
manipulating her hand and preventing her from pulling it away
during the acts of masturbation, did not constitute the use of
"force" within the meaning of section 288, subdivision (b).
(*Senior, supra,* 3 Cal.App.4th at p. 774; *Schulz, supra,* 2
Cal.App.4th at p. 1004.)

     This court rejected a similar claim in *People v. Neel* (1993)
19 Cal.App.4th 1784, 1786 (hereafter *Neel*), which criticized and
declined to follow *Schulz* and *Senior*.  (*Neel, supra,* 19 Cal.App.4th
at pp. 1788-1790; see also *People* v. *Babcock* (1993) 14 Cal.App.4th
383, 388.)  The element of force, violence, duress, menace, or
fear of immediate and unlawful bodily injury is intended as a
requirement that the lewd act be undertaken without the consent of
the victim.  (*Neel, supra,* 19 Cal.App.4th at p. 1787.)  As stated
in *Neel*, "defendant's acts of forcing the victim's head down on
his penis when she tried to pull away and grabbing her wrist,
placing her hand on his penis, and then 'making it go up and down'
constitute force within the meaning of subdivision (b) in that
defendant applied force in order to accomplish the lewd acts
without the victim's consent." (*Id.* at p. 1790; see also *People*
v. *Pitmon* (1985) 170 Cal.App.3d 38, 44-45, 48.)

8

Defendant proffers no cogent reason for us to reconsider the decision in *Neel*. Indeed, the Sixth Appellate District has retreated from its reasoning in *Schulz* and *Senior*. (See *People v. Bolander* (1994) 23 Cal.App.4th 155, 160-161.) Moreover, defendant overlooks that although *Schulz* and *Senior* found insufficient evidence of *force*, they both found ample evidence of *duress* under facts similar to those in the present case and upheld the convictions on that basis. (*Senior, supra,* 3 Cal.App.4th at p. 774; *Schulz, supra,* 2 Cal.App.4th at p. 1004.)

Defendant briefly asserts there is no substantial evidence of duress, but he offers no meaningful argument or analysis explaining why he believes this to be so. Thus, his contention is unavailing. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [a reviewing court need not discuss claims that are asserted perfunctorily and insufficiently developed]; *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1159 [appellate contentions must be supported by analysis]; *People v. Sangani* (1994) 22 Cal.App.4th 1120, 1135-1136 [appellant's legal analysis must be connected to the evidence in the case].)

III

According to defendant, the trial court abused its discretion in denying his *Marsden* motion to replace his defense attorney with whom, he claims, he was embroiled in an irreconcilable conflict.

Whether to permit a defendant to obtain new appointed counsel is a matter within the discretion of the trial court, which is not obligated to appoint independent counsel absent adequate proof of need by the defendant. (*People v. Memro* (1995) 11 Cal.4th 786, 858-859; *People v. Smith* (1993) 6 Cal.4th 684, 696.) Appointment

9

of substitute counsel is necessary "when, and only when, . . . the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*People v. Smith, supra,* 6 Cal.4th at p. 696; *People v. Crandell* (1988) 46 Cal.3d 833, 854.)

"In determining whether defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result, trial courts properly recognize that if a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law. A trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness." (*People v. Crandell, supra,* 46 Cal.3d at p. 860, orig. italics.) Where counsel has represented the defendant a relatively short period of time, the trial court can reasonably conclude the defendant has not made sufficient efforts to resolve his differences with counsel or given

10

counsel sufficient time to demonstrate his or her trustworthiness. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1086.)

At the *Marsden* hearing, which occurred two weeks prior to the preliminary hearing, defendant explained he wanted new counsel because his attorney, Paula Weikel, had not interviewed witnesses, had cursed at him for not accepting a plea offer, and had divulged defense evidence to the prosecution regarding the timing of the charged offenses.

Weikel adamantly denied disclosing privileged information to the prosecutor, but agreed her discussions with defendant had been strained because of his belief she "rat[ted] him out to the DA." According to Weikel, defendant failed to understand that witnesses were entitled to refuse to talk to her investigator, and that his case was undermined by his lengthy confession, rather than by counsel's shortcomings. However, Weikel did not believe that the strain they experienced resulted in an inability to communicate or to provide an effective defense. She noted that prior to the hearing, she spoke with defendant and they were both calm and able to communicate.

Defendant agreed, asserting: "I finally had a good outlook to where we finally did communicate on a good level." In fact, he told counsel he "didn't want a *Marsden* motion," but he had filed it already. Defendant observed that much of their tension arose from his belief that Weikel had been helping the prosecution.

Having overheard the conversation between Weikel and the prosecutor, during which defendant claimed that Weikel revealed privileged information, the trial court confirmed that Weikel did

11

not reveal any confidences.  The court then found that substitution
of counsel was not warranted and denied the *Marsden* motion.

On appeal, defendant argues that his strained relationship
with his attorney precluded the effective assistance of counsel.
He asserts:  "From [defendant's] and counsel's statements, and
from the almost cursory cross-examination of the prosecution's
witnesses, it is clear the attorney-client relationship had
irretrievably broken down; they simply could not work together
effectively and this strained relationship caused counsel to
represent [defendant] at trial in less than a zealous manner."

Defendant's contention is not persuasive because he utterly
fails to demonstrate an irreconcilable conflict.  He simply was
upset with his trial counsel because he believed that she was
assisting the prosecution, which was not true.  Both of them
agreed they were able to communicate "on a good level."  Thus,
defendant has shown nothing more than the exchange of heated
words at a time when counsel had been representing him for a
short period of time.  Absent the presence of an irreconcilable
conflict, which defendant has failed to demonstrate, this did
not mandate substitution of counsel.  (*People v. Smith, supra,*
6 Cal.4th at p. 696.)

IV

Defendant contends his conviction must be reversed because
his due process rights were violated when the jurors gave the
trial judge a birthday present.  His claim arises out of the
following factual background:

12

At the conclusion of testimony on May 19, 2005, the trial judge congenially wished the jury a nice weekend and said he would see the jurors bright and early on Monday morning. The judge also stated, "don't forget Monday's my birthday." One of the jurors impishly responded, "If I'm not here, happy birthday."

On May 24, after closing arguments and instructions, and outside of the presence of the jury, the trial judge stated that an alternate juror had handed the court attendant a birthday gift and the judge did not know if it was from a single juror or the entire jury. He had not opened the gift, did not feel comfortable accepting it during trial, and proposed addressing the jury about the gift after it had returned its verdict. Neither the prosecutor nor defense counsel objected.

After the verdicts were read and the jury had been formally excused, the judge thanked the jury for the gift, indicating it had waited to acknowledge the present until after trial in order to avoid the appearance of any impropriety.

Defendant claims that reversal is required because the "present-giving episode" deprived him of due process, and that his lack of objection did not forfeit this contention. (*People v. Burns* (1969) 270 Cal.App.2d 238, 252 [even absent an objection, the reviewing court can consider whether an unfairness so gross has occurred as to deprive the defendant of due process of law].) He asserts that the judge should have returned the gift and admonished the jury as to the impropriety of giving him a present, and that because the judge did not do so, the aforementioned events created an appearance of bias, and indicated the judge, the jury,

13

and the bailiff had an intimate relationship, which called into question their impartiality. According to defendant, the episode gave rise to the inference that the jury was "more interested in making the trial court happy than it [was] about determining [defendant's] guilt or innocence."

Defendant's contention is forfeited because he failed to object in the trial court to the court's proposed solution to the dilemma presented. "'"No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." [Citation.]'" (*People v. Saunders* (1993) 5 Cal.4th 580, 590, quoting *United States v. Olano* (1993) 507 U.S. 725, 731 [123 L.Ed.2d 508, 517].) This is so because "'"it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial."' [Citation.]" (*People v. Saunders, supra*, 5 Cal.4th at p. 590, orig. italics.)

In any event, defendant has failed to establish "an unfairness so gross" occurred as to deprive him of due process. The fact that the judge and jury were on friendly terms does not demonstrate they were not impartial toward defendant. He fails to show the episode reflected actual bias or created an appearance of bias either for or against the prosecution or defendant.

14

V

Defendant argues the court improperly ordered a fee under section 1465.8, subdivision (a)(1), which imposes a $20 security fee upon all criminal convictions to "ensure and maintain adequate funding for court security . . . ."[2]  The statute became effective on August 2, 2003 (Stats. 2003, ch. 159, § 25), and defendant's offenses occurred between 1993 and 1998.  Thus, he argues the fee violates the constitutional prohibition on ex post facto laws because it made the punishment for his crimes more burdensome than it was at the time they were committed.

In rejecting a similar contention, *People v. Wallace* (2004) 120 Cal.App.4th 867 (hereafter *Wallace*) concluded the Legislature imposed the $20 fee for the nonpunitive purpose of ensuring and maintaining adequate funding for court security, designating it a "fee" as opposed to a "fine."  (*Id.* at pp. 875-876.)  Further, there was not "'"'the clearest proof'"'" the court security fee

_____

[2] Section 1465.8 states in part:  "(a)(1) To ensure and maintain adequate funding for court security, a fee of twenty dollars ($20) shall be imposed on every conviction for a criminal offense, including a traffic offense, . . . [¶] . . . [¶] (b) This fee shall be in addition to the state penalty assessed pursuant to Section 1464 and may not be included in the base fine to calculate the state penalty assessment as specified in subdivision (a) of Section 1464. [¶] (c) When bail is deposited for an offense to which this section applies, and for which a court appearance is not necessary, the person making the deposit shall also deposit a sufficient amount to include the fee prescribed by this section. [¶] (d) Notwithstanding any other provision of law, the fees collected pursuant to subdivision (a) shall all be deposited in a special account in the county treasury and transmitted therefrom monthly to the Controller for deposit in the Trial Court Trust Fund."

15

was so punitive that its purpose or effect was to override the Legislature's treatment of it as a nonpunitive measure. (*Id.* at p. 876.) The fee is assessed for the use of court facilities to make them safer; the same fee is imposed in civil, probate, and traffic cases; and the enactment of the fee depended on the adoption of specified trial court funding levels. (*Id.* at p. 877.) Moreover, the fee is small, it does not promote the traditional aims of punishment, and it has a rational relationship to a nonpunitive purpose. (*Id.* at pp. 877-878.)

We agree with *Wallace* that the $20 court security fee does not violate the ex post facto clauses of the state and federal Constitutions. (Cf. *People v. Rivera* (1998) 65 Cal.App.4th 705, 708-712 [minimal jail booking and classification fees are not punitive and not subject to the limitations of the ex post facto clause].)

Defendant also contends that imposition of the court security fee violates section 3, which states: "No part of [the Penal Code] is retroactive, unless expressly so declared."

Two recent decisions that addressed a similar contention are now pending in the California Supreme Court. (*People v. Carmichael* (2006) 135 Cal.App.4th 937 [holding the fee cannot be imposed retroactively because there was no clear indication the Legislature intended the statute to be applied retroactively], review granted May 10, 2006, S141415; *People v. Alford* (2006) 137 Cal.App.4th 612 (hereafter *Alford*) [holding the fee may be imposed on a defendant whose crime occurred before the effective date of the statute because the history, purpose, and impact of

16

the law reveals that the Legislature intended section 1465.8 to apply retroactively], review granted May 10, 2006, S142508.)

We agree with the reasoning in *Alford*. Section 1465.8 may be applied retroactively because (1) the enactment of section 1465.8 as part of an urgency measure to implement the Budget Act of 2003 indicates a legislative intent to implement the statute immediately to all pending cases (*Wallace, supra*, 120 Cal.App.4th at p. 875); (2) retroactive application facilitates the stated objective of the statute, which is to ensure and maintain adequate funding for court security (§ 1465.8, subd. (a)(1)); (3) a defendant does not incur additional punishment from imposition of the fee (*Wallace, supra*, 120 Cal.App.4th at pp. 877-878); (4) the imposition of the fee does not interfere with a defendant's antecedent rights; and (5) a defendant does not have a vested interest in avoiding a minimal contribution to court security.

Although the charged offenses occurred before section 1465.8 became effective, the trial court proceedings took place after the statute's enactment. Defendant received the benefit of enhanced court security, and no reason appears to exempt him from paying $20 for it.

DISPOSITION

The judgment is affirmed.

_____SCOTLAND_____ , P.J.

I concur:

_____CANTIL-SAKAUYE_____ , J.

17

I concur in Presiding Justice Scotland's opinion except for part V, where I concur in the result.

With respect to part V, I agree that imposition of the court security fee did not violate the prohibition on ex post facto laws for reasons stated in the opinion.

With respect to possible application of Penal Code section 3 ["No part of [the Penal Code] is retroactive unless expressly so declared"], I do not think there is any retroactive application of Penal Code section 1465.8. Section 1465.8 provides in pertinent part that the court security fee "shall be imposed on every conviction for a criminal offense . . . ." (Pen. Code, § 1465.8, subd. (a)(1).) Defendant was convicted of these offenses on May 24, 2005, when the jury returned verdicts of guilty on all offenses. Section 1465.8 had become effective nearly two years earlier, on August 2, 2003. (Stats. 2003, ch. 159, § 25.) Consequently, the fee statute had been operating for nearly two years when the event triggering imposition of the fee ("conviction") occurred. There was no retroactive application of section 1465.8.

_____SIMS_____, J.

## PROOF OF SERVICE

I, John F. Schuck, declare:

I am a citizen of the United States and a resident of the County of Santa Clara; I am over the age of eighteen years and am not a party to the within action; my business address is 4083 Transport Street, Suite B, Palo Alto, CA 94303.

On ____6____ October 2006, I served the within:

### APPELLANT'S PETITION FOR REVIEW

on the following interested persons in said action, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Palo Alto, California addressed as follows:

Sacramento County Superior Court
720 9th Street , Appeals Unit
Sacramento, CA 95814

District Attorney
720 9th Street
Sacramento, CA 95814

Central California Appellate Program
2407 "J" Street, Suite 301
Sacramento, CA 95816

Attorney General
P. O. Box 944255
Sacramento, CA 94244-2550

Larry Prunty
V-86405
Calipatria State Prison
P. O. Box 5007
Calipatria, CA 92233-5007

Court of Appeal
Third Appellate District
900 N. Street, #400
Sacramento, CA 95814-4869

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on the same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Palo Alto, California on ____6____ October 2006.

John F. Schuck

APPENDIX  B

APP  B

EXHIBIT    A

EX  A .

SUPREME COURT, STATE OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA, )          No:
                                   )
        Plaintiff/Respondent,      )
                                   )          APPELLANT'S PETITION
        v.                         )          FOR REVIEW
                                   )
LARRY PRUNTY,                      )
                                   )
        Defendant/Appellant.       )
_____)

AFTER OPINION OF THE COURT OF APPEAL
THIRD APPELLATE DISTRICT
SEPTEMBER 7, 2006
CASE NO. C051285

APPEAL FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
SACRAMENTO COUNTY
SUPERIOR COURT CASE NO. 04F06958

THE HONORABLE TROY L. NUNLEY, JUDGE

LAW OFFICES OF JOHN F. SCHUCK
John F. Schuck, #96111
4083 Transport Street, Suite B
Palo Alto, CA 94303
(650) 856-7963

Attorney for Appellant
LARRY PRUNTY
(Appointed by the Court)

## TABLE OF CONTENTS

I.    ISSUES PRESENTED FOR REVIEW ................................. 1

II.   REASONS WHY REVIEW SHOULD BE GRANTED ................... 1

      A.   RIGHT TO COUNSEL ......................................... 1

      B.   RIGHT TO REMAIN SILENT .................................. 2

      C.   "FORCE" FOR PURPOSES OF PENAL CODE SECTION 288 ........ 2

      D.   THE $20.00 SECURITY ..................................... 2

III.  STATEMENT OF THE CASE ....................................... 3

IV.   STATEMENT OF THE FACTS ...................................... 3

V.    ARGUMENT .................................................... 4

      A.   THE TRIAL COURT ERRONEOUSLY DENIED
           APPELLANT'S *MARSDEN* MOTION FOR NEW
           COUNSEL. AS A RESULT, APPELLANT'S RIGHT TO
           COUNSEL UNDER THE SIXTH AMENDMENT WAS
           VIOLATED. ............................................... 4
           1.   Introduction ........................................ 4
           2.   Appellant was unconstitutionally denied his right to counsel ..... 4
           3.   Conclusion ......................................... 6

      B.   APPELLANT'S PRE-TRIAL STATEMENTS WERE
           OBTAINED IN VIOLATION OF HIS RIGHTS UNDER
           THE FIFTH AMENDMENT AND *MIRANDA* AND
           SHOULD HAVE BEEN EXCLUDED PURSUANT TO
           APPELLANT'S OBJECTION. ................................. 7
           1.   Introduction ........................................ 7
           2.   The facts ........................................... 7
           3.   Appellant's statements were obtained in violation of the Fifth
                Amendment and *Miranda v. Arizona* ..................... 10
           5.   Conclusion ......................................... 13

TABLE OF CONTENTS

C.   THERE IS A CONFLICT REGARDING WHAT
     CONSTITUTES FORCE, VIOLENCE, DURESS, MENACE,
     OR FEAR OF IMMEDIATE BODILY INJURY FOR
     PURPOSES OF PENAL CODE SECTION 288;
     THEREFORE, REVIEW IS REQUIRED TO SETTLE THIS
     ISSUE ....................................................... 13
     1.   Introduction ........................................... 13
     2.   Appellant did not use any force in excess of that
          required to commit the offense ........................... 14
     3.   Conclusion ............................................ 17

D.   THE COURT SECURITY FEE MUST BE STRICKEN ............. 17
     1.   Introduction ........................................... 17
     2.   The $20.00 fee violates constitutional ex post facto provisions . . . 18
     3.   Penal Code section 3 was violated in this case ............... 20
     4.   Conclusion ............................................ 22

VI.  CONCLUSION ................................................... 22

## TABLE OF AUTHORITIES

CASES                                                                      PAGE NO.

*Collins v. Youngblood* (1990)
   497 U.S. 37, 110 S.Ct. 2715 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cooper v. State* (Md.App.2005)
   163 Md.App.70, 877 A.2d 1095 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Garner v. Jones* (2000)
   529 U.S. 244, 120 S.Ct. 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kimmelman v. Morrison* (1986)
   477 U.S. 365, 377, 106 S. Ct. 2574 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Miranda v. Arizona* (1966)
   384 U.S. 436, 86 S. Ct. 1602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7-13

*Missouri v. Seibert* (2004)
   542 U.S. 600, 124 S.Ct. 2601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*New York v. Harris* (1990)
   495 U.S. 14, 110 S. Ct. 1640 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*People v. Aguilera* (1996)
   51 Cal. App. 4th 1151, 59 Cal. Rptr. 2d 587 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*People v. Babcock* (1993)
   14 Cal.App.4th 383, 17 Cal.Rptr.2d 688 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Bergschneider* (1989)
   211 Cal.App.3d 144, 259 Cal.Rptr.219 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Blakeley* (2000)
   23 Cal.4th 82, 96 Cal.Rptr.2d 451 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Bolander* (1994)
   23 Cal.App.4th 155, 28 Cal.Rptr.2d 365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## TABLE OF AUTHORITIES

CASES                                                                    PAGE NO.

*People v. Bradley* (1998)
    64 Cal.App.4th 386, 75 Cal.Rptr.2d 244  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Cicero* (1984)
    157 Cal.App.3d 465, 204 Cal.Rptr.582  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Cochran* (2002)
    103 Cal.App.4th 8, 126 Cal.Rptr.2d 416  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Crandell* (1988)
    46 Cal. 3d 833, 251 Cal. Rptr. 227  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*People v. Daniels* (1963)
    222 Cal.App.2d 99, 34 Cal.Rptr.844  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Frazer* (1999)
    21 Cal.4th 737, 88 Cal.Rptr.2d 312  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Grant* (1999)
    20 Cal.4th 150, 83 Cal.Rptr.2d 295  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Griffin* (2004)
    33 Cal.4th 1015, 16 Cal.Rptr.2d 891  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Hart* (1990)
    20 Cal. 4th 546, 85 Cal. Rptr. 2d 132  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*People v. Kusumoto* (1985)
    169 Cal.App.3d 487, 215 Cal.Rptr.347  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Loeun* (1997)
    17 Cal.4th 1, 9, 69 Cal.Rptr.2d 776  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Mom* (2000)
    80 Cal.App.4th 1217, 96 Cal.Rptr.2d 172  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF AUTHORITIES

CASES                                                        PAGE NO.

*People v. Montero* (1986)
185 Cal.App.3d 415, 229 Cal.Rptr.750 ................................. 17

*People v. Mosley* (1999)
73 Cal.App.4th 1081, 87 Cal.Rptr.2d 325 .............................. 11

*People v. Murphy* (2001)
25 Cal.4th 136, 105 Cal.Rptr.2d 387 .................................. 21

*People v. Neel* (1993)
19 Cal.App.4th 1784, 24 Cal.Rptr.2d 293 ......................... 2, 15, 17

*People v. Ortiz* (1990)
51 Cal. 3d 975, 275 Cal. Rptr. 191 .................................... 4

*People v. Schulz* (1992)
2 Cal.App.4th 994, 3 Cal.Rptr.2d 799 ..................... 2, 13, 15, 16, 17

*People v. Senior* (1992)
3 Cal.4th 765, 5 Cal.Rptr.2d 14 ..................................... 15

*People v. Tapia* (1991)
53 Cal.3d 282, 279 Cal.Rptr. 592 .................................... 21

*People v. Wallace* (2004)
120 Cal.App.4th 867, 16 Cal.Rptr.3d 152 .......................... 19-21

*Rhode Island v. Innis* (1980)
446 U.S. 291, 100 S. Ct. 1682 ................................... 10, 11

*Sanders v. P.G.&E.* (1975)
53 Cal.App.3d 661, 126 Cal.Rptr.415 ................................ 19

*Tapia v. Superior Court* (1991)
53 Cal.3d 282, 279 Cal.Rptr.592 .................................... 20

TABLE OF AUTHORITIES

CASES                                                                PAGE NO.

*United States v. Bajakajian* (1998)
    524 U.S. 321, 118 S.Ct. 2028 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Williams* (9th Cir.2006)
    435 F.3d 1149 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

STATUTES

California Constitution, article 1, section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Rules of Court, Rules 28 and 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Penal Code section 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 18, 20-22

Penal Code section 288 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 13, 14

Penal Code section 288.5, subdivision (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Penal Code section 288, subdivision (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Code section 288, subdivision (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13, 14

Penal Code section 667.6, subdivision (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Penal Code section 1465.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17-22

Penal Code section 1465.8, subdivision (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States Constitution, article 1, section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States Constitution, article 1, section 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States Constitution, Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7, 10, 12, 13

United States Constitution, Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 6, 7

United States Constitution, Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

PETITION FOR REVIEW

## TO THE HONORABLE CHIEF JUSTICE OF CALIFORNIA AND ASSOCIATE JUSTICES OF THE SUPREME COURT:

Appellant Larry Prunty, pursuant to Rules 28 and 29 of the California Rules of

Court, petitions for review of the Opinion of the Court of Appeal, Third District filed

September 7, 2006. (Exhibit A, attached.)

## I.    ISSUES PRESENTED FOR REVIEW

1. Was appellant's Sixth Amendment right to counsel violated by the trial court

when it denied his *Marsden* motion for new trial?

2. Were appellant's *Miranda* and Fifth Amendment rights to remain silent violated

by law enforcement?

3. What constitutes "force" for purposes of Penal Code section 288?

4. Is the $20.00 security fee provided for by Penal Code section 1465.8 an

unconstitutional ex post facto law?  Does it violate Penal Code section 3?

## II.    REASONS WHY REVIEW SHOULD BE GRANTED

### A.    RIGHT TO COUNSEL

Under the Sixth Amendment, a defendant has the right to counsel of his choice.

Here, appellant sought to exercise that right when he requested appointment of new

counsel. The trial court violated this fundamental right when it denied the request.

Review is therefore required to vindicate appellant's Sixth Amendment right to counsel.

## B.    RIGHT TO REMAIN SILENT

Pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602 and the Fifth

Amendment, a defendant has the right to remain silent when interrogated by law

enforcement. This basic right was violated in the instant case when the police questioned

appellant without first giving him the warnings required by *Miranda*. The Court of

Appeal held there was no violation. Review is required to correct this erroneous ruling.

## C.    "FORCE" FOR PURPOSES OF PENAL CODE SECTION 288     .

In *People v. Schulz* (1992) 2 Cal.App.4th 994, 1004, 3 Cal.Rptr.2d 799, 802, the

Sixth District held that "'[f]orce' means '"physical force substantially different from or

substantially in excess of that required for the lewd act."' ...[A] modicum of holding and

even restraining cannot be regarded as substantially different or excessive 'force.'" The

Third District, in *People v. Neel* (1993) 19 Cal.App.4th 1784, 24 Cal.Rptr.2d 293, and in

the instant case, rejected *Schultz*'s analysis. Thus, there is a conflict between the Courts

of Appeal as to the proper interpretation or definition of "force" in the context of a Penal

Code section 288 prosecution. Review is required to resolve this conflict.

## D.    THE $20.00 SECURITY FEE

In this case, the $20 security fee violates the retroactivity proscriptions of Penal

Code section 3 and also constitutes an unconstitutional ex post facto law. Review is

required to so hold.

## III.    STATEMENT OF THE CASE

An information was filed charging appellant Larry Prunty with violations of Penal

Code section 288.5, subdivision (a), continuous sexual abuse of a child (count 1) and

Penal Code section 288, subdivision (b)(1), lewd acts with a child under 14 years of age

(counts 2 through 20).  (CT1: 72-82.)[1]

On May 16, 2005, trial commenced.  (CT1: 164; RT1: 24.)  On May 24, 2005, the

jury found appellant guilty as charged.  (CT1: 203-222; CT2: 442-448; RT1, 2: 295-308.)

On June 24, 2005, appellant was sentenced to the mid-term of 12 years on count 1.

Pursuant to Penal Code section 667.6, subdivision (d) and California Rules of Court, rule

4.426(a)(2), appellant was sentenced to fully consecutive mid-term sentences of 6 years

on counts 2 through 20.  Thus, appellant's total sentence was 126 years.  (CT1, 2: 5, 479-

481; RT2: 313-321.)

On September 7, 2006, the Court of Appeal affirmed the judgment.

## IV.    STATEMENT OF THE FACTS

As stated in the Court of Appeal's opinion, "[d]efendant abused his stepdaughter

between 1993 and 1998, starting when she was in the second grade."  (Ex. A, p.2.)  The

Court's opinion provides a detailed statement of the facts.  (Ex. A, p.2-4.)

---

[1] "CT" refers to the three-volume Clerk's Transcript.  "RT" refers to the two-volume Reporter's Transcript.

## V.    ARGUMENT

### A.    THE TRIAL COURT ERRONEOUSLY DENIED APPELLANT'S *MARSDEN* MOTION FOR NEW COUNSEL. AS A RESULT, APPELLANT'S RIGHT TO COUNSEL UNDER THE SIXTH AMENDMENT WAS VIOLATED.

#### 1.    Introduction

Appellant was dissatisfied with the representation he was receiving from his appointed defense counsel. Therefore, he sought appointment of new trial counsel. The trial court denied appellant's request for new counsel. (RT 3/3/05; CT1: 3.) However, this ruling constituted an abuse of discretion which denied appellant his Sixth Amendment right to counsel. Review is therefore required.

#### 2.    Appellant was unconstitutionally denied his right to counsel.

It is beyond dispute that, "[T]he right of a criminal defendant to counsel and to present a defense are among the most sacred and sensitive of our constitutional rights." (*People v. Ortiz* (1990) 51 Cal. 3d 975, 982, 275 Cal. Rptr. 191, 196; accord, *Kimmelman v. Morrison* (1986) 477 U.S. 365, 374, 377, 106 S. Ct. 2574, 2582, 2584 ["The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process...***... [T]he right to counsel is the right to effective assistance of counsel."])

This fundamental right to counsel requires that new counsel be appointed to represent an indigent defendant when present counsel is providing ineffective assistance or where the relationship between the defendant and his or her attorney has devolved into

an irreconcilable conflict. (*People v. Hart* (1990) 20 Cal. 4th 546, 603, 85 Cal. Rptr. 2d 132, 167; *People v. Marsden, supra*, 2 Cal. 3d at 124-125, 84 Cal. Rptr. at 160.)

Pursuant to *Marsden* and *Hart*, prior to trial, the trial court allowed appellant to explain why he wanted new counsel appointed. Appellant informed the trial court that counsel had not interviewed the witnesses. She "cursed" at him. He believed she had divulged defense evidence to the prosecution. On the two visits counsel had with appellant, "...she's ended the conversation with, this conversation's over." (RT 3/3/05.)

Counsel claimed she did not make any inappropriate comments to the prosecutor nor did she reveal any confidence. However, counsel agreed that communication with appellant "...has been strained for some time." They have had "strained relations... The last visit...was very strained...we did have this kind of conversation or language that came out. This time I did lose my cool." The conversation "...was extremely frustrating...for counsel. The last visit "...was contentious." Counsel conceded that appellant "...is correct there has been a strained relationship between himself and myself." She agreed that, during "...a lot of the jail visits," there was "frustration and breakdown in communication." (RT 3/3/05.)

The trial court's denial of appellant's *Marsden* motion constituted an abuse of discretion. From appellant's and counsel's statements, and from the almost cursory cross-examination of the prosecution's witnesses, it is clear the attorney-client relationship had irretrievably broken down; they simply could not work together effectively and this

strained relationship caused counsel to represent appellant at trial in less than a zealous

manner. Appellant believed that counsel had betrayed him to the prosecution. Counsel

expressly agreed that the relationship was strained. Obviously, a strained, difficult

relationship precludes effective assistance of counsel. As a result, this unproductive

relationship violated appellant's constitutional right to counsel under the Sixth

Amendment. His right to effective counsel was substantially impaired. Thus, the motion

for new counsel should have been granted. (*People v. Crandell* (1988) 46 Cal. 3d 833,

854, 251 Cal. Rptr. 227, 235 [new counsel should be appointed where "...defendant and

counsel have become embroiled in such an irreconcilable conflict that no effective

representation is likely to result."])

As a matter of law, appellant provided more than sufficient cause for replacement

of his trial counsel. The contentious relationship between counsel and appellant

foreclosed any chance of cooperation and ensured that effective representation would not

be forthcoming. The trial court should have granted appellant's motion.

### 3.    Conclusion

The trial court erred when it denied appellant's *Marsden* motion. As a result,

appellant was denied his rights to counsel, effective assistance of counsel, and to present

a defense under the Sixth Amendment and the California Constitution, article 1, section

15. Review is therefore required to vindicate these fundamental rights.

**B.    APPELLANT'S PRE-TRIAL STATEMENTS WERE OBTAINED IN
VIOLATION OF HIS RIGHTS UNDER THE FIFTH AMENDMENT
AND *MIRANDA* AND SHOULD HAVE BEEN EXCLUDED
PURSUANT TO APPELLANT'S OBJECTION.**

### 1.    Introduction

Appellant's statements to Officer Alioto and Detective Tyndale were obtained in

violation of his right to remain silent under the Fifth Amendment and *Miranda v. Arizona*

(1966) 384 U.S. 436, 86 S. Ct. 1602.[2]  Therefore, appellant objected to admission of the

statements on the ground that Officer Alioto's conduct was likely to elicit an incrim-

inating response from him and that the statement he gave to Detective Tyndale was a

byproduct of Alioto's illegal interrogation.  After holding an evidentiary hearing (RT1:

51-96), the trial court denied the objection. (RT1: 90-93.)  However, as a matter of law,

this ruling was wrong and severely prejudicial to appellant.  His rights to due process, a

fair trial, to remain silent, and fundamental fairness under the Fifth, Sixth and Fourteenth

Amendments were violated.  Review is therefore required.

### 2.    The facts

At the evidentiary hearing, Officer Alioto testified that, prior to going to

appellant's residence on August 10, 2004, he had spoken with Corina.  Corina had

described to Alioto "...over a period of years...touching and fondling for sexual

---

[2] Appellant's initial statement, "...I've been waiting for you.  I'm on the phone with
the CPS worker right how" (RT1: 190), was not unconstitutionally obtained and thus was
not admitted improperly at trial.

gratification." Alioto agreed he "...had some knowledge of...why [he was] arresting Mr. Prunty." (RT1: 54-55, 72-74.)

A "little after noon...," Alioto knocked on appellant's door. He answered and said, "...I've been waiting for you. I'm on the phone with the CPS worker right now." Officer Alioto spoke to the CPS worker "...for...a matter of seconds..." (RT1: 55, 63, 66) and, without informing appellant of his *Miranda* rights, interrogated him for "[a]bout 10 minutes approximately." (RT1:68.) Alioto asked "Why am I here?" Appellant stated that there had been inappropriate acts between him and Corina. Alioto asked appellant to "...clarify what you meant by lewd acts." Appellant stated "...those acts including touching of genitalia." (RT1: 55-56, 68-69, 70.) After obtaining these inculpatory statements, Officer Alioto, for the first time, told appellant he was under no obligation to talk to him and to not say anything else until the *Miranda* warnings were given. (RT1: 56, 69, 71.)

Appellant was handcuffed and placed in the rear of a police car at about 12:30 p.m. Officer Alioto began to transport appellant to police headquarters at around 1:00-1:15. Prior to starting transportation, Alioto allegedly read appellant his *Miranda* rights from a police department issued card. Alioto claimed appellant understood these rights. On the way to headquarters, Alioto continued to discuss the case with appellant. (RT1: 56-59, 66-67, 75.)

The drive to police headquarters took about 20 minutes. (RT1: 58.) At head-

PruntyPetitionForReview                                                        8

quarters, Alioto spoke with Detective Tyndale and "described the situation." Appellant

was interviewed by Detective Tyndale. (RT1: 58, 77-78.) The interview started at 2:27

(CT3: 601), over an hour after the *Miranda* warnings allegedly had been given by Officer

Alioto. Detective Tyndale did not inform appellant of his *Miranda* rights prior to the

interrogation. The transcript shows the following coloquy:

> "DET. TYNDALE: Okay. Okay, the officer that brought you
> in, --
>
> MR. PRUNTY:     Uh-huh.
>
> DET. TYNDALE: Um, he advised you of your rights?
>
> MR. PRUNTY:     Uh-huh.
>
> DET. TYNDALE: You know and he said you were willing
> to talk to us –
>
> MR. PRUNTY:     Uh-huh.
>
> DET. TYNDALE: -- and answer some questions? Um, why
> don't we just start from the beginning?
> Kind of run down real quick for me.
>
> MR. PRUNTY:     Okay." (CT 2: 492.)

Appellant thereafter made a lengthy statement regarding the commission of many sex

offenses with Corina. The recorded statement was played at trial. (RT1: 208-210.)

Appellant's statements to Officer Alioto made during the interrogation in appellant's

residence were also admitted. (RT1: 190-191.)

### 3.    Appellant's statements were obtained in violation of the Fifth Amendment and *Miranda v. Arizona*.

The Fifth Amendment to the United States Constitution guarantees that "No person...shall be compelled in any criminal case to be a witness against himself." To ensure compliance with this fundamental right, the Court in *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S. Ct. at 1612 held:

> "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safe-guards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."

(Accord, *New York v. Harris* (1990) 495 U.S. 14, 20, 110 S. Ct. 1640, 1644 ["Statements taken during legal custody would of course be inadmissible...if *Miranda* warnings were not given... "]; *Rhode Island v. Innis* (1980) 446 U.S. 291, 297-298, 100 S. Ct. 1682, 1687-1688; *People v. Aguilera* (1996) 51 Cal. App. 4th 1151, 1160-1161, 59 Cal. Rptr. 2d 587, 591-592.)

"'[I]nterrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police...that the police should know are reasonably likely to elicit an incriminating response..." (*Rhode Island v. Innis, supra*, 446 U.S. at 300-301, 100 S. Ct. at 1689-1690, *People v. Mosley* (1999) 73 Cal.App.4th 1081, 1089, 87 Cal.Rptr.2d 325, 330 ["For *Miranda* purposes, interrogation is defined as any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response"]; *People v. Aguilera, supra,* 51 Cal.App.4th at 1161, 59 Cal.Rptr.2d at 592.)

In *Missouri v. Seibert* (2004) 542 U.S. 600, 609-617, 124 S.Ct. 2601, 2608-2613, the Court held that where, as here, the police deliberately omitted the *Miranda* warnings during an initial interrogation in which the suspect confessed, a subsequent Mirandized confession is inadmissible. (Accord, *United States v. Williams* (9th Cir.2006) 435 F.3d 1149, 1150 ["...a trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning...did not effectively apprise the suspect of his rights."]; *Cooper v. State* (Md.App.2005) 163 Md.App.70, 74, 877 A.2d 1095, 1097.)

Here, when Officer Alioto arrived at appellant's residence, he knew that appellant had been molesting Corina for a number of years. As soon as appellant said, "I've been waiting for you...," Alioto, who appeared to be a reasonable officer, knew that appellant had made an inculpatory statement corroborative of the criminal molestation claims.

Clearly, Alioto would not have permitted appellant to leave. Alioto also knew that any

questioning would certainly elicit incriminating statements, yet he interrogated appellant

for 10 minutes without advising him of his *Miranda* rights and obtained a confession

before telling appellant he had no obligation to answer the officer's questions. As a

matter of law, the Fifth Amendment was violated; all statements to Officer Alioto

subsequent to "I've been waiting..." should have been suppressed.

The lengthy statement given to Detective Tyndale also should have been

suppressed. First, Tyndale never read the *Miranda* rights to appellant prior to the start of

the interrogation. And second, pursuant to *Seibert, supra*, the police strategy of obtaining

an unwarned statement at appellant's house was adopted to undermine the salutary

principles of *Miranda*. The unwarned interrogation at appellant's residence lasted for 10

minutes. Appellant informed Alioto "...that there had been inappropriate behavior,

inappropriate acts between he and the victim" (RT1: 55) and gave "...his explanation of

those acts including touching of genitalia." (RT1: 69.) Detective Tyndale's interrogation

commenced at 2:27 p.m. (CT2: 491), about one hour, 15 minutes or so after Alioto had

read the *Miranda* rights. No one ever told appellant that the warning regarding "anything

he said could be used against him" also applied to his previous, unwarned statement.

Appellant could very well have been under the impression that Tyndale's interrogation

was nothing more than a continuation of Alioto's un-Mirandized questioning. As in

*Seibert,* the warnings given 75 minutes before Tyndale's interrogation did not "...convey a

**2.    Appellant did not use any force in excess of that required <u>to</u> <u>commit the offense</u>.**

The offense of forcible lewd or lascivious act is defined in Penal Code section 288,

subdivision (b)(1):

> "(a) Any person who willfully and lewdly commits any
> lewd or lascivious act...upon or with the body, or any part or
> member thereof, of a child who is under the age of 14 years,
> with the intent of arousing, appealing to, or gratifying the lust,
> passions, or sexual desires of that person or the child, is guilty
> of a felony...
>
> (b)(1) Any person who commits an act described in
> subdivision (a) by use of force, violence, duress, menace, or
> fear of immediate and unlawful bodily injury on the victim or
> another person, is guilty of a felony and shall be punished by
> imprisonment in the state prison for three, six, or eight years."

The term "force" as used in section 288 is not defined by the statute. Its meaning,

however, has been well-established in case law as "that level of force substantially

different from or substantially greater than that necessary to accomplish the [act] itself."

*(People v. Mom* (2000) 80 Cal.App.4th 1217, 1224-1225, 96 Cal.Rptr.2d 172, 177;

*People v. Cochran* (2002) 103 Cal.App.4th 8, 13, 126 Cal.Rptr.2d 416, 420; *People v.*

*Bergschneider* (1989) 211 Cal.App.3d 144, 153, 259 Cal.Rptr.219, 223; *People v. Cicero*

(1984)157 Cal.App.3d 465, 474, 204 Cal.Rptr.582, 589.) In *People v. Griffin* (2004) 33

Cal.4th 1015, 1027, 16 Cal.Rptr.2d 891, 899, the Supreme Court made clear "...that the

'force' required to commit a forcible lewd act under subdivision (b) [must] be

substantially different from or substantially greater than the physical force inherently

PruntyPetitionForReview                    14

necessary to commit a lewd act proscribed under subdivision (a)." That such force was absent in the instant case is illustrated by cases which have construed the term "force" in the context of section 288, subdivision (b).

For example, in *People v. Schulz, supra,* 2 Cal.App.4th at 1004, 3 Cal.Rptr.2d at 802, the Court stated:

> "'[F]orce" means '"physical force substantially different from or substantially in excess of that required for the lewd act."' We do not regard as constituting 'force' the evidence that defendant grabbed the victim's arm and held her while fondling her. The 'force' factor differentiates the charged sex crime from the ordinary sex crime. Since ordinary lewd touching often involves some additional physical contact, a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force.'"

(Accord, *People v. Senior* (1992) 3 Cal.4th 765, 774, 5 Cal.Rptr.2d 14, 20.) In *People v. Babcock* (1993) 14 Cal.App.4th 383, 387-388, 17 Cal.Rptr.2d 688, 691-692, the Court expressly rejected the reasoning of *Schulz* and *Senior.* Other authorities have not followed *Schulz* and *Senior.* (See, e.g., *People v. Bolander* (1994) 23 Cal.App.4th 155, 160-161, 28 Cal.Rptr.2d 365, 368; *People v. Neel* (1993) 19 Cal.App.4th 1784, 1785-1789, 24 Cal.Rptr.2d 293.) So did the Court of Appeal in the instant case. (Ex. A, p.7-9.) However, the analysis and reasoning of *Schulz* and *Senior* is consistent with the requirement that the force used must be *substantially* different from or *substantially* greater than that necessary to accomplish the act. The other authorities misconstrue the element of *substantial* force. Clearly, there is a conflict in the reported cases.

Applying *Schulz* to the facts of the instant case, it must be concluded that appellant did not forcibly commit any offenses against Corina. The evidence in this case does not reflect any *substantial* force beyond that necessary to commit the acts. The evidence shows either that Corina basically acquiesced to appellant's sexual conduct or that appellant did not apply any form of force, violence or duress over and above that minimally necessary to commit the offenses. The incidents were completed without any effort on the part of appellant to threaten, injure, or otherwise exert physical force upon her to continue.

Corina testified that, regarding the incidents of inappropriate touching, appellant never threatened physical harm nor did he ever hit her or use any violence. (RT1: 168-169.) Corina testified that when she said appellant had forced her to do these acts, she meant "...she didn't want to be there, ...didn't want to participate..." He was not "...rough on [her] using physical force besides the sex stuff...to accomplish the sex stuff." He did not hold her down. (RT3: 169.) The "force" that was employed by appellant, such as "...he would grab my hands and try to make me touch him and I'd pull away and he'd grab them" (CT3: 170) and pushing him and turning her face away (CT3: 142, 145), was nothing more than that necessary to commit the act. Clearly, the force used by appellant was not substantially different from or substantially greater than the usual or minimal force needed to accomplish the offenses. "[T]he requirement of 'force'...simply cannot be stretched to encompass the type of conduct involved in this case, ...where the victim's

will was not overcome by any physical force substantially different from or greater than that necessary to accomplish the act itself." (*People v. Kusumoto* (1985) 169 Cal.App.3d 487, 494, 215 Cal.Rptr.347, 351; accord, *People v. Montero* (1986) 185 Cal.App.3d 415, 431-432, 229 Cal.Rptr.750, 758.) But, under *Neel,* there is sufficient force. Which line of cases is correct?

### 3.    Conclusion

The concept of "force" means something qualitatively different than merely the victim's lack of consent or simply being "forced" to do something she did not want to do. (*People v. Kusumoto, supra,* 169 Cal.App.3d at 494-494.) Under *Schulz,* given appellant's lack of use of any substantial force to facilitate or continue the actions, no forcible offenses occurred. But, the Court here rejected *Schulz,* thus setting up a conflict. This Court should grant review.

### D.    THE COURT SECURITY FEE MUST BE STRICKEN.[3]

### 1.    Introduction

The trial court imposed a $20.00 court security fee pursuant to Penal Code section 1465.8. (CT2: 481; RT2: 318-319.) However, appellant's offenses were committed between 1993 and 1998, long before section 1465.8 became operative in August 2003. Thus, imposition of the court security fee violates the ex post facto provisions of the

---

[3] This issue is presently pending before this Court in *People v. Alford,* case no. S142508.

United States and California Constitutions and the retroactivity proscriptions of Penal
Code section 3. The fee must be stricken.

### 2.    The $20.00 fee violates constitutional ex post facto provisions.

An ex post facto law is a retrospective statute which makes the punishment for a
crime more burdensome. (*Collins v. Youngblood* (1990) 497 U.S. 37, 41-42, 110 S.Ct.
2715, 2718-2719; *People v. Blakeley* (2000) 23 Cal.4th 82, 91, 96 Cal.Rptr.2d 451, 457
["'a statute'" which makes more burdensome the punishment for a crime after its
commission'"'"" is unconstitutional.)

Under the United States Constitution, article 1, section 9, "No...ex post facto Law
shall be passed. Pursuant to the United States Constitution, article 1, section 10, "No
State shall...pass any...ex post facto Law..." (Accord, *Garner v. Jones* (2000) 529 U.S.
244, 249, 120 S.Ct. 1362, 1367 ["The States are prohibited from enacting an *ex post facto*
law."])

The California Constitution, article 1, section 9 includes a similar preclusion:
"A...ex post facto law...may not be passed." (*People v. Frazer* (1999) 21 Cal.4th 737,
754, 88 Cal.Rptr.2d 312, 324 ["The ban on ex post facto legislation..."]) The Courts
"...have consistently interpreted the state ex post facto clause no differently from its
federal counterparts.." (*Id.,* fn.15.)

Penal Code section 1465.8 imposes a "fee...on every conviction for a criminal
offense." Imposition of a "fee" upon conviction is no different than imposition of a fine,

PruntyPetitionForReview                    18

and, as a matter of law, a fine is punishment. (*United States v. Bajakajian* (1998) 524 U.S. 321, 327, 118 S.Ct. 2028, 2033 ["'the word "fine" was understood to mean a payment to a sovereign as punishment for some offense."]; *Sanders v. P.G.&E.* (1975) 53 Cal.App.3d 661, 677, 126 Cal.Rptr.415, 425 ["the term 'fine' refers to a pecuniary punishment imposed as a punishment only.'"]) As a matter of law, a section 1465.8 fee constitutes punishment.

In the instant case, application of Penal Code section 1465.8 as to appellant's convictions violates the State and Federal ex post facto clauses. His offenses were committed from 1993 through 1998. Section 1465.8 was added in 2003 and became operative on August 17, 2003, over five years after the offenses were committed. As a matter of law, the $20.00 court security fee imposed here is unconstitutional. This Court should so hold.

In *People v. Wallace* (2004) 120 Cal.App.4th 867, 16 Cal.Rptr.3d 152, the Court held that section 1465.8 did not violate constitutional ex post facto proscriptions because the fee is a nonpunitive civil assessment. But, subdivision (a) of section 1465.8 states the fee "...shall be imposed on every conviction for a criminal offense..." Clearly, according to the express words of the statute, the fee is imposed because of *criminal* conduct; thus, regardless of how the payment is denominated, it is a fine, i.e., punishment, and is subject to the ex post facto proscriptions. Indeed, although Justice Mosk concurred with the majority opinion under compunction of previous authority, he stated, regarding the court

security fee, "The imposition of a monetary obligation pursuant to a Penal Code provision

would seem to be a penalty that is subject to the ex post facto laws... I believe the

obligation results in punishment." (120 Cal.App.4th at 879, 16 Cal.Rptr.3d at 161.)

Based on the argument herein, and on Justice Mosk's comments, this Court should reject

*Wallace*'s analysis.

### 3.    Penal Code section 3 was violated in this case.

Penal Code section 3 states, "No part of it [the Penal Code] is retroactive, unless

expressly so declared." As stated in *People v. Daniels* (1963) 222 Cal.App.2d 99, 101, 34

Cal.Rptr.844, 846:

> "It is a cardinal rule of statutory construction that every statute
> will be construed to operate prospectively unless the contrary
> legislative intention is clearly expressed. This rule is
> particularly applicable to Penal Code statutes. A statute is
> given retroactive effect only when there is clearly expressed
> legislative intent that it is to have that effect."

This principle is well-settled. (See, e.g., *People v. Bradley* (1998) 64 Cal.App.4th 386,

396-397, 75 Cal.Rptr.2d 244, 250 ["As a general rule, criminal statutes are therefore

applied prospectively only, in the absence of a legislative intent to the contrary.")

As a matter of law, there is no express declaration of any Legislative intent in

section 1465.8 that it have retroactive effect. And, because the language of section

1465.8 is clear and unambiguous, there is no need for interpretation in an effort to glean

such an intent. (*People v. Loeun* (1997) 17 Cal.4th 1, 9, 69 Cal.Rptr.2d 776, 780 ["If

there is no ambiguity in the language of the statute, then...the plain meaning of the

language governs. ...Where the statute is clear, courts will not interpret away clear language in favor of an ambiguity that does not exist." (Internal quotes omitted.)]) If the Legislature had intended retroactivity, it would have so provided. (See, e.g., *People v. Murphy* (2001) 25 Cal.4th 136, 159, 105 Cal.Rptr.2d 387, 404 ["...the Legislature has shown that...it knows how to use language clearly expressing...intent."]) This Court may not read retroactive application into section 1465.8.

As noted, *People v. Wallace, supra,* 120 Cal.App.4th 867, 16 Cal.Rptr.2d 152 held that section 1465.8 did not violate constitutional ex post facto proscriptions because the $20.00 fine was not punishment. However, *Wallace* did not involve Penal Code section 3 and that section's proscription against retroactivity. For this reason, it is inapposite as to the instant point.

Penal Code section 3 applies to the entire Penal Code, and is not limited to punishment. Thus, even if, *arguendo, Wallace* is correct, section 1465.8 nevertheless violates section 3 because it adds new consequences to and increases a defendant's liability for his or her pre-enactment conduct. (*People v. Tapia* (1991) 53 Cal.3d 282, 287-288, 279 Cal.Rptr. 592, 594 ["...Certainly a law is retrospective if it..., as applied to a past crime, 'change[s] the legal consequences of an act completed before [the law's] effective date,' namely the defendant's criminal behavior."]; *People v. Grant* (1999) 20 Cal.4th 150, 157, 83 Cal.Rptr.2d 295, 298 ["...application of a law is retrospective...if it attaches new legal consequences to, or increases a party's liability for, an event,

transaction, or conduct that was *completed* before the law's effective date."]) The fact

that section 1465.8 may not involve punishment does not mean that it is not subject to

section 3's prohibition against retroactive application.

### 4.    Conclusion

As a matter of law, constitutional ex post facto provisions and the retroactivity

proscription of Penal Code section 3 apply to Penal Code section 1465.8. Thus, because

appellant committed his offenses before section 1465.8 became operative, he is not

subject to the $20.00 court security fee.

## VI.    CONCLUSION

For the reasons stated above, review is required.

Dated: ____ 24 ____ September 2006

Respectfully submitted,
LAW OFFICES OF JOHN F. SCHUCK
John F. Schuck, #96111
4083 Transport Street, Suite B
Palo Alto, CA 94303
(650) 856-7963

By _____
JOHN F. SCHUCK
Attorney for Appellant
LARRY PRUNTY
(Appointed by the Court of Appeal)

CERTIFICATE OF WORD COUNT

In reliance on the word count of the computer program used to generate this brief,

I, John F. Schuck, hereby certify that this Petition for Review contains 5,166 words.

I declare under penalty of perjury that the above is true and correct.

Dated: September ___, 2006

John F. Schuck

EXHIBIT   B

EX B



1  JAN SCULLY
2  DISTRICT ATTORNEY                                    SPD-04-304762
3  901 G STREET
4  SACRAMENTO, CA 95814                                 N. PHILLIPS, DDA
5  (916) 874-6218                                       TEAM: 8/MO (SACA)
6                                                       XRef: 1796220
7
8                    SUPERIOR COURT OF CALIFORNIA
9                     COUNTY OF SACRAMENTO
10
11  THE PEOPLE OF THE STATE OF CALIFORNIA,      COMPLAINT deemed information
                                                AMENDED INFORMATION NO.
12                    vs.                        04F06958
13  LARRY PRUNTY                                In the Superior Court of the County of
14                                              Sacramento, the 4th day of March, 2005
15                              Defendant(s),
16  The defendant(s), LARRY PRUNTY, is accused by the District Attorney of said County of
17  Sacramento, by this information, as follows:
18                              COUNT ONE
19  On or about and between February 22, 1993, and February 21, 1996, at and in the County of
20  Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a
21  violation of Section 288.5(a) of the Penal Code of the State of California, in that said defendant
22  did unlawfully engage in three and more acts of "substantial sexual conduct", as defined in Penal
23  Code Section 1203.066(b), and three and more acts in violation of Section 288 with CORINA
24  M., a child under the age of 14 years, to wit, age 5 to 7 years, while the defendant(s) resided
25  with, and had recurring access to, the child.
26
27  "NOTICE: The above offense is a serious felony within the meaning of Penal Code Section
28  1192.7(c)."
29
30  "NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section
31  290.  Willful failure to register is a crime."
32
33  "NOTICE: Conviction of this offense will require the court to order you to submit to a blood test
34  for evidence of antibodies to the probable causative agent of Acquired Immune Deficiency
35  Syndrome (AIDS)_ Penal Code Section 1202.1."
36                              COUNT TWO
37  For a further and separate cause of action, being a different offense of the same class of crimes
38  and offenses and connected in its commission with the charges set forth in Count One hereof: On
39  or about and between February 22, 1996, and February 21, 1997, at and in the County of
40  Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a
41  03040004.C05                    (1)                          000059

violation of Section 288(b)(1) of the Penal Code of the State of California; in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT THREE

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One and Two hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT FOUR

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Three hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of

03040004.C05                                    (2)                                    000060

fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT FIVE

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Four hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT SIX

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Five hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

03040004.C05                    (3)                    000061

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT SEVEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Six hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT EIGHT

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Seven hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

03040004.C05                          (4)                          000062

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

COUNT NINE

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Eight hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

COUNT TEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Nine hereof: On or about and between February 22, 1996, and February 21, 1997, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 8 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

03040004.C05                                    (5)                              000063

### COUNT ELEVEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Ten hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT TWELVE

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Eleven hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

1
2
3
4
### COUNT THIRTEEN

5
6
7
8
9
10
11
12
13
14
For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Twelve hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

15
16
17
18
"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

19
20
"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

21
### COUNT FOURTEEN

22
23
24
25
26
27
28
29
30
31
For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Thirteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

32
33
34
35
"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

36
37
38
"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

39
40
41

### COUNT FIFTEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Fourteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

### COUNT SIXTEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Fifteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

03040004.C05                    (8)                    000066

1
2
3
4

**COUNT SEVENTEEN**

5
6
7
8
9
10
11
12
13
14

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Sixteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

15
16
17
18

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

19
20
21

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

**COUNT EIGHTEEN**

22
23
24
25
26
27
28
29
30
31

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Seventeen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

32
33
34
35

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

36
37
38
39
40
41

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

1
2
3
4

## COUNT NINETEEN

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Eighteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

## COUNT TWENTY

For a further and separate cause of action, being a different offense of the same class of crimes and offenses and connected in its commission with the charges set forth in Counts One through Nineteen hereof: On or about and between February 22, 1997, and February 21, 1998, at and in the County of Sacramento, State of California, defendant(s) LARRY PRUNTY did commit a felony namely: a violation of Section 288(b)(1) of the Penal Code of the State of California, in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of CORINA M., a child under the age of fourteen years, to wit, age 9 years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Conviction of this offense will require you to register pursuant to Penal Code Section 290. Willful failure to register is a crime."

Contrary to the form, force and effect of the Statute in such case made and provided, and against the peace and dignity of the People of the State of California.

Subscribed to this 4th day of March, 2005.

JAN SCULLY
District Attorney of Sacramento County,
in the State of California.

By:_____
NOAH PHILLIPS
Deputy District Attorney

CGS

03040004.C05                    (11)                    000069

EXHIBIT C

EX. C

**DECLARATION OF LARRY PRUNTY**

I, Larry Prunty, Petitioner, do so declare, under penalty of perjury pursuant to the laws of the United States of America as follows:

1. On August 10, 2004, my wife, Nanette Ramos told me that on August 9, 2004, her daughter (my step-daughter) Corina went to the police station, and accused me of sexually abusing her for a long period of time.

2. I became upset and screamed at Nanette. Nanette asked me if the allegations were true, and I said they were not.

3. Nanette told me that a police officer was going to show up on that day to ask me questions and get my side of the story. At that time I became upset, and we started arguing. An hour later, I heard a knock on the door. I opened the door, and saw a police officer, at which time I said "I know why you're here." He asked me if I was "Larry," and after saying yes, he placed handcuffs on me, told me I was under arrest, and placed me in his patrol car.

4. At no time did the arresting officer (now known as Officer Alioto read me my Miranda rights   He drove me to the police station where another officer began asking me questions, I became confused, at which time, I made up a story about abusing Corina so they would stop pressuring me. I was scared for my life.

EXECUTED on this $\underline{15}$ day of February, 2008 in the state of California, city of Calipatria.

Larry Prunty

EXHIBIT D

EX D

```
 1  Q    Okay.  What -- what did you know about the nature of
 2  the complaint?
 3  A    What the victim had described to me over a period of
 4  years including (sic) touching and fondling for sexual
 5  gratification.
 6  Q    So you had spoken to the victim and interviewed her
 7  before you talked to Mr. Prunty; is that correct?
 8  A    From the day before.
 9  Q    And you had talked to family members of her as well;
10  have you not -- did you not?
11  A    I spoke --
12  Q    -- prior to making contact with Mr. Prunty?
13  A    I spoke with, uh, a few members of his family who had
14  no idea what was going on.
15  Q    And when you spoke -- when you spoke to the alleged
16  victim in this case and she told you what happened, did you
17  believe her?
18  A    I felt it was credible enough to take a report.
19  Q    And you felt it was credible enough to follow-up on it?
20  A    Yes, ma'am.
21  Q    And so when he -- when Mr. Prunty first answered the
22  door and said I know why you're here because of lewd acts,
23  because I committed lewd acts on my stepdaughter, given what
24  you had heard from the alleged victim is it your testimony,
25  sir, that you did not form the intent at that time to take
26  this man to jail?
27  A    The reason why I say no is because the acts had
28  occurred several years prior to the contact.  I had no idea
```

```
 1  at that point whether they were just merely touching
 2  misdemeanor type assaults or felony type assaults.  I wasn't
 3  that familiar with the touch of the law so no, I couldn't
 4  arrest him right then and there for his admission to a
 5  misdemeanor so that's why I asked him to clarify for me.
 6          THE COURT:  All right.  Continue, Counsel, my
 7  apologies.
 8          MS. WEIKEL:  Did you get that last part here?
 9          THE COURT:  I'm sorry.
10              (The Court reviewed the realtime screen).
11          THE COURT:  Continue.  I got it.
12          Tell them we'll be about five or 10 minutes.
13          MS. WEIKEL:  Would you like me to proceed?
14          THE COURT:  Yes.  Proceed.
15  Q   (By Ms. Weikel)  Okay.  Let me ask you this.  After he
16  said I know why you're here, it's because of the lewd acts
17  that I committed against my stepdaughter, at that moment in
18  time would you say that Mr. Prunty was free to leave after
19  saying that?
20  A     That did change things considerably, yes.
21  Q   So it -- it -- it's fair to say he wasn't free to leave
22  after he said -- after those words came out of his mouth?
23  A   . Correct.
24  Q   And this was approximately 12:15?
25  A   Yes.
26  Q   And then you stated that you transported him in your --
27  or you actually handcuffed him and put him in the back of
28  your patrol car; is that right?
```

```
 1  A      Yes.
 2  Q      And then you waited for other officers to arrive and to
 3  check in with your sergeant and detectives, right?
 4  A      Yes.
 5  Q      And then after, uh, a period of I guess other matters,
 6  like I just described, then you began to transport Mr. Prunty
 7  downtown; did you not?
 8  A      Well, to hall of justice.  It's Freeport and Franklin
 9  or Fruitridge.
10  Q      Okay.  And what time was it in your best estimation
11  that you read Mr. Prunty his Miranda Rights off of your
12  preapproved card?
13  A      I -- I really can't estimate.  Most likely between half
14  an hour and 45 minutes from initial contact.
15  Q      So between 1 o'clock and 1:15; would that be a fair
16  estimate?
17  A      I would -- I would have to guess.
18  Q      Well, I don't want you to guess, but I -- but we don't
19  need to be completely precise.  So your best estimate.
20  A      That would be my best estimate would be around 1:15.
21  Q      Okay.  So how far away was from it Mr. Prunty's house
22  to the station where you took him?
23  A      As I think I stated before, between 10 and 12 minutes
24  driving time.
25  Q      And after you got him to the station what did you do
26  with Mr. Prunty?
27  A      As I stated, he was placed in an interview room.
28  Q      And approximately what time was he placed in that
```

EXHIBIT E

EX E.

```
 1  A     I don't recall if I did.

 2  Q     Did you ask him to -- the various categories of sexual

 3  assault and whether he had participated in -- within those

 4  categories?

 5  A     What do you --

 6  Q     You know what I mean.  That there's some types of

 7  touching that is sex and some type of touching that is oral

 8  sex.

 9        Did you ask him to -- which categories of sexual

10  contact he had with the alleged victim?

11  A     Well, he pretty much clarified by saying he touched her

12  breasts and genitalia and likewise so I didn't -- that's at

13  the point where I told him you are under no obligation to

14  talk to me.

15  Q     Okay.  But before you said that he was under no

16  obligation to talk to you, um, he had already described the

17  -- to you some substantial sexual contact with the victim; is

18  that a fair statement?

19  A     Yes, it would be a fair statement.

20  Q     When you were at his door that day were you in full

21  uniform?

22  A     Yes, I was.

23  Q     Did you have a gun with you?

24  A     I would have had to have.

25  Q     And when you knocked on the door and he answered the

26  door and you had that initial conversation, in your opinion

27  was he free to leave at that point?

28  A     Absolutely.  The screen door was still closed.
```

```
 1  Q    So absolutely.
 2       If -- if you knocked on the door and he said I know why
 3  you're here --
 4  A    He could have technically slammed the door.
 5       THE COURT:  Wait a minute.  Wait a minute.  Stop.
 6       Finish your question.
 7  Q    (By Ms. Weikel)  You knock on the door.  You know why
 8  you're there, right?  You have information before you went
 9  out to that call about the nature of this investigation --
10  A    Yes, I did.
11  Q    -- right?
12       So you know -- you knew why you were there, right?
13  A    Yes, ma'am.
14  Q    And were you there really to arrest him, weren't you?
15  A    No, I was not.
16  Q    Why were you there?
17  A    I was there to get his side of the story.
18  Q    Okay.  And under what -- if he would have said I don't
19  know anything about what you're talking about, would you then
20  have said okay, Mr. Prunty, have a nice day and return to
21  your patrol car and gone on your way?
22  A    I don't know because that didn't happen.
23  Q    When did you form the opinion that you should take him
24  into custody?
25  A    When he made the statements about the contact and the
26  conduct.
27  Q    Okay.  When he -- when he first said I know why you're
28  here because of lewd acts, when he made those first initial
```

EXHIBIT F

EX F

| 1 | TUESDAY, MAY 17, 2005 |
| 2 | MORNING SESSION |
| 3 | ---o0o--- |

4       The matter of the People of the State of California

5   versus Larry Prunty, Defendant, No. 04F06958, came on

6   regularly before the Honorable Troy L. Nunley, Judge of the

7   Superior Court of California, County of Sacramento, State of

8   California, sitting in Department 22 thereof.

9       The People were represented by Noah Phillips, Deputy

10   District Attorney for the County of Sacramento, State of

11   California.

12       The Defendant Larry Prunty was personally present and

13   represented by Paula A. Weikel, Assistant Public Defender for

14   the County of Sacramento, State of California, as his

15   counsel.

16       The following proceedings were then had, to-wit:

17       THE COURT:  All right.  We're on the record in the

18   matter of the People of the State of California versus Larry

19   Prunty.

20       This matter has been sent here for a jury trial, and

21   the jury should be here in several moments, if they're not

22   already outside.

23       In any event, um, Counsel for the defense indicated

24   that she liked to conduct a Miranda hearing, um, to see if

25   the defendant was properly mirandized prior to making

26   incriminating -- certain incriminating statements.

27       And my understanding Miss Weikel, over and above the

28   Miranda hearing, you also requesting a hearing under 402 Sub

```
 1   (B)?
 2        MS. WEIKEL:  I am.
 3        THE COURT:  All right.  All right.  So we'll -- do you
 4   have any objection to doing the Miranda hearing as well as
 5   the hearing under Evidence Code Section 402 Sub (B) at the
 6   same time?
 7        Because essentially Evidence Code Section 402 at any
 8   party's request, the Court is required to do a hearing
 9   concerning the admissions that the defendant's made in
10   confession or admission that the defendant made.  So I'm
11   prepared to do that.
12        But I think the two issues dovetail into one another,
13   confession, admission, as well as Miranda.  Because my
14   understanding is that, at least according to the prosecution,
15   the defendant was properly mirandized and then they proceeded
16   to make certain incriminating statements.
17        Is that correct, Counsel?
18        MR. PHILLIPS:  Yes.
19        THE COURT:  All right.  Does any party have any
20   objection to me doing the Miranda hearing and 402 Sub (B)
21   hearing simultaneously?
22        MR. PHILLIPS:  No.
23        MS. WEIKEL:  No.
24        THE COURT:  All right.  Let's proceed.
25        MR. PHILLIPS:  Officer Alioto.
26        THE COURT:  All right.  C'mon up, Officer.
27        THE CLERK:  Please raise your right hand.
28        Do you solemnly state that the evidence you shall give
```

EXHIBIT G

EX G

```
 1  Q     What kind of -- what, if any, conversation did you have
 2  with him at the door?
 3  A     I knocked on the door.  The door opened and the
 4  defendant stated I've been waiting for you.  I'm on the phone
 5  with the CPS worker right now.
 6  Q     All right.  And by August 10th of 2000 and 4 you had --
 7  is it fair to say that you had some knowledge of, uh, why you
 8  were arresting Mr. Prunty?
 9  A     Yes.  Was contacting Mr. Prunty.  Yes, I did.
10  Q     Okay.  And you had -- uh, you had made contact was it
11  the day prior with a, uh, young lady by the name of Corina
12  Montez?
13  A     Yes, I did.
14  Q     Okay.  You meet Mr. Prunty at the door.  He says I've
15  been waiting for you.
16        What, if anything, do you ask him?
17  A     I actually waited for -- for him to get off the phone,
18  and I -- then I spoke to the CPS worker for I think a matter
19  of seconds.  Told him that --
20  Q     On the phone?
21  A     On the phone, 'cuz he had been speaking with her.  And
22  I asked him well, why am I here?  And that's when he um --
23  Q     What did he say?
24  A     He informed me at that point that there had been
25  inappropriate behavior, inappropriate acts between he and the
26  victim.
27  Q     Okay.  Did he describe the nature of the inappropriate
28  actions?
```

1  A      He stated that it was a -- uh, I think the word that he
2  used was lewd, sexual --

3  Q     Okay.

4  A     -- contact.

5  Q     Did he describe in anymore detail the particularities
6  of that kind of contact when you first speak with him at the
7  door?

8  A     I asked him to just clarify what he meant by -- by
9  lewd, and that's when he -- he -- he went in to very, very
10 little detail.  I don't recall the -- the -- the -- exactly
11 what he said but it was sexual in nature.

12 Q     Um, what, if anything, did you do next?

13 A     I informed him that he was under no obligation to talk
14 to me at that point, and advised him basically not to say
15 anything more until I had the opportunity to mirandize him.

16 Q     Okay.  Um, what, if anything, did you physically do
17 with him at that point in time?

18 A     At that point I also detained him in handcuffs, and I
19 notified my sergeant at which time I, uh, placed the
20 defendant in the rear seat of my police vehicle.

21 Q     Once you get him in the police vehicle, what happens
22 from there?

23 A     I waited for the sergeant to arrive.  Advised him of
24 the situation.  Contacted the detectives in our sexual
25 assault unit and, uh, was planning on transporting the
26 defendant.

27      Prior to starting the transport, I then activated my in
28 car camera in my police vehicle and mirandized him from

```
 1   verbatim from our S.P.D.  -- my Sacramento Police Department
 2   issue Miranda card.
 3   Q    All right.  Um, prior to that date, August 10th, had
 4   you everd use that Miranda card to mirandize someone?
 5   A    Every time I mirandize somebody.
 6   Q    All right.  Did you have an opportunity to, uh, read
 7   Mr. Prunty his Miranda warnings -- his Miranda Rights from
 8   the card on August 10th of 2000 and 4?
 9   A    Yes, I did.
10   Q    Did he appear to understand the Miranda warnings you
11   were providing to him?
12   A    Yes.  I -- yes, he did.  He -- he answered yes four
13   times as I read the rights.
14   Q    Verbally?
15   A    Yes.
16   Q    How many questions are there?
17   A    There are four.
18   Q    Okay.  After you read him his Miranda warnings and he
19   verbally answered yes to your questions, what if anything
20   happened next between the two of you?
21   A    We, I -- I drove him to, uh, our police headquarters to
22   where the detectives' unit is located, and we had a
23   conversation on the way there.
24   Q    Okay.  Uh, did the conversation in some regards relate
25   to, uh, his stepdaughter, Corina?
26   A    Yes, it did.
27   Q    Okay.  How long did you speak with him about that?
28   A    About?
```

EXHIBIT    H

EX H

```
 1          MR. PHILLIPS:  It's not -- this is going to be it.
 2          THE COURT:  Okay.
 3                          (tape played).
 4  Q     (By Mr. Phillips)  Okay.  For the record, um, Officer
 5  Alioto, I'm going to play it again slowly.
 6          But does it appear on the tape, Court Exhibit 1-A, that
 7  the, um, numbers in the bottom right-hand corner had
 8  changed --  or strike that.
 9          Did you have an opportunity to watch that?
10  A     Just now?
11  Q     Yeah.
12  A     Yes, I did.
13  Q     Can you give us your impression based on your
14  experience with, um, in camera tapes what, if anything, is
15  going on on the tape?
16  A     It -- it actually appears like that the -- that the
17  videotape either skipped or failed to a record, hence the
18  blue screen.
19  Q     Okay.
20  A     Thus, meaning that the record was activated but it
21  wasn't actively recording.
22  Q     Okay.  Did you -- uh, I'll probably just let the tape
23  play for itself but --
24  A     Yes.
25                          (tape played).
26  Q     (By Mr. Phillips)  Do you want me to stop it?
27  A     Yeah.  The part where it skipped right there.  I don't
28  know if you noticed that.
```

EXHIBIT    I

EX. I

1       But this is not the way the happened, and that's not
2  the way testimony was.  The testimony was a question and
3  answer session at a time Mr. Prunty was not free to leave,
4  and at which time some of the major details in this case came
5  out.

6      And what .happened later after the warnings and after
7  the advisements was just a clarification of what had already
8  been said.  So I don't think that that saves the statement
9  that Mr. Prunty had made.

10     THE COURT:  All right.  Is the matter submitted?
11     MR. PHILLIPS:  Yes.

12     THE COURT:  All right.  Essentially what you have in
13  this case is this.  And this is respects to the Miranda
14  issue.

15      Um, according to the Officer prior to going to the
16  residence the alleged victim told the Officer that the
17  defendant had been molesting her over a period of time.  In
18  fact, over a number of years.

19      Based on that information, the Officer -- and let's
20  face it, at this point in time the case is still in the
21  investigatory stage.  Okay.  He goes to the defendant's
22  house.

23      Now, once the Officer knocks -- knocks on the door and
24  by no prompts from the Officer, the first words out of the
25  defendant's mouth, according the Officer Alioto, was I've
26  been waiting for you.  And the Officer notices that the
27  defendant is on the telephone.

28      Okay.  Um, now, at that point in time clearly there is

1   no Miranda violation because the Officer hasn't even stated
2   his purpose for being there.  You know, he just knocked on
3   the door.  The defendant answers and says I know why you're
4   here.  Um, and he says I've been waiting for you.

5        The defendant apparently is on the phone with child
6   protective services, and he gives the telephone to the
7   Officer without any prompting from the Officer and, um, tells
8   the Officer that I'm on the phone with CPS and the Officer
9   engages in a brief conversation with, um, CPS.

10       Now, that actually has some implication to a large
11  extent because the question is did the defendant voluntarily
12  give the phone off to the Officer or did the Officer force
13  the defendant to give the phone over?

14       Now, clearly based on the Officer Alioto's testimony
15  the defendant voluntarily gave the phone over to the Officer.

16       Now, at this point in time one -- one crucial aspect is
17  -- is, um, -- is lacking here.  The Officer doesn't say
18  anything.  He doesn't say, for example, I'm here to arrest
19  you or I have a warrant so at this point in time, um, there
20  is no Miranda problem.

21       In fact, the only thing the Officer says, and this is
22  in response to the defendant saying I know why you're here,
23  the Officer says why am I here?  And that was the testimony.

24       And at that point in time the defendant says, um, in
25  response to why am I here, there has been inappropriate
26  sexual or lewd and sexual conduct between me and my
27  stepdaughter.  Okay. that's the testimony.

28       Now, this is only in response to the question why am I

1 | here? Up to this point this is not custodial. There's
2 | nothing you can't even say this is custodial.

3 | Because let's face it. Up to this point everything up
4 | to this point is initiated by the defendant, and the Officer
5 | is still engaged in a consensual encounter or investigatory
6 | stage.

7 | Now, the defendant tells the Officer, and I indicated
8 | that, um, he committed lewd act on his stepdaughter and the
9 | Officer says well, what do you mean by lewd acts? And at
10 | that point in time the -- um, and I'll indicate this at this
11 | point in time I still don't see any custody. The Officer
12 | hasn't drawn a gun. He hasn't put handcuffs on the
13 | defendant.

14 | In fact, um, the only way the officer enters the
15 | residence presumably is because the defendant gives him a
16 | telephone and presumably invites him into the residence. So
17 | the Officer doesn't even force his way into the residence in
18 | any manner.

19 | Um, so at this point it doesn't appear to the Court
20 | that anything has happened to make the defendant feel not
21 | free to end the consensual encounter.

22 | Now, once the defendant gives a brief description of
23 | the lewd act what does the Officer do? Does he go further
24 | and say well, tell me more? He says don't say anything more
25 | until I give you your Miranda Rights he tells him.

26 | And at that point in time he's essentially saying to
27 | him I have an intent to arrest you. I'm going to read you
28 | your Miranda Rights,

1        And, you know, even when you look at the Officer's
2    conduct -- and, in fact, when he testified, he said the
3    defendant was not free to leave once he admitted that he
4    committed lewd acts on the victim.

5        Now, the true question here is whether a reasonable
6    person in the defendant's shoes would not have felt free to
7    leave at that moment. And it's not dependent upon the
8    Officer's question. It's actually dependent upon the
9    Officer's -- Officer's behavior.

10       And quite frankly, the Court hasn't found anything in
11   Officer Alioto's behavior that would lead one to believe --
12   in looking at this reasonably that would lead one to believe
13   that he wasn't free to leave.

14       So, um, I don't see any, um, -- um, any Miranda
15   violation. It appears to me that the Officer was invited in,
16   and that's accorded by the fact that the defendant gave him
17   the phone.

18       And I will indicate to -- to Counsel that it sounded to
19   me like what you have is an invitation -- an implied
20   invitation to enter. And I don't find any Miranda violation.

21       Now, as to the examination under Evidence Code Section
22   402 Sub (B), that's a different issue. And I'll have a
23   ruling for you this afternoon because I want to finish my
24   review of the transcript, but the Miranda Motion is hereby
25   denied.

26       All right. And we'll deal with the other motion in
27   limines briefly this afternoon.

28       MS. WEIKEL:  Do we want to come back before 1:30 or do

1    we want to come --

2         THE COURT:  1:30 is fine because the jury will be

3    filtering in at 1:30.

4         Okay.  We're off the record.

5         MS. WEIKEL:  We have other motions that aren't going to

6    take that much time that just need to be put on the record,

7    the exclusion motion, etceterae.

8         THE COURT:  Right.  That's what I just indicated.

9

10

11                        (noon recess)

12

13                          --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT J

EX: J

1  he come into your bedroom?

2  A    A lot of times.  I can't even count.

3  Q    More than five?

4  A    Probably.

5  Q    More than 10?

6  A    Probably, yeah.

7  Q    Um, you lived there -- how long do you think you lived

8  at the T Street apartment?

9  A    For about two years 'cuz I ways living there from

10 second to third grade.  Probably a year and a half, two

11 years.

12 Q    How often do you think he came into your bedroom while

13 you were living at the T Street address -- excuse me, at the

14 4th Street address?

15 A    A lot of times.  I can't even count.

16 Q    If it was, um -- would it be more or less than a couple

17 times a week?

18 A    Be a couple times a week.

19 Q    Were there any particular -- were -- were there certain

20 nights of the week that he would come in more often than not?

21 A    No.

22 Q    Okay.  So it wasn't like every Saturday night?

23 A    No.

24 Q    All right.  Um, did you notice any pattern to the -- to

25 the days that he would come?

26 A    Na-uh.

27 Q    Can you tell us, um, what your earliest memory as far

28 as physically what he would do with you?

1  A      Second grade.

2  Q      Uh, when he would come into your room during the second

3  grade, uh, how did this inappropriate conduct start?  That is

4  what were the things that he would do to you initially?

5  A      Like touch me in places that he wasn't supposed to

6  touch me.

7  Q      Can you describe those places for us?

8  A      He touched my breasts, that's what he -- he would do

9  that or he touched -- tried to feel my vagina under like my

10  clothes were on.

11  Q      When you say he would try to feel your vagina, would it

12  be on the outside of your clothes or the inside of your

13  clothes?

14  A      Outside.

15  Q      Would he say anything to you while he was doing this?

16  A      No.  Not that -- sometimes he would but I can't

17  remember.

18  Q      Okay.  Um, at any point in time did, uh, he ever touch

19  you under your clothes?

20  A      Yes.

21  Q      Would he ever touch you under your clothes while

22  you were still living at that -- at that apartment on 4th

23  Street?

24  A      Yes.

25  Q      Um, how long was it before he started touching you

26  under your clothes?

27  A      I don't know.

28  Q      How often would he touch you under your clothes?

1  A      I don't know.  A lot of times.

2  Q      Um, at any point in time did, uh, his hand touch your

3  vagina?

4  A      Yes.

5  Q      At any point in time did his fingers go inside of your

6  vagina?

7  A      Yes.

8  Q      How often do you think that he did that?

9  A      I don't know.

10  Q      Um, would that kind of conduct occur while you were at

11  the 4th Street address?

12  A      Yes.

13  Q      Can you tell us whether or not he ever put more than

14  one finger in your vagina at the same time?

15         Do you understand my question?

16  A      Yeah.  I understand that question.  Yeah.  But I don't

17  think so.  I'm not --

18  Q      Okay.

19  A      -- perfectly sure.

20  Q      Did -- um, do you have any memories at the T Street

21  address of him actually, uh, placing a finger in your vagina?

22  A      Yeah.  I can remember him trying to, yeah.

23  Q      Can you tell us about that?  What would happen when he

24  would try to?

25  A      I either started to cry or like push away, like try to

26  move or something.

27  Q      How effective was that when you would try to, uh, push

28  away?

EXHIBIT K

1  so of course he would stop.

2  Q    Okay.  Um, how many times do you think he tried to

3  insert a finger into your vagina while you were living down

4  there at T Street -- excuse me, 4th Street?  Sorry about

5  that.

6  A    Um, I don't really know.  He came into my room a lot of

7  times, all the time so --

8  Q    Um, other than placing his fingers on your vagina and,

9  um, touching your breasts did he do or engage in any other,

10  um, inappropriate behavior with you?

11  A    Yes.

12  Q    Um, what else did he do?

13      THE COURT:  I'm sorry, Counsel.  Let me -- let me

14  interrupt you at this point.

15      Are you talking about 4th Street or T Street?

16      MR. PHILLIPS:  I've been mislabeling it.  It is 4th

17  Street.

18      THE COURT:  Okay.

19      MR. PHILLIPS:  And I apologize.

20  Q    (By Mr. Phillips)  The, uh, apartment that we saw up

21  there in People's 6, um, other than touching you with his

22  fingers, um, did he engage in any other inappropriate

23  behavior with you at that apartment?

24  A    Yes.

25  Q    What, if anything, else occurred?

26  A    Um, he would take his penis out and make me touch it.

27  Q    Where?

28  A    With my hands.

```
 1   Q      Okay.  And where -- what part of his penis would you
 2   touch?
 3   A      All of it.
 4   Q      How would he make you touch his penis?
 5   A      Um, he grabbed my hands and he would make me touch it
 6   up and down.
 7   Q      Okay.  Would you ever try to stop touching his penis?
 8   A      Yeah.  Yes.
 9   Q      What would happen when you would try to stop touching
10   his penis?
11   A      He would keep trying to make me touch it until, you
12   know, I would just fight with him then --
13   Q      Was he excited or not excited with -- when you would
14   touch his penis?  That is not a great question.
15          Was he erect when you would be touching his penis?
16   A      Yes.
17   Q      Okay.  Did he, um, at any point in time when you would
18   touch his -- his penis, would -- would he ejaculate?
19   A      Sometimes.
20   Q      How often would you, uh, touch his penis?
21   A      I don't know.
22   Q      More than once?
23   A      Yes.
24   Q      Okay.  In the -- the -- in the scheme of things how
25   often was it that you would be touching his penis versus, you
26   know, him touching your vagina or something else?
27   A      How often?
28   Q      Yes.
```

MC-275

Name **Larry Prunty**

Address **P.O.Box 5002**

**Calipatria, CA 92233**

CDC or ID Number **V-86405**

### SUPERIOR COURT OF SACRAMENTO COUNTY

### STATE OF CALIFORNIA
(Court)

*MMC*

**LARRY PRUNTY**
Petitioner
                         vs.

**LARRY SCRIBNER, Warden.**
Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

CV No. **08    2070**
*(To be supplied by the Clerk of the Court)*

*(PR)*

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

THOMSON
WEST

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380

MC–275

**This petition concerns:**

[XX] A conviction                    [ ] Parole

[ ] A sentence                       [ ] Credits

[ ] Jail or prison conditions        [ ] Prison discipline

[ ] Other *(specify):* _____

1. Your name: Larry Prunty

2. Where are you incarcerated? Calipatria State Prison, P.O.Box 5002, Calipatria, CA 92233

3. Why are you in custody?    [XX] Criminal Conviction    [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      Continuous sexual abuse; and lewd and lascivious acts.

      _____

   b. Penal or other code sections: Penal Code §§ 288.5; and 288(b)(1).

   c. Name and location of sentencing or committing court: Sacramento County Superior Court,

      720 Ninth Street, Sacramento, CA 95814.

   d. Case number: Superior Court Case No. 04F06958.

   e. Date convicted or committed: May 25, 2005.

   f. Date sentenced: June 24, 2005.

   g. Length of sentence: 126 years.

   h. When do you expect to be released? N/A

   i. Were you represented by counsel in the trial court?    [XX] Yes.    [ ] No. If yes, state the attorney's name and address:

      Paula Weikel (she changed her last name to Spano), Public Defender's

      Office, 720 Ninth Street., Sacramento, CA 95814.

4. What was the LAST plea you entered? *(check one)*

   [XX] Not guilty    [ ] Guilty    [ ] Nolo Contendere    [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [XX] Jury    [ ] Judge without a jury    [ ] Submitted on transcript    [ ] Awaiting trial

6. GROUNDS FOR RELIEF                                                                    MC–275

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached Memorandum of Points and Authorities

_____

_____

_____

_____

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

See attached Memorandum of Points and Authorities

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

See attached Memorandum of Points and Authorities

_____

_____

_____

7. **Ground 2 or Ground** _____ *(if applicable):*                                    MC–275

   See attached Memorandum of Points and Autorities

a. Supporting facts:
   See attached Memorandum of Points and Authorities.

b. Supporting cases, rules, or other authority:
   See attached Memorandum of Points and Authorities.

MC–275

8. Did you appeal from the conviction, sentence, or commitment?   ☒ Yes.   ☐  No.  If yes, give the following information:

a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
Court of Appeal, Third Appellate District.

b.  Result  Affirmed. (Appendix A.)                         c.  Date of decision:  Sep, 7, 2006.

d.  Case number or citation of opinion, if known:  C051285. (Appendix A.)

e.  Issues raised:  (1)  Not in possession of brief, but they must be the same

(2) _____ as those raised on petition for review, see Exhibit A.

(3) _____

f.  Were you represented by counsel on appeal?  ☒ Yes.  ☐  No. If yes, state the attorney's name and address, if known:
John F. Schuck, 4083 Transport St., Suite B. Palo Alto, CA 94303.

9. Did you seek review in the California Supreme Court?   ☒ Yes ☐  No.  If yes, give the following information:

a.  Result  Denied. (Appendix B.)                         b.  Date of decision: December  20,  2006

c.  Case number or citation of opinion, if known:  S147216. (Appendix B.)

d.  Issues raised:  (1)  Please see Exhibit A for Petition.

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
My appellate attorney was ineffective, please see Argument II, p. 31
of Memorandum of Points and Authorities.

11. Administrative Review:

a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:
N/A

b.  Did you seek the highest level of administrative review available?  ☐  Yes.  ☐  No.
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction,    MC–275
commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.    ☒☒ No. If no, skip to number 15.

13. a.  (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b.  (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

Please see attached page.

_____

16. Are you presently represented by counsel?  ☐ Yes.  ☒☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: March 8, 08

_____
(SIGNATURE OF PETITIONER)

## ATTACHMENT TO QUESTION 15

On December 20, 2006, the California Supreme Court denied review in my case; and in early January, 2007, my appellate attorney sent me a copy of the trial transcript.

It took me a couple of weeks to read the entire transcript, and so in early February, 2007, I began attending weekly sessions at the prison law library in order to understand and formulate a legal theory for filing a petition for writ of habeas corpus. Understanding the law and formulating a legal theory to attack my conviction was a little difficult, especially where I only have a high school education, and am a very slow reader. It became even more difficult after I became aware of the prison's strict law-library policy. For one, prisoner's are only allowed to attend one two-hour library session per week (see attachment 1, page 4); we are not allowed to check out any books (attachment 1, page 4); and can not make copies for our own use, the copier is to be used only for "documents that are completed and ready to me mailed to the court (attachment 1, page 3). Put simply, if an inmate wants to learn or study a particular piece of law, he must hand copy the material out of the book and take it back to the cell. This is time consuming when you take into consideration that we're only allowed to go to the library once a week for only two hours.

In late February, 2007, I wrote a letter to my trial attorney, asking her of she can send me a copy of the client-file, in that I was (1) investigating my case; and (2) formulating my arguments to file a petition for writ of habeas corpus.

While waiting for a response from my attorney and while going to the law library every week, in May, 2007, I was placed in administrative segregation (the hole) as a result of an argument I had with my cell mate. Before going to the hole, my property was placed on administrative hold, in that we're not allowed to have any personal property in the hole, not even legal work. In June of 2007, I was released from the hole, but I did not obtain my property until July, 2007.

During my time in the hole, I did not receive a response from my trial attorney. As such, in July, 2007, I wrote her again, asking her for the same. Meanwhile, I continued to use my weekly two hours at the library to investigate and formulate my arguments.

On October, 2007, I filed a complaint to the state bar as a result of my trial attorney nor responding to my letters; and on December 6, 2007, the state bar informed my that it had contacted my trial attorney and directed her to make available my client-file (see attachment 2); and on December 31, 2007, my trial counsel mailed to me a copy of the client-file (attachment 3).

After researching the client-file, I discerned a lot of information that I did not know existed. I used this information to complete my legal claims, and began the process of drafting a petition. With the assistance of another inmate, I typed this petition, and now present it to the court.

///

///

///

///

///

///

///

///

///

///

///

///

ATTACHMENT 1

# CALIPATRIA STATE PRISON
# DOM SUPPLEMENT



| California Department of Corrections | Chapter: 55000 CUSTODY/SECURITY OPERATIONS | |
|---|---|---|
| | Subchapter: 53000 ACTIVITIES | Division: EDUCATION |
| OPERATIONS MANUAL | Section:53060 LIBRARY/LAW LIBRARY | Revision Date: January 2002 |

RESPONSIBILITY FOR REVIEW:              Associate Warden-Central Operations
REVIEWED ANNUALLY:                            During the month of July
DATE OF LAST REVIEW:                          January 2001

**53060.1
LIBRARY/LAW
LIBRARY POLICY**

Yard "A" and "D" Libraries are designated Law Libraries for this institution. Yard "A" Library will accommodate "A" and "B" Yard Inmates and Yard "D" Library will accommodate "C" and "D" Yard inmates.

Yard "B", "C", and Minimum Support Facility (MSF) Yard Libraries are designated Recreational Libraries. Yard "A" and "D" Inmates will have recreational access through the Law Libraries on those yards.

A general fiction and non-fiction book collection, newspapers, and magazines shall be available in all Yard Libraries. Every Yard Library will maintain a current book collection list for inmate access. Only Recreational Library users will have access to Recreational Materials.

**53060.6
LIBRARY/LAW
LIBRARY PURPOSE**

"A" and "D" Law Libraries will be opened everyday, Sunday through Saturday with the exception of legal holidays and during emergency situations.

Access to the Law Library for "B" and "C" Yard Inmates will be on alternating days with "A" and "D" Yard Inmates.

At no time will inmates from different yards be allowed access to Law Libraries at the same time.

Three (3) sessions at two (2) hours per session will be scheduled each day.

Yard "B" and C Libraries will be opened three (3) days per week from Tuesday through Thursday with the exception of legal holidays and during emergency situations. Recreational Library sessions are one (1) hour per session.   Only inmates who have been issued ducats will be allowed access to the Yard "B" and "C" Recreation Libraries.  Those inmates wishing access to the Recreation Library may request a ducat by entering his name on the Recreation Library Sign-up Sheet (Attachment A) available at the floor officers podium in each housing unit.

Inmates in the MSF will have access to a general fiction and non-fiction book collection, newspapers, and magazines in the Yard's library. The MSF Library is opened from Wednesday through Sunday from 1800 to 1945 hours (excluding legal holidays and emergencies).  A Correctional Officer supervises the MSF Library during the hours of operation.

Ad-Seg Unit inmates may request, during Third Watch, recreational reading materials through the Ad-Seg Officer, only two (2) reading books at a time from the site book collection will be issued per requesting inmate.

Upon entering the library all inmates will immediately sign-in and present their Identification (I.D.) Cards and ducats to the library staff.   Inmates not in possession of their I.D. cards will be denied access to the Law Library.   At the end of the session inmates will sign-out and retrieve their I.D. cards before exiting.  The Law Library Officer will be responsible for conducting a Close Custody Count in the library.

No inmates, other than the assigned Library Clerks, shall be permitted behind the counters in the library. A quiet atmosphere shall be maintained at all times in the library.

No smoking, food, drinks, personal headsets, typewriters, games or loitering will be allowed in the library.   Only legal material or recreational reading material will be allowed in the library.

Library users will be properly dressed, i.e., a clean state-issued blue chambray shirt and blue denim trousers. Shirts will be buttoned and tucked in at all times. No hats will be worn in the Library. Violators are subject to progressive discipline.

Blank legal forms are available through institutional mail and in each Library. Only legal documents that are completed and ready to be mailed to the court will be copied (no partial writs or motions will be accepted for copying). Inmates may request copies of only their own ready-to-mail legal documents by submitting a Trust Account Withdrawal Slip for ten (10) cents per page. Non-legal materials will not be copied. No requests for copying will be accepted during the last fifteen (15) minutes of the scheduled library session. All completed photocopied legal documents will be mailed out from the Law Libraries only at the time copies are completed. 10"X13" gray clasp envelopes will be available for indigent inmates only upon signing a CDC 128-B verifying indigent status. The Law Library Officer will scan the contents of the legal envelopes for contraband before sealing and signing the envelopes and placing them in the mail Drop Box. The First Watch S&E Officer will collect all the legal mail from the Law Libraries daily. Law Library hours will be posted in each housing unit and each Yard Library (Attachment C).

**53060.10**
**INMATE ACCESS**
**TO LAW LIBARIES**

Only inmates who have been issued ducats will be allowed access to Law Libraries. Those inmates wishing access to the Law Library may request to be ducated by entering his name on the Law Library Sign-up Sheet (Attachment A) available at the floor officers and podium in each housing unit.

Inmates are encouraged to request time slots on days that will not conflict with their work/program assignment hours. Law Library users will remain in the Law Library for the entire two (2) hour session.

A maximum of twenty (20) inmates (fifteen [15] Law Library users and five [5] recreation users) will be accommodated per session in the Law Libraries. Only Recreational Library users will have access to Recreational Materials. Inmates may request Law

Library materials by completing a Book Request Form" (Attachment B) and submitting it to either the Library Clerk, or the on-duty Library Staff. Checkout materials, books, law journals, etc. will be limited to four (4) items at any given time, per inmate requester. No legal research materials will be removed from the Law Library.

The Law Library and Recreational Library Sign-up Sheet shall be maintained in a manila folder by the Floor Officer and located on the floor podium in each General Population Housing Unit. Inmates are to have access to the sign-up sheets. If an inmate is restricted to his cell for any of the following reasons: long term illness, restricted programming, and CTQ, and indicates that he wishes to sign-up, the Housing Officer will make sign-up sheet available to him. Library time slots are not restricted to the unit's yard time.

The Library Technical Assistant (LTA) will assign a Law Library time slot within seven (7) working days of the request. An inmate without a verified court deadline will receive Law Library access two (2) hours per week. Priority will be given to inmates with verified court deadlines. Inmates with assignments will request a time slot on their days off to comply with Inmate Work/Training Incentive Program Policy. If the inmate cannot be accommodated during his unassigned hours, the inmate has the option to request time off from his work assignment to obtain access to the Law Library. Any inmate that is issued a ducat for the Law Library and does not attend his session will be subject to progressive disciplinary action.

The Third Watch Security and Escort (S&E) Officer will get the next day's Podium Sign-up Sheets from the Program Sergeant's Office and distribute them to each housing unit after 1600 hours. The Third Watch Housing Unit Officer will deliver the completed-current dated Podium Sign-up Sheets to the Third Watch Program Sergeant's Office after the 2100 hours Institutional Count, where they will be posted on the "Library" clipboard. The LTA will pick-up the completed sign-up sheets from that office each

_A-4_

morning as they report for duty. The LTA will prepare a ducat list of the Law Library users for the next scheduled day for the Law Library. This ducat list will be picked up by the designated S&E Officer and delivered by 1030 hours to the Inmate Assignment Office for placement on the Daily Movement Sheet for the next day.

The Inmate Assignment Office will type the library ducats and will deliver them to the appropriate housing units for distribution to the scheduled inmates. Third Watch Housing Unit Staff will pass out the ducats prior to the end of their watch.

Both Second and Third Watch Officers are responsible to make the sign-up sheets available to the inmates at the Officer's Podium. Housing Unit Staff will release the ducated inmates from their cells fifteen (15) minutes prior to their assigned library time to allow for travel time between the Housing Unit and the Library. The inmates who are escorted to the Law Library will be released from their cell thirty (30) minutes prior to their assigned Law Library time so they can go to the designated-escort area.

**Restricted Housing Unit Access**

Inmates assigned to Ad-Seg Unit shall be allowed physical access to the Yard "A" Law Library. Law Library hours and services afforded to Ad-Seg inmates will be issued to each inmate upon arrival into the Ad-Seg Unit. Inmates will receive Law Library Request Forms from the Ad-Seg Law Library Officer.

On Thursday mornings, that officer will retrieve the Law Library Access Request Form and any inmate's court deadline documents provided by the courts. Ad-Seg Unit inmates without court deadlines will be scheduled for one (1) two-(2) hour block session per week. In any event, all Ad-Seg Unit inmates who request the Law Library will be scheduled within five (5) calendar days of the request being received by the Ad-Seg Law Library Officer.

Ad-Seg Unit inmates will be escorted to the "A" Yard Law Library by Ad-Seg Unit Officers, as per the Law Library Schedule.

Due to the General Population inmate's presence, and the brief two (2) hour session, Ad-Seg inmates will not have access to the restroom facilities in the Law Libraries.

From Monday through Friday, the secured area and library booths in the "A" Yard Law Library are intended for Ad-Seg Unit Inmates' use only and on weekends for other Restricted Program Inmates.

Ad-Seg Unit inmates may request Law Library materials by completing a "Book Request Form" (Attachment B) and submitting it to Ad-Seg Law Library Officer. A General Population Inmate Library Clerk will be assigned to work during all Ad-Seg library schedules. General Population inmate clerks may not come into contact with Ad-Seg Unit Inmates, but will collect all the Ad-Seg inmate's requested legal books and materials and deliver them to the Ad-Seg Officer for inspection and distribution to Ad-Seg inmates.

Ad-Seg will provide pencils, pen fillers and unlined paper for use in the Law Library.

The Ad-Seg Law Library Officer will remain in the Law Library and is responsible for the supervision of the Ad-Seg Unit inmates.

**Return to Custody (RTC) and Camps Inmate Access**

Minimum Support Facility (MSF) inmates may request Law Library materials, such as court forms, and case law through photocopy paging service by sending a "Legal Photocopy Request Form" (Attachment D) to the LTA at the "D" Yard Law Library via Institution Mail. The Library Staff will photocopy the requested cases(s) and the case photocopies will be forwarded to the MSF Law Library for the inmate's use in the library only. When the inmate is finished reviewing the case(s) the MSF Library Clerk will collect the photocopied case(s) from the inmate and deliver it to the MSF Program Office Staff who will forward those photocopied case(s) back to the "D" Yard Law Library. Any MSF inmate who requests direct physical access to the MSF Law Library shall be considered for a temporary move into "C" Yard.

Inmates with court deadlines must submit to the LTA a copy of the court document showing the name of the court that issued the documents and with a specified deadline or statutory deadline. Ad-Seg inmates will submit their court deadline documents through the Ad-Seg Law Library Officer. Upon verification, the deadline documents will be returned to the inmates. Inmates with these verified deadlines will have priority access to the Law Library thirty (30) days prior to the expiration of that court deadlines, and will receive a minimum of four (4) hours per week in two-(2) hour increments. This priority cannot be transferred. Court deadlines do not guarantee an inmate daily access to the Law Library. Inmates with a court deadline must continue to use the Law Library Sign-up Sheet in the housing unit for Law Library access.

If an inmate received a court deadline during restricted movement, he must notify his Housing Officer. Unit Officers will bring the inmate's, court documents, to the Law Library to verify their deadline status. During periods of Yard Lockdowns, inmates with verified court deadlines will be scheduled for the Law Library' in accordance with the Institutional Security Procedure.

The institution recognizes CCR Title 15, § 3163 Legal Papers, books, opinions, and forms being used by one inmate to assist another may be in the possession of either inmate with the permission of the owner. Every effort will be made by the LTA to schedule both inmates for the same Law Library time slot. Inmates requesting assistance from other inmates with their legal work should sign an Informed Consent Inmate Legal Assistance Form, valid for sixty (60) days from the date signed (Attachment E), which are available from the LTA. Inmates, whether offering or receiving legal assistance, must be from the same Yard.

ATTACHMENT A:            Recreational Library Sign-up Sheet
ATTACHMENT A-1:          Law Library Sign-up Sheet
ATTACHMENT B:            Book Request Form (Restricted Housing Unit)
ATTACHMENT C:            Library Operation Schedule
ATTACHMENT D:            Legal Photocopy Request Form (MSF)

ATTACHMENT E:                    Informed Consent Inmate Legal Assistance Form

S. GARCIA                                          Date
Warden (A)

ATTACHMENT 2



**THE STATE BAR**
**OF CALIFORNIA**
1149 SOUTH HILL STREET, LOS ANGELES, CALIFORNIA 90015-2299

OFFICE OF THE CHIEF TRIAL COUNSEL
INTAKE

TELEPHONE: (213) 765-1000
TDD: (213) 765-1566
FAX: (213) 765-1168
http://www.calbar.ca.gov

December 6, 2007

Larry V. Prunty
CDC #V-86405
P.O. Box 5002
Caliparia, CA 92233

RE:   Inquiry Number:      07-27360
        Respondent:          Paula A. Spano

Dear Mr. Prunty:

You have complained that Paula A. Spano has been discharged and not returned your documents to you. Your complaint concerns us. However, it is hoped that bringing your complaint to the attorney's attention will resolve this matter.

We have advised the attorney to contact you within ten (10) working days from the date of this letter, regarding the availability of your client file. Under the Rules of Professional Conduct, the attorney is not required to mail or deliver the file to you. Whether you, or a designee, pick up the file from the attorney's office or the attorney mails the file to you, is a decision to be made between you and the attorney.

Should the attorney fail to contact you within the specified time, please recontact the State Bar. At that time, we will determine if further action is needed.

At this time, your complaint file is being closed, without prejudice.

Very truly yours,

Lisa McGeo
Paralegal

/lm

ATTACHMENT 3



**County of Sacramento**
*Office of the Public Defender*

Felony Division

PAULINO G. DURÁN
Public Defender

**Karen M. Flynn**
Chief Assistant Public Defender

**Steven W. Lewis**
Chief Assistant Public Defender

December 31, 2007

Larry Prunty
CDC# V-86405
P.O. Box 5002
Calipatria, California 92233

Dear Mr. Prunty:

Enclosed is the copy of your file that you have requested. I apologize for any delay but your trial attorney has been on medical leave.

Sincerely,

Alice Michel
Assistant Public Defender

Letter
12/31/2007

700 H Street, Suite 0270   Sacramento, CA 95814   Telephone: (916) 874-6411   Fax: (916) 874-8223

1  Larry Prunty
   CDC# V-86405
2  P.O.Box 5002
   Calipatria, CA 9233
3  Petitioner In Propria Persona

4

5

6

7

8              SUPERIOR COURT OF SACRAMENTO COUNTY

9                    STATE OF CALIFORNIA

10

11 **LARRY PRUNTY,**                  )  **PETITION FOR WRIT OF HABEAS**
                                       )  **CORPUS**
12                    Petitioner,      )
                                       )
13             v.                      )
                                       )
14 **LARRY SCRIBNER, Warden,**         )
                                       )
15                    Respondent.      )
   ─────────────────────────────────  )

16

17

18

19

20

21          **PETITION FOR WRIT OF HABEAS CORPUS**

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

MEMORANDUM OF POINTS AND AUTHORITIES                                    1

ARGUMENT I

    PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL
RIGHTS UNDER THE 6TH AND 14TH AMENDMENTS, IN
THAT HE WAS DENIED THE RIGHT TO COMPETENT TRIAL
COUNSEL                                                                1

    a. Standard of Review For Ineffective Assistance
       Of Counsel Claim                                             3

    b. Trial Counsel's Acts And Omissions At Preliminary
       Hearings And At Trial Fell Below The Reasonable
       Standard Guaranteed Under The State and Federal
       Constitutions                                                4

       1. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
          BRING TO THE COURT'S ATTENTION THE FACT THAT
          THE STATUTE OF LIMITATIONS FOR ALL CHARGES OF
          SEXUAL ABUSE HAD RUN OUT AND THUS THE COURT DID
          NOT HAVE JURISDICTION TO TRY PETITIONER          5

          A. Relevant Law                                    6

          B. Relevant Facts                                  6

          C. Under Penal Code § 800, The Statute of Lim-
             tations To Charge Petitioner Had Run Out,
             Thus Counsel's Failure To Bring This To The
             Court's Attention Was A Violation Of His
             State And Federal Rights To (1) An Effec-
             tive Attorney; (2) Due Process; And (3)
             Equal Protection.                               7

          2. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
          BRING TO THE COURT'S ATTENTION THAT PETITIONER
          WAS ARRESTED WITHOUT PROBABLE CAUSE, THEREBY VIO-
          LATING HIS CONSTITUTIONAL RIGHT UNDER THE FOURTH
          AMENDMENT: AND ACCORDINGLY, UNDER THE EXCLU-
          SIONARY RULE, ALL EVIDENCE GENERATED BY POLICE
          AFTER PETITIONER'S ARREST SHOULD HAVE BEEN
          EXCLUDED                                         8

          A. Relevant Law                                    9

          B. Relevant Facts                                  11

C. Petitioner's Constitutional Rights Under The
Fourth Amendment Was Violated, In That, Con-
trary To Officer Alioto's Testimony, Peti-
tioner Was Arrested Before Making The Alleged
Inculparoty Statements; Thus Counsel's Failure
To Bring This To The Court's Attention Deprived
Petitioner Of His Right To Competent Counsel;
Due Process; And Equal Protection                                14

3. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
BRING TO THE COURT'S ATTENTION THAT BEFORE PETI-
TIONER WAS ARRESTED, POLICE DID NOT READ HIM
HIS RIGHTS UNDER ARIZONA V. MIRANDA, THUS VIO-
LATING HIS CONSTITUTIONAL RIGHTS UNDER THE 5TH
AMENDMENT                                                        16

   A. Relevant Law                                               17

   B. Relevant Facts                                             18

   C. During The Evidentiary Hearing, The Court
   Did Not Make Any Findings At To Whether
   Police Read Petitioner His Miranda Rights,
   And Therefore The Prosecutor Should Not
   Have Been Able To Present To The Jury The
   Taped Confession, And Counsel's Failure To
   Point This Out To The Court Was A Violation
   Of Petitioner's Constitutional Right To A
   Competent Attorney                                            20

4. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING
TO BRING TO THE COURT'S ATTENTION THAT THERE
WAS INSUFFICIENT EVIDENCE TO CONVICT PETI
TIONER AS TO COUNT 1                                             21

   A. Relevant Law                                               22

   B. Relevant Facts                                             23

   C. There Was Insufficient Evidence To Convict
   Petitioner On Count 1, And Counsel's Failure
   To Bring This To The Court's Attention Dep-
   rived Him Of Competent Counsel                                26

5. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING
TO BRING TO THE COURT'S ATTENTION THAT THERE
WAS INSUFFICIENT EVIDENCE TO CONVICT PETI-
TIONER AS TO COUNTS 2-20                                         27

   A. Relevant Law                                               28

1          B. Relevant Facts                                                       28

2          C. There Was Insufficient Evidence To Con-
              vict Petitioner As To Counts 2-20, And
3             Counsel's Failure To Bring This To The
              Court's Attention Deprived Petitioner Of
4             Competent Counsel                                  29

5           6. THE CUMULATIVE EFFECT OF ERRORS HEREIN
               DEPRIVED PETITIONER OF DUE PROCESS                30
6

7  ARGUMENT II

8      PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE REP-
       RESENTATION OF EFFECTIVE APPELLATE COUNSEL             31
9
   VERIFICATION                                                      32
10
   PROOF OF SERVICE                                           32
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B. Relevant Facts                                              28

C. There Was Insufficient Evidence To Con-
   vict Petitioner As To Counts 2-20, And
   Counsel's Failure To Bring This To The
   Court's Attention Deprived Petitioner Of
   Competent Counsel

6. THE CUMULATIVE EFFECT OF ERRORS HEREIN
   DEPRIVED PETITIONER OF DUE PROCESS                          32

ARGUMENT II

   PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE REP-
   RESENTATION OF EFFECTIVE APPELLATE COUNSEL                  31

ARGUMENT III

   THE TRIAL COURT ERRONEOUSLY DENIED PETITIONER's
   MARSDEN MOTION FOR NEW COUNSEL. AS A RESULT,
   PETITIONER'S RIGHT TO COUNSEL UNDER THE SIXTH
   AMENDMENT WAS VIOLATED                                      32

   a. Petitioner Was Unconstitutionally Denied His
      Right To Counsel                                         32

   b. Conclusion                                               34

ARGUMENT IV

   PETITIONER'S PRETRIAL STATEMENTS WERE OBTAINED IN
   VIOLATION OF HIS RIGHTS UNDER THE FIFTH AMENDMENT
   AND MIRANDA; AND SHOULD HAVE BEEN EXCLUDED PURSUANT
   TO PETITIONER'S OBJECTION                                   35

   a. The Facts                                                35

   b. Petitioner's Statements Were Obtained In Vio-
      lation Of The Fifth Amendment And Arizona
      v. Miranda                                               37

   c. Conclusion                                               40

VERIFICATION                                                   41

PROOF OF SERVICE                                               41

1               **TABLE OF AUTHORITIES**

2                                                 Page

3 Federal Cases

4 Arizona v. Miranda
   (1966) 384 U.S. 436                       17, 21
5

6 Beck v. Ohio
   (1964) 379 U.S. 89                       10, 11

7 Chambers v. Mississippi
   (1972) 410 U.S. 284                       30
8

9 Evitts v. Lucey
   (1985) 469 U.S. 387                       31

10 Illinois v. Gates
   (1985) 462 U.S. 213                       10, 11
11

12 Jackson v. Virginia
   (1979) 443 U.S. 307                       22, 23

13 Nunes v. Mueller
   350 F.3d 1045 (9th Cir. 2003)              3
14

15 Ornelas v. U.S.
   (1996) 517 U.S. 690                       11

16 Powell v. Alabame
   (1932) 287 U.S. 45                       4
17

18 Sibron v. New York
   (1968) 392 U.S. 40                       4

19 Strickland v. Washington
   (1984) 466 U.S. 668                       4
20

21 U.S. v. Marion
   (1971) 404 U.S. 307                       6

22 U.S. v. Sharpe
   (1985) 470 U.S. 675                       10
23

24 State Cases

25 In re Sanders
26    (1970) 2 Cal.3d. 1033                     4

27

28

People v. Allen
(1985) 165 Cal.App.3d 616 ............................................. 23

People v. Barnes
(1986) 42 Cal.3d 284 .................................................. 22

People v. Carrin
(2001) 26 Cal.4th 81 ................................................... 6

People v. Hoez
(1988) 200 Cal.App.3d 811 ............................................ 28

People v. Ibarra
(1963) 60 Cal.2d 460 ................................................... 4

People v. Johnson (1980) 26 Cal.3d 357
(1980) 26 Cal.3d 284 .............................................. 22, 23

People v. Jones
(1990) 51 Cal.3d 294 .............................................. 27, 28

People v. Ledesma
(1987) 43 Cal.3d 171 ................................................... 4

People v. Lewis
(1990) 50 Cal.3d 262 .................................................. 21

People v. Mabin
92 Cal. 4th 654 ........................................................ 7

People v. Markham
(1989) 49 Cal.3d 63 ................................................... 18

People v. Martinez
(2000) 26 C.4th 750 .................................................... 6

People v. Murtishaw
(1981) 29 Cal.3d 733 ................................................. 18

People v. Pope
(1979) 23 Cal.3d 412 ................................................... 4

People v. Rodriguez
(2002) 28 Cal.4th 543 ............................................. 23, 26

People v. Sims
(1993) 5 Cal.4th 405 ................................................. 21

People v. Vazquez
(1996) 51 Cal.App 4th 1277 ........................................ 23, 36

People v. Witham
(1995) 38 Cal.App.4th 1283 ........................................ 23, 26

Federal Statutes/Codes

Constitution, Amend. 4                                    5, 9

Constitution, Amend. 5                                    5, 21

Constitution, Amend. 6                                      21

State Statutes/Codes

Constitution, Art. I, Sec 7(a), 24, 29                   5, 8

Penal Code § 800                                            6

Penal Code § 288.5                                   7, 23, 26

Penal Code § 803(f)                                      7, 8

///

MEMORANDUM OF POINTS AND AUTHORITIES

ARGUMENT

I

**PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS UNDER THE 6TH AND 14TH AMENDMENTS, IN THAT HE WAS DENIED THE RIGHT TO COMPETENT TRIAL COUNSEL**

Introduction

The California and United States constitutions guarantee that a defendant, in a criminal proceeding, will have a competent attorney to uphold and protect his or her rights regardless of the accusations.

Here, in February, 2004, Petitioner's step-daughter, Corina, went to police and filed a report accusing Petitioner of sexually abusing her from 1993 to 1998. After taking Corina's report, police Officer Joe Alioto reported that Corina's accusations were not credible enough to arrest Petitioner, but were credible enough to investigate, and interview him to get his side of the story. The following day, Officer Alioto went to Petitioner's house, but instead of interviewing him, Officer Alioto handcuffed Petitioner, placed him under arrest, and then took him down to police headquarters to be interrogated. These actions resulted in Petitioner making inculpatory statements, which, the police used to charge him with (1) continuous sexual abuse; and (2) lewd and lascivious acts.

Before trial, defense counsel Paula Weikal, moved to dismiss (1) Petitioner's inculpatory statements to Officer Alioto; and (2) his taped confession at the police station,--in that he was never read his miranda rights. Although the court held an evidentiary hearing, wherein it found that Petitioner's admissions to Officer

1

1 Alioto were voluntary, the court at no time made a finding of fact
2 as to whether Officer Alioto, or any police officer, read Petitioner
3 his miranda rights; nonetheless, Petitioner's inculpatory state-
4 ments were introduced to the jury.

5     At trial, the prosecutor asked Corina if Petitioner sexually
6 abused her; although she answered "yes," she, however, was unable to
7 provide any information as to (1) when she was abused; and (2) how
8 many times Petitioner abused her, stating "I don't know" and "I
9 don't remember."

10     Consequently, Petitioner was not provided with a competent
11 trial attorney as guaranteed by the state and federal constitutions.
12 Specifically, counsel's incompetence resulted from, among other
13 things, the cumulative effect of the following specific acts and
14 omissions:

15     (1) once Petitioner was arrested, counsel failed to bring to the
16         court's attention the fact that the statute of limitations
17         for all charges of sexual abuse had run out, and thus the
18         court did not have jurisdiction to try Petitioner;

19     (2) before trial, counsel failed to raise the claim that Peti-
20         tioner was arrested without probable cause, and that his
21         admissions to police should have been excluded as "fruit of
22         the poisonous tree";

23     (3) before making inculpatory statements to police, Petitioner
24         was not read his miranda rights, thus counsel failed to make
25         sure the taped confession was excluded at trial; and
26
27     (4) after the prosecution presented its case-in-chief, trial
28         counsel failed to request that all charges be dismissed, in

1           that the prosecutor failed to prove all the elements of the

2           sexual abuse (specifically, when the abuse occurred, and

3           how often).

4

5   **a. Standard of Review for Ineffective Assistance of Counsel Claim**

6           Both the state and federal governments provide state prisoners

7   the opportunity to show that he or she was deprived of a competent

8   trial attorney. In that respect, a state prisoner may file a peti-

9   tion for writ of habeas corpus in the state courts where he or she

10  resides, providing facts as to the theory of how and why trial coun-

11  sel was ineffective. Initially, when the prisoner files the habeas

12  petition, he or she need not "prove" the claim of ineffective coun-

13  sel. Instead, the court requires the prisoner to only make a "prima

14  facie" showing; meaning, Petitioner's factual allegations are taken

15  as true, and if those facts would entitle him or her to relief,

16  than the Petitioner has made a prima facie showing. (See Cal. Rules

17  of Court, Rule 4.551(c); Nunes v. Mueller,[1] state court "should not

18  have required [petitioner] to prove his claim without affording

19  him an evidentiary hearing.")[2]

20          Although Petitioner--at this stage--is not required to prove

21  his claim of ineffective counsel; Petitioner, here, nonetheless,

22  asserts that trial counsel's performance fell below the reasonable

23  standard set forth in the state and federal constitutions.

24          Generally speaking, both constitutions require that counsel

25

26  1.  (2003) 350 F.3d 1045 (9th Cir.)

    2.  Id. at 1054.

27

28

3

be "effective," (Powell v. Alabama;[3] People v. Ibarra;[4] In re Sand-
ers[5]), and "reasonably competent" when "acting as [the defendant's]
conscientious advocate." (See People v. Pope;[6] and Strickland v.
Washington.[7])  To test whether counsel was not "effective" or
"reasonably competent," a petitioner must make two showings. First,
the Petitioner must show that "counsel's performance was dificient"
(see People v. Ledesma;[8] Strickland v. Washington[9].) To prove difi-
ciency of counsel, Petitioner"must establish that counsel's rep-
resentation fell below an objective standard of reasonableness . . .
under prevailing professional norms." (See Ledesma, supra;[10] and
Strickland, supra;[11]) And second, that counsel's deficiencies were
prejudicial. (See Ledesma, supra;[12] Strickland, supra[13].)


**Trial Counsel's Acts and Ommission at Preliminary hearings  and**
**at Trial  fell below the reasonable standard guaranteed under**
**the State and Federal Constitutions**

   Both the California and Federal Constitutions guarantee a
criminal defendant to (1) an effective attorney; and (2) due process

---

3. (1932) 287 U.S. 45, 72

4. (1963) 60 Cal.2d. 460, 464

5. (1970) 2 Cal.3d 1033, 1041

6. (1979) 23 Cal.3d 412, 423

7. 466 U.S. 668, 668-695

8. (1987) 43 Cal.3d 171, 215

9. supra, at 687-688.

10. supra, at 216.

11. supra, at 687-688.

12. supra at 218.

13. supra, at

///

4

1  of law. (See California Constitution[14] and U.S. Constitution[15].)

2      Here, Petitioner's trial counsel made several mistakes that

3  resulted in him being convicted; where, otherwise, Petitioner

4  would have been acquitted of all charges. As such, Petitioner sets

5  forth below the four errors of trial counsel that resulted in a

6  violation of his state and federal rights.

7

8  **1. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING**
   **TO THE COURT'S ATTENTION THE FACT THAT THE STATUTE**
9  **OF LIMITATIONS FOR ALL CHARGES OF SEXUAL ABUSE HAD**
   **RUN OUT AND THUS THE COURT DID NOT HAVE JURISDICTION**
10 **TO TRY PETITIONER**

11     Introduction

12     The Due Process Clause of the 14th Amendment to the United

13 States Constitution protects persons from being convicted of crimes

14 where the statute of limitations to charge that person has run out.

15 Here, the prosecutor charged Petitioner with committing several,

16 sexual acts with his step-daughter, in violation of Penal Code 288.5

17 and 288(b)(1). Those statutes, however, required that the victim

18 report the acts to police no later than six years after the acts took

19 place. But Petitioner's step-daughter did not report the acts until

20 six years and six months after the act took place. Accordingly, then,

21 since the statute of limitations to charge Petitioner had run out,

22 the court did not have jurisdiction to try Petitioner, and therefore

23 counsel's failure to bring this to the court's attention violated

24 Petitioner's right to (1) have a competent attorney; and (2) Due

25

26     14. Art. I, Sec §§ 7(a), 24, 29.

27     15. Amend. 5 and 14.

28 ///

1  Process of Law.

2

3  **A. Relevant Law**

4      Generally, the statute of limitations period protects criminal
5  defendants during the prearrest and preaccusation stages (see U.S.
6  v. Marion[16]), while the due process clause protects criminal def-
7  endants after the statute of limitations has expired and before the
8  right to a speedy trial has attached, that is before the defendant
9  is arrested or a complaint is filed.(See People v. Martinez;[17] and
10 People v. Cattin[18].)

11      Penal Code § 800 establishes a statute of limitations for all[19]
12 crimes that are punishable by eight years or more. However, if the
13 particular crime is a "sex crime," § 803 permits prosecution for
14 those crimes where "[t]he limitation period specified in [prior
15 statute of limitation's] has expired"--provided that (1) a victim
16 has reported an allegation of abuse to the police; (2) [t]here is
17 independent evidence that corroborates the victim's allegations; and
18 (3) the prosecution is begun within one year of the victim's re-
19 port.

20

21 **B. Relevant Facts**

22      On August 9, 2004, Petitioner's step-daughter, Corina, made a
23 complaint to police that Petitioner had sexually abused her from
24 1993 to 1998. (Exhibit B.) Accordingly, on March 4, 2005, the

25  _____

26 16. (1971) 404 U.S. 307, 322-333  30 L.Ed.2d 468

27 17. (2000) 26 C.4th 750, 765 767

   18. (2001) 26 Cal.4th 81, 107
28 19. All statutory references are to the Penal Code unless otherwise specified.

1  prosecutor charged Petitioner, under § 288.5, with one count of

2  committing "continuous sexual abuse" on Corina between February

3  22, 1993 to February 21, 1996; and 19 counts, under § 288(b)(1),

4  of committing "lewd and lascivious" acts with Corina between Feb-

5  ruary 22, 1996 to February 21, 1998. (Exhibit B .)

6

7  C. **Under Penal Code § 800, The Statute of Limitations To Charge**
   **Petitioner Had Run Out, Thus Counsel's Failure To Bring This**
8  **To The Court's Attention Was A Violation Of His State And**
   **Federal Rights To (1) An Effective Attorney; (2) Due Process;**
9  **And (3) Equal Protection**

10  Petitioner was charged with sexually abusing Corina from  Feb-

11  ruary 22, 1993 to February 21, 1998. As such, in order for the pro-

12  secutor to have met the statute of limitations, Corina must have

13  reported the alleged abuse to the police no later than February 21,

14  2004. But that did not happen. Instead, Corina made her complaint

15  to police on August 9, 2004. Thus, the statute of limitations to

16  charge and/or convict Petitioner had ran out.

17  Although one may argue that § 803(f) "revives" the statute of

18  limitations where there is "independent evidence that corroborates

19  the victim's allegations," that argument fails for one reason. The

20  only evidence that existed when Corina made her report to police

21  were her allegations, which, standing alone, did not provide "evid-

22  ence" that was "independent" to her allegations. (See People v.

23  Mabin,[20] (Evidence that defendant was previously charged for sexual

24  offence was "independent" to victim's "allegations."[21])

25  _____

26  20. 92 Cal.4th 654, 657  112 Cal.Rptr.2d 159.

27  21. Id. at 657.

28  ///

7

1   And, that Petitioner made inculpatory statements is irrele-
2   vant, in that § 803(f) requires that the independent evidence exist
3   at the moment the victim made her allegations. But even if the
4   inculpatory    statements could corroborate Corina's allegations
5   (which they do not) those statements were not valid as a matter of
6   law. (See subclaims 2, 3, and 6.)

7   Accordingly, because (1) the statute of limitations on the
8   charges against Petitioner had run out; and (2) the court did not
9   have jurisdiction to try Petitioner; counsel's failure to bring the
10  above to the court's attention was prejudicial; --for, if brought
11  to the court's attention, the court would have had no choice but to
12  dismiss all charges against Petitioner, thus violating his state
13  and federal constitutional rights to (1) effective counsel; (2)
14  due process; and (3) equal protection. (See California[22] and U.S.[23]
15  Constitutions.)

16

17  **2. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING TO THE**
18  **COURT'S ATTENTION THAT PETITIONER WAS ARRESTED WITHOUT**
    **PROBABLE CAUSE, THEREBY VIOLATING HIS CONSTITUTIONAL RIGHT**
19  **UNDER THE FOURTH AMENDEMNT; AND ACCORDINGLY, UNDER THE**
    **EXCLUSIONARY RULE, ALL EVIDENCE GENERATED BY POLICE AFTER**
20  **PETITIONER'S ARREST SHOULD HAVE BEEN EXCLUDED**

21  Introduction

22  The Fourth Amendment to the U.S. Constitution protects all
23  persons from unreasonable searches and seizures. Here, Corina made
24  allegations to police that Petitioner had, over a course of many

25
26  22. Art. I, Sec §§ 7(a), 24, 29.
    23. Amend. 5 and 14.
27
28  ///

8

1  years, sexually abused her. The officer in charge of taking Cor-
2  ina's report, stated in the report that he did not have probable
3  cause to arrest Petitioner because (1) the alleged crimes occurred
4  several years in the past; (2) the officer still had to obtain Peti-
5  tioner's side of the story; and (3) the crimes could have been of
6  a misdemeanor nature. The police officer went to Petitioner's house,
7  but at no time obtained Petitioner's side of the story, nor did the
8  officer inquire into his belief that the crimes were merely a mis-
9  demeanor; instead, the officer arrested Petitioner, resulting in
10  him being arrested without probable cause. Accordingly, trial coun-
11  sel's failure to bring this to the court's attention was a viola-
12  tion of (1) his Fourth Amendment right; (2) right to have the
13  state's evidence excluded as "fruit of the poisonous tree"; and (3)
14  and his right to effective counsel.

15

16      **A. Relevant Law**

17      The Fourth Amendment of the United States Constitution governs
18  all searches and seizures conducted by government agents. That
19  Amendment contains two separate clauses: a prohibition against un-
20  reasonable searches and seizures, and a requirement that probable
21  cause support each warrant issued. (See U.S. Const. Amend. Four.)
22  Interpreted literally, the Fourth Amendment requires a government
23  agent to have probable cause before obtaining a warrant or probable
24  cause before seizing and searching a person.

25      Probable cause, then, is required to justify governmental
26  intrusions upon interests protected by the Fourth Amendment.
27  ///
28  ///

9

1   The United States Supreme Court, in Beck v. Ohio,[24] held that pro-
2   bable cause to obtain an arrest warrant or to conduct a warrantless
3   arrest exists when police have, at the moment of arrest, knowledge
4   of facts and circumstances grounded in reasonable trustworthy info-
5   rmation and sufficient in themselves to warrant a belief by a pru-
6   dent man in believing that the arrested person committed or was
7   committing an offense. (See Beck.)[25]

8       Because probable cause refers back to the "knowledge" and
9   "facts" in possession of the individual officer as applied solely
10  to the "circumstances" of the individual case, the Court has dec-
11  lined to formulate a "bright line rule" (see U.S. v. Sharpe)[26] that
12  a court may apply to all cases to determine at what point the facts
13  and knowledge (held by the particular officer) developed in pro-
14  bable cause. (See Sibron v. New York.)[27] Rather, in Illinois v.
15  Gates,[28] the Court held that Fourth Amendment claims must be rev-
16  iewed on a case-by-case analysis using the "totality-of-the-circum-
17  stances approach."[29]

18      To this, the Court explained that the probable cause determina-
19  tion is two fold and that each step warrants its own assessment.
20  First, judges must determine the "historic facts," that is, the

21

22  24. (1064) 379 U.S. 89, 85 S.Ct 223 13 L.Ed.2d 142
23  25. Id. at 91.
    26. (1985) 470 U.S. 675, 685
24  27. (1968) 392 U.S. 40, 59 88 S.Ct 1889 20 L.Ed.2d 917
25  28. (1985) 462 U.S. 213
26  29. Id. at 231.
27  ///
28  ///

10

1  events that occurred leading up to the stop or search. Second, the
2  judge must decide "whether these historical facts, viewed from the
3  stand point of an objectively reasonable police officer," amount to
4  probable cause. (See Ornelas v. U.S.;[30] also see Beck, [when the
5  constitutional validity of an arrest is challenged, it is the fun-
6  ction of the court to determine the facts available to the officer
7  at the moment of arrest; it is the function of the court to deter-
8  mine whether the facts available to the officer at the moment of
9  arrest would "warrant a man of reasonable caution in the belief that
10 an offence has been committed.[31]

11     This form of review, the Court held, is necessary because
12 articulating precisely what "reasonable suspicion" and "probable
13 cause" mean is not possible. --They are common sense, nontechnical
14 conceptions that deal with "'the factual and practical considera-
15 tion of everyday life on which reasonable and prudent men, not
16 legal technicians, act"; finding, that "[o]ne simple rule will not
17 cover every situation. (See Illinois;[32] also see Beck, [court can
18 not properly discharge its fourth amendment analysis unless it
19 obtains all necessary facts.].)[33]

20

21     B. Relevant Facts
22     On August 9, 2004, Corina went to police complaining that Peti-
23 tioner sexually abused her from 1993 to 1998.
24

25 30. (1996) 517 U.S. 690
26 31. supra, at 91.
27 32. supra, at 231, quoting Brinegar v. U.S., (1949) 338 U.S. 160, 175
   33. supra, at 96.
28

11

1   The following day, Petitioner was made aware by his wife that
2  Corina had made said allegations, and that a police officer was
3  going to come to the house to interview him. (Exhibit C .) Upon
4  hearing this information, Petitioner became upset, and asked his
5  wife how Corina could make such allegations against him. (Exhibit C.)
6  A couple of hours later, and after a heated discussion between Peti-
7  tioner and his wife, there was a knock on the door. There, standing
8  on the porch was Police Officer Joe Alioto. Upon seeing the Officer,
9  Petitioner opened the door, at which time he stated "I know why
10 you're here"; Officer Alioto ordered Petitioner to exit the house,
11 handcuffed him, and placed him in the back seat of his patrol car,
12  never having a chance to speak. (Exhibit C.)

13   Before trial, Officer Alioto testified at a preliminary hearing
14 that he did not go to Petitioner's house to arrest him, for he had
15 no probable cause to do so, in that (1) Corina's allegations were
16 not credible enough to make him believe that a crime was committed
17 (Exhibit D, p.1);(2) the allegations could be misdemeanor type crimes
18 (Exhibit D, p.2);and (3) Officer Alioto still had to get Petitioner's
19 side of the story. (Exhibit D.) But that because of statements by
20 Petitioner that he sexually abused Corina, that he had no choice
21 but to arrest Petitioner. (Exhibit D, p. 1.)

22   In relevant part, the following took place at the preliminary
23 hearing:

24   Q: [by defense counsel] And when you knocked on the door and he
25      [Petitioner] answered the door and you had that initial
26      conversation, in your opinion was he free to leave at that
27      point?
28 ///

12

1    A: [by officer Alioto] Absolutely.

2   (Exhibit E, p.1.)

3    Q: And were you not there really to arrest him, weren't you?

4    A: No I was not.

5    Q: Why were you there?

6    A: I was there to get his side of the story.

7   (Exhibit E, p. 2.)

8    Q: And so when he -- when Mr. Prunty first answered the door and

9       said I know why you're here because of lewd acts, because I

10       committed lewd acts on my step daughter, given what you heard

11       from the alleged victim is it your testimony, sir, that you

12       did not inform the intent at that time to take this man to

13       jail?

14    A: The reason I say no is because the acts had occurred several

15       years prior to the contact. I had no idea at that point

16       whether they were just merely touching misdemeanor type

17       assaults or felony type assaults.

18   (Exhibit D, pp. 1-2.)

19

20    Q: Did you ask him to -- which categories of sexual contact he

21       had with the alleged victim?

22    A: Well, he pretty much clarified by saying he touched her

23       breasts and genitalia and likewise so I didn't -- that's at

24       the point where I told him you are under no obligation to

25       talk to me.

26   (Exhibit E, p. 1.)

27   ///

28   ///

13

1    Q: SO it -- it -- it's fair to say he wasn't free to leave after

2        those words came out of his mouth?

3    A: Correct.

4    Q: And this was approximately 12:15?

5    A: Yes.

6    Q: And then you stated that you transported him in your -- or

7        you actually handcuffed him in the back of you patrol car; is

8        that right?

9    A: Yes.

10   (Exhibit D, p. 3.)

11   C. **Petitioner's Constitutional Rights Under The Fourth Amend-
     ment Was Violated, In That, Contrary To Officer Alioto's**

12   **Testimony, Petitioner was Arrested before making the alleged
     Inculpatory Statement; Thus Counsel's Failure To Bring This**

13   **To The Court's Attention Deprived Petitioner Of His Right To
     Competent Counsel; Due Process; And Equal Protection**

14

15        As previously mentioned, if a government agent is to seize or

16   arrest a private citizen, the Fourth Amendment requires that agent

17   to have probable cause before obtaining a warrant or probable cause

18   before seizing and searching that person. Here, Officer Alioto had

19   neither.

20        At the preliminary hearing, Officer Tinsdale testified that

21   Corina's allegations, as he (an officer) saw them were not credible

22   enough to seize (arrest) Petitioner, but only sufficient to follow-

23   up and get Petitioner's side of the story. (Exhibit E.) (See Beck,

24   [to have probable cause, officer must have, at the moment of arrest,

25   "trustworthy information" to warrant a belief by a prudent man in

26   believing that a crime was committed.)[34] Put simply, Officer Alioto

27   _____

28   34. supra, 379 U.S. at 91.

14

1   as the person who took the report, was the only person who had the
2   chance to observe Corina's demeanor, and judge her allegations as
3   to whether they were "trustworthy" enough to arrest Petitioner, and
4   did not believe that a crime had been committed. Accordingly, Offi-
5   cer Alioto did not have the right to seize Petitioner, that is,
6   unless he obtained more information that would have led him to bel-
7   ieve that the alleged crimes had been committed.

8       But Officer Alioto did not obtain any more information. Inst-
9   ead, Officer Alioto went to Petitioner's house, and before speak-
10  ing with him, handcuffed and arrested him. (Exhibit C .) Thus, Peti-
11  tioner was arrested without probable cause.

12      That Officer Alioto testified at the preliminary hearing that
13  he went to Petitioner's house to get his side of the story is not
14  true. The transcript shows that Officer Alioto stated that he went
15  to Petitioner's house, and was told by Petitioner "I know why you're
16  here, because I committed sexual lewd acts with my step-daughter. "
17  (Exhibit D .) Not knowing whether the sex acts were of misdemeanor
18  or felony type, he initiated a 10 minute interview with Petitioner
19  (Exhibit D ), wherein he obtained information that led him to believe
20  that Petitioner had committed the acts, and accordingly, arrested
21  Petitioner. (Exhibit D .) However, this testimony is false; for,
22  there is no such thing as misdemeanor sexual lewd acts against a
23  minor. As far as the penal code is concerned, any person who comm-
24  itts a sexual lewd against a minor is guilty of a felony, there is
25  no law that suggests that such conduct could be a misdemeanor.

26      Therefore, Officer Alioto's testimony that he conducted a 10
27  minute interview into supposed misdemeanor sex acts is not true, no
28  such interview ever took place. Accordingly, Petitioner was arrested

15

1  without probable cause, and counsel's failure to bring this to the
2  court's attention was prejudicial. The court, upon finding that
3  Petitioner was arrested without probable cause, would have had no
4  choice but to exclude Petitioner's confession from the trial as
5  "fruit of the poisonous tree," thus Petitioner would have received
6  an acquittal, or a lighter sentence. Consequently, violating Peti-
7  tioner's constitutional right to a competent attorney.

8

9  **3. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING TO THE
   COURT'S ATTENTION THAT BEFORE PETITIONER WAS ARRESTED, POLICE
10  DID NOT READ HIM HIS RIGHTS UNDER MIRANDA V. ARIZONA, THUS
   VIOLATING HIS CONSTITUTIONAL RIGHTS UNDER THE 5TH AMENDMENT**

11  Introduction

12     The 5th Amendment to the United States Constitution protects
13  defendant's, during a criminal proceeding, from testifying against
14  oneself. In Arizona v. Miranda, the United States Supreme Court
15  held that the principle against self-incrimination must be applied
16  as early as the moment the defendant is arrested; holding, that a
17  police officer is required to inform the arrestee that he or he has
18  the right to remain silent.
19

20     Here, Petitioner was not read his miranda right before or
21  after being arrested. As a result, Petitioner made inculpatory
22  statements that the prosecutor planned to use against him at trial.
23  During preliminary hearings, Petitioner's attorney filed a motion
24  requesting that the court hold an evidentiary hearing to see if (1)
25  Petitioner's admissions to Officer Alioto before his arrest were
26  voluntary; and (2) if Petitioner was read his miranda rights. The
27  Court held a hearing, although it found that Petitioner's admiss-
28  ions to Officer Alioto were voluntary; at no time did the court make

16

1 | a finding as to whether Petitioner was ever read his miranda rights.

2 | Thus, because the court failed to make a finding that Peti-

3 | tioner was read his miranda rights, it did not have authority to

4 | allow the prosecution to introduce Petitioner's statements to the

5 | jury, and counsel's failure to bring this to the court's attention

6 | deprived Petitioner of (1) effective counsel; (2) due process; and

7 | (3) equal protection.

8 |

9 | **a. Relevant Law**

10 | The 5th Amendment to the United States Constitution protects

11 | persons immediately after their arrest--from being a witness against

12 | oneself--by requiring police to advise the arrested person of his

13 | or her right to remain silent. In Arizona v. Miranda,[35] the United

14 | States Supreme Court held that, "[w]hen an individual is taken into

15 | custody or otherwise deprived of his freedom by the authorities in

16 | any significant way and is subjected to questioning, the privilege

17 | against self-incrimination is jeopardized. Procedural safeguards

18 | must be employed to protect the privilege."[36]

19 | Those safeguards require that the suspect be advised prior to

20 | any questioning as follows:

21 | -- the suspect has the right to remain silent, and that anything

22 | he or she says can he used against him or her in a court of

23 | law;

24 | -- the suspect has the right to the presence of an attorney;

25 | -- if the suspect can not afford an attorney, one will be

26 |

27 | 35. (1966) 384 U.S. 436

28 | 36. Id. at 478.

17

1          appointed for him or her prior to any questioning, if he or
2          she desires.

3 See Miranda.)[37] Failure to advise the arrested person of these

4 rights is a violation of the 5th Amendment. (See Miranda, e.g.)

5       If these safeguards are not provided to an arrested person,

6 and that person makes involuntary or incriminating statements in

7 violation of miranda, there are several methods that may be used to

8 object to the statement at various stages in court proceedings.

9 Initially, counsel may object to use of the statement at the pre-

10 liminary hearing or any other pretrial hearing at which the prose-

11 cuter introduces the statement. (Evidence Code §§ 400-406.) In

12 moving to exclude a disputed confession or admission, the defendant

13 has the burden of presenting evidence on the issue of whether the

14 statement is illegal, but the prosecutor has the burden of proof as

15 to whether the statement was voluntary or in compliance with mir-

16 anda. (People v. Murtishaw.)[38] The standard of proof is prepon-

17 derance of the evidence. (People v. Markham.)[39]

18

19    **b.** Relevant Facts

20     After Petitioner's arrest, law enforcement made out a police

21 report stating that Petitioner had made incriminating statement to

22 police officers (1) upon his arrest; and (2) during his interro-

23 gation; statements, which the prosecutor intended to use at trial

24 _____

25   37. Id. at 444.

26   38. (1981) 29 Cal.3d 733, 753   175 Cal.Rptr 738.
     39. (1989) 49 Cal.3d 63, 71   260 Cal.Rptr 273.
27

28   ///

18

1  against Petitioner. Prior to trial, defense counsel, Paula Weikel
2  indicated that the court should conduct a miranda hearing (as to
3  the interrogation) and a 402 hearing (as to the incriminating
4  statements made during arrest)--to see if (1) Petitioner's admiss-
5  ions were voluntary; and (2) if he was read his miranda rights
6  before the alleged confession. (Exbibit F .) Finding that both
7  issues were similar, the court decided to hold a hearing and decide
8  both issues simultaneously. (Exhibit F, p. 2.)

9      At the hearing, Officer Alioto testified, claiming that as he
10  approached Petitioner's house, Petitioner opened the door and said
11  "I've been waiting for you," and that Petitioner continued by in-
12  forming Officer Alioto that he had committed illegal sex acts with
13  Corina. (Exhibit  G.) At which time, Officer Alioto placed Peti-
14  tioner under arrest, and placed him in his car. Once in the car,
15  he turned on the car camera, and recorded himself reading Peti-
16  tioner his miranda rights. (Exhibit G, pp. 2-3.)

17     To corroborate this claim, Officer Alioto brought to the court
18  a video cassette to show the Miranda advisement; but when Officer
19  Alioto tried to play the tape, there was nothing recorded, only a
20  blue screen; at which time he suggested "that the videotape either
21  skipped or failed to record, hence the blue screen." (Exhibit H.)

22     Officer Alioto then testified to driving Petitioner to the
23  police department, where he handed him over to another officer, who
24  interrogated him, resulting in Petitioner making inculpatory state-
25  ments. (Exhibit  F.)

26     After Officer Alioto's testimony, the court went into a play-
27  by-play analysis of how Officer Alioto approached Petitioner's
28  house, and how Petitioner was under no obligation to speak with him,

19

1 | but took it upon himself to inform Officer Alioto that he had comm-
2 | itted sexual acts with Corina. As such, the court found that Peti-
3 | tioner's admissions at the time he encountered Officer Alioto were
4 | not given in violation of the law. (Exhibit I.) The court, how-
5 | ever, failed to make any findings of fact as to whether or not (1)
6 | Officer Alioto read Petitioner his Miranda rights; and (2) whether
7 | Petitioner's statements at the police station were voluntary.

8

9 | C. **During The Evidentiary Hearing, The Court Did Not Make**
  | **Any Findings As To Whether Police Read Petitioner His**
10 | **Miranda Rights, And Therefore The Prosecutor Should Not**
  | **Have Been Able To Present To The Jury The Taped Confession,**
11 | **And Counsel's Failure To Point This Out To The Court Was A**
  | **Vilation Of Petitioner's Right To A Competent Attorney**
12

13 | Evidence Code § 402 states that if a defendant contests the
14 | validity of a "confession or admission" the court must determine
15 | the question of "admissibility" before that evidence can be used
  | against the defendant in a trial. (Evidence Code § 402.)
16

17 | Here, Petitioner challenged the validity of the taped confess-
18 | ion, by asserting that at no time did any officer inform him that
  | he had the right to remain silent. (Exhibit F.) Although the court
19 | held a hearing in that respect, the court wanted to use the same
20 | hearing to decide the issue of whether Petitioner's admissions to
21 | Officer Alioto, upon their encounter, were voluntary. As a result,
22 | the court focused its attention to the conversation between Peti-
23 | tioner and Oficer Alioto at Petitioner's house, and never got to
24 | whether Petitioner was read his Miranda rights.
25

26 | Thus, because the court did not find that Officer Alioto read
27 | Petitioner his Miranda rights, the taped confession should not
  | ///
28

20

1  have been introduced at trial. (See People v. Sims,[40] [For confess-

2  ion to be valid, court must find that defendant knowingly and inte--

3  lligently waived right to remain silent]; also see People v.

4  Lewis;[41] and Miranda.[42]) And counsel's failure to bring this to the

5  court's attention was a violation of Petitioner's state and federal

6  constitutional rights to (1) effective counsel;[43] (2) Miranda

7  rights;[44] (3) due process;[45] and (4) equal protection.[46]

8

9     **4. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING TO THE**
       **COURT'S ATTENTION THAT THERE WAS INSUFFICIENT EVIDENCE TO**
10     **CONVICT PETITIONER AS TO COUNT 1**

11    Introduction

12     The Due Process clause of the 14th Amendment requires that the

13  prosecutor, in a criminal trial, prove every element of an offense.

14  Here, Petitioner was charged--under Penal Code 288.5--with one

15  count of "continuous sexual abuse" against his step daughter, Cor-

16  ina. Under the statute, the prosecutor had to prove that Petitioner

17  committed three acts of sexual abuse within a three month period.

18  At trial, Corina stated that Petitioner had touched her inappro-

19  priately, but when asked when the crimes occurred, or how often he

20  abused her, Corina was unable to give any specifics, answering "I

21  _____

22    40. (1993) 5 Cal.4th 405, 439   20 Cal.Rptr.2d 537.

23    41. (1990) 50 Cal.3d 262, 274   266 Cal.Rptr 834
      42. See e.g.

24    43. U.S. Const. Amend. Six.

25    44. U.S. Const. Amend. Five.

26    45. Cal. Const. Art. I, §§ 7(a), 24, 29; U.S. Const. Amend. 5 and 14.
      46. Id.

27

28  ///

21

1  don't know" and "I don't rememeber." Accordingly, then, Corina's
2  testimony was insufficient to prove that Petitioner committed three
3  acts of sexual abuse within three months; therefore, the prosecu-
4  tor did not prove every element of the crime; and counsel's fail-
5  ure to bring this to the court's attention deprived Petitioner of
6  his right to competent counsel.

7

8  **B. Relevant Law**

9  In a criminal trial, a jury can not find a defendant guilty of
10 a crime unless the prosecutor presented sufficient evidence to prove
11 every element of the crime. The test to determine sufficiency of the
12 evidence is "whether, on the entire record, a rational trier of
13 fact could find [the defendant] guilty beyond a reasonable doubt."
14 (See People v. Johnson,[47] ["Finding the task twofold. First, the
15 court must resolve the issue in light of the whole record . . . .
16 Second, the court must judge whether the evidence of each of the
17 essential elements . . . is  substantial . . ."[48]]; see also Jack-
18 son v. Virginia;[49] and People v. Barnes.[50]) Substantial evidence
19 must support each essential element underlying the verdict: "'it
20 is not enough for the respondent simply to point to 'some' evidence
21 supporting the finding.'" (See Johnson.[51]) If the facts as proved

22

23  47. (1980) 26 Cal.3d. 557, 576–578.
24  48. Id. at 576–577.
     49. (1979) 443 U.S. 307, 318–319  61 L.Ed.2d 560  99 S.Ct 278.
25  50. (1986) 42 Cal.3d 284, 303.)
26  51. supra, 26 Cal.3d at 577, quoting People v. Bassett (1968) 69 Cal.2d 122,
27         138.
    ///
28
22

1   equally support two inconsistent interpretations, the judgment goes
2   against the party bearing the burden of proof as a matter of law.
3   (See People v. Allen.)[52] Evidence that fails to meet this substan-
4   tive standard violates the Due Process Clause of the Fourteenth
5   Amendment and Article I, § 15 of the California Constitution. (See
6   Jackson;[53] and Johnson.[54])

7       To establish guilt for a charge under Penal Code 288.5, the
8   prosecutor must prove that the defendant "engage[d] in three or
9   more acts of substantial sexual conduct" with a child under the age
10  of 14 within a three month period. (See § 288.5; People v. Rodri-
11  guez;[55] People v. Vasquez;[56] and People v. Witham,[57] ["In the case
12  of a defendant charged with violating section 288.5, the require-
13  ment of proof beyond a reasonable doubt, is that the defendant
14  engaged in at least three acts of sexual abuse with the child vic-
15  tim within the prescribed time frame."[58]].)

16

17  **B.** **Relevant Facts**

18      On March 4, 2004, the district attorney's office filed a
19  complaint charging Petitioner--under Penal Code § 288.5--with one
20  count of "continuous sexual abuse" between February 22, 1993 to
21  February 21, 1996. (Exhibit B.)

22  ------------------------------------------------------------

23  52. (1985) 165 Cal.App.3d 616, 626, citing Pennsyvania R. Co. v. Chamberlin,
        (1933) 288 U.S. 333, 339 77 L.Ed. 819 53 S.Ct 391.
24  53. supra, 443 U.S. at 319.
25  54. supra, 26 Cal.3d at 575-578.
26  55. (2002) 28 Cal.4th 543, 550.
    56. (1996) 51 Cal.App.4th 1277, 1287.
27  57. (1995) 38 Cal.App.4th 1283, 1297.
28  58  Id.

23

1    At trial, the prosecutor asked Corina to state her earliest
2 memory of Petitioner doing something inappropriate to her, and how
3 often it would happen. Although Corrina mentioned that Petitioner
4 sexually abused her, she could not say what day, month, or year the
5 crime occurred, and was unable to say how many times it happened.
6 In relevant part, the following took place at trial:

7    Q: [by prosecutor]: Can you tell us, um, what your earliest
8       memory as far as physically what he would do with you?
9    A: [by Corina] Second grade.
10   Q: Uh, when he would come into your room during the second grade,
11      uh, how did this inappropriate conduct start? That is what
12      were the things that he would do to you initially?
13   A: Like touch me in places that he wasn't suppose to touch me.
14   Q: Can you describe those places for us?
15   A: He touched my breasts, that's what he -- he would do or he
16      touched -- tried to feel my vagina under like my clothes
17      were on.
18                *              *              *              *
19   Q: Okay. Um, at any point in time did, uh, he ever touch you
20      under your clothes?
21   A: Yes.
22   Q. Would he ever touch you under your clothes while you were
23      still living at that -- at that apartment on 4th Street?
24   A: Yes.
25   Q: Um, how long was it before he started touching you under
26      your clothes?
27   A: I don't know.

24

1    Q: How often would he touch you under your clothes?

2    A: I don't know. A lot of times.

3    Q. Um, at any point in time did, uh, his hand touch you vagina?

4    A: Yes.

5    Q. At any point in time did his fingers go inside of your

6        vagina?

7    A: Yes.

8    Q. How often do you thing that he did that?

9    A. I don't know.

10   (Exhibit  J, pp. 1-3.)

11   Q. Okay. um, how many times do you think he tried to insert a

12       finger into your vagina while you were living down there at

13       T Street -- excuse me, 4th Street? Sorry about that.

14   A. Um, I don't really know. He came into my room a lot of times,

15       all the time so --

16   (Exhibit  K.)

17

18   Q. The, uh, apartment that we saw up there in People's 6, um,

19       did he engage in any other inappropriate behavior with you

20       at that apartment?

21   A: Yes.

22   Q. What, if anything, else occurred?

23   A: Um, he would take his penis out and make me touch it.

24   Q. Where?

25   A. With my hands.

26       *            *            *            *

27   Q. How often would you, uh, touch his penis?

28   A. I don't know.

Q. More than once?

A. Yes.

(Exhibit K, pp. 1-2.)

### C. There was insufficient evidence to convict Petitioner on Count 1, And Counsel's Failure To Bring This To The Court's Attention Deprived Him of Competent Counel

A judgment must be supported by substantial evidence in light of the whole record. As previously noted, Rodriguez, Vazquez, and Whitman, hold that testimony regarding incidents without any explanation of dates or occurrences can not be regarded as substantial evidence, and this defect requires reversal of conviction.

Here, the prosecutor charged Petitioner with one count of § 288.5, claiming that Petitioner committed continuous sexual abuse on Corina between February 22, 1993 to February 21, 1996. To begin with, § 288.5 does not allow a prosecutor to charge a defendant with one count of continuous sexual abuse for a three year period. Rather, it must be for a three month period. (See. § 288.5; Rodriguez;[59] Vazquez;[60] and Whitman.[61] Consequently, the prosecutor's charging document was too broad, and not supported by law. Thus violating Petitioner's state and federal constitutional rights to due process and equal protection.

Even if the prosecutor were to have filed multiple § 288.5's

59. 28 Cal. 4th 543.
60. 51 Cal.App.4th 543.
61. 38 Cal.App.4th 1283.

///

///

26

to cover the three year gap, the prosecutor nonetheless could not have proved that three acts of substantial sexual abuse occurred within any three month period. At trial, the prosecutor asked Corina repeatedly if Petitioner had ever touched her inappropriately; although Corina went into some detail of sexual touching, she, however, was unable to say what day, week, or month the crime occurred, or how often it happened. (See People v. Jones,[62] [Prosecutor is required to prove that three acts occurred within a three month period.].) Therefore, there was insufficient evidence to convict Petitioner as to count 1; and counsel's failure to bring this to the court's attention was prejudicial, for the court would have had no choice but to dismiss the count.

### 5. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING TO THE COURT'S ATTENTION THAT THERE WAS INSUFFICIENT EVIDENCE TO CONVICT PETITIONER AS TO COUNTS 2-20

#### Introduction

The Due Process Clause of the 14th Amendment requires that the prosecutor, in a criminal trial, prove every element of an offense. Here, the prosecutor charged Petitioner--under Penal Code § 288(b)(1)--with 19 counts of lewd and lascivious acts against Corina between February 22, 1996 to February 21, 1998. However, 288(b)(1) does not allow two year gaps for each count. Rather, each count must have its own individual date as to when that particular count occurred, as to give Petitioner an idea of when that count occurred, so he or she may properly defend oneself. Accordingly, then, the prosecutor's charging document violated Petitioner's constitutional

---

62. (1990) 51 Cal.3d 294, 314.

27

1 rights to due process, and counsel's failure to bring this to the
2 court's attention deprived him of competent counsel.

3
4 **A. Relevant Law**

5 With respect to Petitioner's general rights to (1) due process
6 and (2) the prosecution's burden of proving every element of the
7 offense, Petitioner requests that this adopt section A. of subclaim
8 3. (See page 22-23.)

9 To establish guilt for a charge under 288(b)(1) the prosecutor
10 must prove that (1) on a particular date (2) Petitioner used force
11 violence, duress, menace, or fear, against a victim to arouse his
12 sexual desires. § See § 288(a) and (b)(1).) Failure to prove both
13 is a violation of due process, because it makes it impossible for
14 the jury to agree upon any specific act or acts as they pertain to
15 a particular date. (See People v. Hoez;[63] People v. Jones.[64]·

16
17 **B. Relevant Facts**

18 The prosecutor charged Petitioner with 10 counts of lewd and
19 lascivious acts against Corina between February 22, 1996 to Feb-
20 ruary 21, 1997, and another 10 counts for February 22, 1997 to Feb-
21 ruary 21, 1998. (Exhibit B.)

22 During trial, the prosecutor asked Corina several questions as
23 to Petitioner forcing her to commit sexual acts with him, but at no
24 time during her testimony did she say how often he sexually abused
25 her, nor did she ever give a date as to when any of the crimes

26

27 63. (1988) 200 C.A.3d 811, 814-817 246 Cal.Rptr 352
64. (1990) 52 Cal.3d 294, 309-310 270 Cal.Rptr 611.
28

took place. (See subclaim 4, pp.

### C. There Was Insufficient Evidence to Convict Petitioner as to Count 2-20, And Counsel's Failure To Bring This To The Court's Attention Deprived Petitioner Of Competent Counsel

The prosecution's charging document was not supported by law, and it violated Petitioner's constitutional rights to due process; for, it made it impossible for Petitioner to defend himself.

Here, the prosecutor charged Petitioner with 9 identical counts (2-10). Each count stated the same thing, that Petitioner committed lewd and lascivious acts against Corina between Fenruary 22, 1996 to February 21, 1997. And, the prosecutor charged Petitioner with 10 more identical counts (11-20). --Each count stated the same thing, that Petitioner committed lewd and lascivious acts against Corina between February 22, 1997 to February 21, 1998. But § 288(b)(1) does not allow for such broad and general language. Rather, the prosecutor was required to charge Petitioner with independent counts, each with its own date as to when that particular act occurred. (See § 288.(b)(1).) Specifically, this type of charging document makes it impossible for a defendant to defend himself. For instance, counts 2-10 are to have taken place between February 22, 1996 to February 21, 1997. Does that mean that five acts occurred in February, 2006, and five in February, 2007? Or did one act occur each month except for June and July? Or did all nine occur in one month? Petitioner did not know, and accordingly, could not defend himself.

Both the state legislature and court's have held that when it comes to charging a defendant under a general umbrella, it must be done under § 288.5, but even then, each count can not exceed a three

month period; here, what the prosecutor suggests is to be allowed
to make one charge under § 288(b)(1), and say that the crime could
have happened anytime between a 12 month period. That suggestion is
too broad, and not supported by law. Thus, Petitioner's constitu-
tional rights to due process and equal protection were violated.

Even if the prosecutor had the right to charge Petitioner in
this fashion (which he did not), the prosecutor still failed to
prove every element of the crime. For, to convict Petitioner the
prosecutor was required to prove that Petitioner engaged in lewd
and lascivious acts 19 times between said dates. But as mentioned
in subclaim 4 , pp 23-26, Corina failed to mention that the acts
occurred on any amount of times, and failed to mention that the
crimes occurred on any particular dates; thus, counsel's failure to
bring this to the court's attention was prejudicial, in that the
court would have had no other choice but to dismiss all counts.

## 6. THE CUMULATIVE EFFECT OF ERRORS HEREIN DEPRIVED PETITIONER OF DUE PROCESS

The Supreme Court has clearly established that the combined
effect of multiple trial court errors violates due process where it
renders the resulting criminal trial fundamentally unfair.(Chambers
v. Missippi.)[65]

Here, trial counsel made several errors, which taken together,
result in a violation of several constitutional rights, all of which
resulted in Petitioner being deprived of competent counsel.

---

65. (1973) 410 U.S. 284.

///

30

1

**ARGUMENT**

2

**II**

3
4

**PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE REPRESENTATION OF EFFECTIVE OF APPELLATE COUNSEL**

5      The United States Supreme Court has held that a criminal

6 defendant is entitled to effective representation on direct appeal.

7 (See Evitts v. Lucey, (1985) 469 U.S. 387.)

8      Here, Petitioner appealed his conviction; but appellate coun-

9 sel failed to raise Argument I in the direct appeal. This was the

10 result of (1) appellate counsel not properly reading the trial

11 transcript; and failing to obtain the client file from trial coun-

12 sel, which contained the discovery material that Petitioner used

13 to raise said claims.

14      Thus, appellate counsel's acts and omissions resulted in Arg-

15 ument I of this Petition not being raised on direct appeal. There-

16 by violating Petitioner's constitutional right to effective app-

17 ellate counsel.

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28

# VERIFICATION

STATE OF CALIFORNIA
COUNTY OF IMPERIAL

_____

(C.C.P. SEC. 446 & 2015.5: 28 U.S.C. 1746)
I, Larry Prunty        DECLARE UNDER PENALY OF PERJURY THAT: I AM THE Petitioner
IN THE ABOVE ENTITLED ACTION. I HAVE READ THE FOREGOING DOCUMENTS AND KNOW THE CONTENTS THEREOF
AND THE SAME IS TRUE OF MY OWN KNOWLEDGE EXCEPT AS TO MATTERS STATED THEREIN UPON INFORMATION,
AND BELIEF, AND AS TO THOSE MATTERS, I BELIEVE THEM TO BE TRUE.

EXECUTED THIS _____8_____ DAY OF March _____ 2008 AT
CALIPATRIA STATE PRISON, CALIPATRIA CALIFORNIA 92233-5002

(SIGNATURE) _____
DECLARANT/PRISONER

---

## PROOF OF SERVICE BY MAIL

(C.C.P. SEC. 1013 (a) & 2015.5 28 U.S.C. 1746)
I, Bismarck Ceja        AM A RESIDENT OF CALIPATRIA STATE PRISON, IN THE COUNTY OF
IMPERIAL, STATE OF CALIFORNIA, I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE AND    AM NOT A
PARTY OF THE ABOVE ENTITLED ACTION. MY STATE PRISON ADDRESS IS P.O. BOX 5002, CALIPATRIA STATE PRISON,
CALIPATRIA, CALIFORNIA 92233-5002.
ON March  8, 2008 .    IS SERVED THE FOREGOING
:

**PETITION FOR WRIT OF HABEAS CORPUS**

---
SET FORTH EXACT TITLE OF DOCUMENTS SERVED

ON THE PARTY(S) HEREIN BY PLACING A TRUE COPY(S) THEREOF, ENCLOSED IN A SEALED ENVELOPE(S) WITH
POSTAGE THEREON FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT BOX SO PROVIDED AT
CALIPATRIA STATE PRISON, CALIPATRIA, CALIFORNIA 92233-5002.

Sacramento County          Sacramento County
Superior Court             District Attorney's Office
720 Ninth St.          &   P.O.Box 749
Sacramento, CA 95814       Sacramento, CA 95814
Clerk's Office

THERE IS DELIVERY SERVICE BY UNITED STATES MAIL AT THE PLACE SO ADDRESSED, AND THERE IS REGULAR
COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE PLACE SO ADDRESSED. I DECLARE
UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

DATE March 8, 2008 .    _____
(DECLARANT / PRISONER)

32